IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

——————————————————————x

BANK OF AMERICA, N.A.,

                      Plaintiff,

     vs.

APOLLO ENTERPRISE SOLUTIONS, LLC,
APOLLO ENTERPRISE SOLUTIONS, INC., and
MORIAH PARTNERS, LLC,

                   Defendant.

——————————————————————x

:   Civil Action No. 10-5707 (DLC)

:   <u>CLASS ACTION</u>

:   MEMORANDUM IN OPPOSITION TO
:   PLAINTIFF'S MOTION FOR
:   PRELIMINARY INJUNCTION

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................1

STATEMENT OF FACTS .....................................................................................1

ARGUMENT .........................................................................................................8

B OF A IS NOT ENTITLED TO A PRELIMINARY INJUNCTION ...........................8

    I.      STANDARDS FOR ENTRY OF A PRELIMINARY INJUNCTION ...............8

    II.     B OF A HAS FAILED TO SUSTAIN ITS HEAVY BURDEN OF
             DEMONSTRATING IRREPARABLE HARM .........................................9

    III.    B OF A WILL BE UNABLE TO SUCCEED ON THE MERITS
             BECAUSE APOLLO IS ENTITLED TO END THE CONTRACT....................14

          A.     APOLLO HAS APPROPRIATELY EXERCISED ITS RIGHT
                NOT TO RENEW THE CONTRACT .......................................15

              1.     A Perpetual Term Was Not Provided Nor Intended .....................15

              2.     Defendant's Interpretation Renders Terms of the
                    Agreement Superfluous and Nonsensical ....................................16

              3.     Defendant's Interpretation Undermines the Obligation of
                    the Parties to Negotiate in Good Faith Regarding
                    Additional Costs.........................................................................18

          B.     APOLLO HAS APPROPRIATELY EXERCISED ITS RIGHT TO
                 TERMINATE THE CONTRACT IN THE FACE OF B OF A'S
                 MATERIAL BREACHES ......................................................19

          C.     UNCLEAN HANDS...............................................................21

    IV.    THE BALANCE OF HARDSHIPS DOES NOT FAVOR GRANT OF A
             PRELIMINARY INJUNCTION ...........................................................22

## <u>TABLE OF AUTHORITIES</u>

**PAGE**

**FEDERAL CASES**

*Am. Airlines, Inc. v. Imhof,*
    620 F. Supp. 2d 574 (S.D.N.Y. 2009)..............................................................9

*Awards.com v. Kinko's, Inc.,*
    42 A.D.3d 178 (1st Dep't 2007) ....................................................................15

*C3 Media & Mktg. Group, LLC v. Firstgate Internet, Inc.,*
    419 F. Supp. 2d 419 (S.D.N.Y. 2005).............................................................19

*Cevasco v. Nat'l R.R. Passenger Corp,*
    606 F. Supp. 2d 401 (S.D.N.Y. 2005).............................................................19

*Comic Strip, Inc. v. Fox Television Stations, Inc.,*
    710 F. Supp. 976 (S.D.N.Y. 1989).................................................................14

*Corhhill Corp v. S.D. Plants, Inc.*
    9 N.Y.2d 595 (1961) ....................................................................................17

*Designers North Carpet, Inc. v. Mohawk Indus., Inc.,*
    153 F. Supp. 2d 193 (E.D.N.Y. 2001) ...........................................................20

*Doldo Bros, Inc. v. Coors Brewing Co.,*
    2008 WL 657252 (N.D.N.Y. Mar. 7, 2008) ..................................................11

*Estate of Lennon by Lennon v. Screen Creations, Ltd.,*
    939 F. Supp. 287(S.D.N.Y. 1996)..................................................................21

*Freedom Holdings, Inc. v. Spitzer,*
    408 F.3d 112 (2d Cir. 2005)............................................................................9

*Galli v. Metz,*
    973 F.2d 145 (1992)......................................................................................16

*Garland v. Ruskin,*
    249 F. Supp. 977 (D.C.N.Y. 1965) ...............................................................22

*Garza v. Marine Transport Lines, Inc.*
    861 F.2d 23 (2d Cir. 1988).............................................................................17

*Grand River Enterprise Six Nations, Ltd. v. Pryor,*
    481 F.3d 60 (2d Cir. 2007)..........................................................................9, 10

*Haines v. City of New York,*
    41 N.Y.2d 769 (1977) ......................................................................................... 16

*Hurletron Inc. v. Eltex-Elektrostatic-Gesellschaft mbH,*
    116 F.3d 1482 (7th Cir. 1997) ............................................................................ 17

*ImOn, Inc. v. ImaginOn, Inc.,*
    90 F. Supp. 2d 345 (S.D.N.Y. 2000)................................................................... 14

*Jacobson & Company, Inc. v. Armstrong Cork Co.,*
    548 F.2d 438 (2d Cir. 1977)................................................................................ 11

*Lusk v. Viallge of Cold Spring,*
    475 F.3d 480 (2d Cir. 2007)................................................................................. 9

*Magnet Communications LLC v. Magnet Communications, Inc.,*
    2001 WL 1097865 (S.D.N.Y. Sept. 19, 2001)................................................... 14

*Markowitz Jewelry Co., Inc. v.Chapal/Zenray, Inc.,*
    988 F. Supp. 404 (S.D.N.Y. 1997)....................................................................... 9

*Mazurek v. Armstrong,*
    520 U.S. 968 (1997) ............................................................................................ 8

*Miss America Organization v. Mattell, Inc.,*
    945 F.2d 536 (2d Cir. 1991)............................................................................... 10

*Moore v. Consolidated Edison Co. Of New York, Inc.,*
    409 F.3d 506 (2d Cir. 2005)................................................................................. 8

*National Elevator Cab & Door Corp. v. H&B, Inc.,*
    282 Fed. Appx. 885 (2d Cir. 2008) ................................................................... 10

*O.D.F. Optronics Ltd. v. Remington Arms Co.,*
    2008 WL 4410130  (S.D.N.Y. Sept. 26, 2008)......................................... 11, 13

*PaineWebber Inc. v. Bybyk,*
    81 F.3d 1193 (2d Cir. 1996)............................................................................... 16

*Passlogix, Inc. v. 2FA Technology, LLC,*
    2010 WL 2505628 (S.D.N.Y. Jun. 21, 2010) ....................................... 9, 11, 13

*Pecorella v. Greater Buffalo Press, Inc.,*
    107 A.D.2d 1064 (N.Y. A.D., 1985)................................................................... 21

*Proctor & Gamble Co. v. Ultreo, Inc.*
   574 F. Supp. 2d 339 (S.D.N.Y. 2008)...........................................................................13

*Register.com, Inc. v. Verio, Inc.,*
   356 F.3d 393 (2d Cir. 2004)............................................................................................13

*Reuters Limited v. United Press International, Inc.,*
   903 F.2d 904 (2d Cir. 1990)............................................................................................11

*Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co. of New York, Inc.,*
   749 F.2d 124 (2d Cir. 1984)............................................................................................11

*Safety Management Systems, Inc. v. Safety Software Ltd.,*
   2010 WL 1837770 (S.D.N.Y. May 5, 2010) ............................................................10, 13

*Shepard Indus., Inc. v. 135 East 57th Street, LLC,*
   1999 WL 728641(S.D.N.Y. Sept. 17, 1999).................................................................13

*Snecma v. Turbine Engine Components Technologies Corp.,*
   531 F. Supp. 2d 354 (N.D.N.Y., 2008).........................................................................24

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.,*
   60 F.3d 27 (2d Cir. 1995) ...............................................................................................13

*Travelers Int'l AG v. Trans World Airlines, Inc.,*
   684 F. Supp. 1206 (S.D.N.Y. 1988)..............................................................................11

*Webadviso v. Bank of America Corp.,*
   2009 WL 5177997 (S.D.N.Y. Dec. 31, 2009) ..............................................................12

*Wheeler v. Sage,*
   68 U.S. 518 (1863)..........................................................................................................21

*Winter v. Natural Resources Defense Council*
   129 S. Ct. 365, 375-76 (2008).......................................................................................10

**STATE CASES**

*Awards.com, LLC, v. Kinko's, Inc.,*
   42 A.D.3d 178 (1st Dep't 2007) ....................................................................................15

*Bloor v. State,*
   403 N.Y.S.2d 983 (N.Y. Ct. Cl. 1978)......................................................................16, 18

*Corhhill Corp v. S.D. Plants, Inc.,*
   9 N.Y.2d 595 (1961) .......................................................................................................16

*Dalton v. Educ. Testing Serv.,*
    87 N.Y.2d 384 (N.Y. 1995) ........................................................................... 20

*Evans v. Famous Music Corp.,*
    1 N.Y.3d 452 (2004) ..................................................................................... 15

*Haines v. City of New York,*
    41 N.Y.2d 769 (1977) ................................................................................... 16

*Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher,*
    52 N.Y.2d 105 (N.Y. 1981) .......................................................................... 19

*Pecorella v. Greater Buffalo Press, Inc.,*
    107 A.D.2d 1064 (N.Y.A.D. 4 Dept., 1985) ................................................. 21

*Uniformed Firefighters Assn. v. City of New York,*
    79 N.Y.2d 236 (1992) ..................................................................................... 9

**STATE RULES**

107 N.Y. Jur. 2d Uniform Commercial Code § 35 ....................................................... 20

## INTRODUCTION

Bank of America ("B of A") is seeking to force Apollo to continue to perform a contract in perpetuity, where Apollo is performing an enormous multiple of the services expressly stated under the contract, where B of A is refusing to pay for those services, and where Apollo is losing money in the process.  B of A provided false information to Apollo about benefits it was receiving, and Apollo relied upon that false information in underbilling B of A.  B of A has acknowledged that it can transition all services being provided through Apollo's website in 30 days.  Despite B of A's breaches, Apollo is performing all services required under the contract in an agreed wind-down period through October 15, 2010.  B of A is bringing this motion in an attempt to force Apollo to give up or compromise its claim to millions of dollars due for past services under the contract.

Even after the phase out period of the contract in October, the motion for preliminary injunction should be denied for any one of the following reasons.  First, B of A will not experience irreparable harm and has an adequate remedy at law.  Second, Apollo is entitled to give notice to keep the contract from renewing year after year in perpetuity.  Third, Apollo was entitled to terminate the contract because B of A is in breach.  Fourth, B of A has unclean hands. Fifth, the balance of hardships do not favor B of A.  As a result, B of A has not demonstrated *any* of the prerequisites necessary for issuance of a preliminary injunction and its motion should be denied.

## STATEMENT OF FACTS

The relevant facts demonstrating that B of A's motion for a preliminary injunction should be denied are set forth in the accompanying declarations of Christopher Imrey, the founder and former President of Apollo, Joseph S. Kononwiecki, Apollo's Chairman and Chief Executive

Officer, and Dr. Adrian Gluck, the Company's Executive Vice President and Chief Operating Officer, and are summarized below.

The Application Service Provider Agreement # APO-21064 effective April 15, 2006 (the "Services Agreement" or "Agreement") at issue in this action was negotiated by Christopher Imrey, Apollo's founder and current Vice President of Strategy.  Dana Wassam, who has submitted a declaration in support of B of A's motion for preliminary injunction, was *not* involved in the negotiation of the Agreement, and unlike Mr. Imrey,  has not been involved in the course of dealing between Apollo and B of A pursuant to the Service Agreement from its effective date to the present.

Pursuant to the Service Agreement, which was drafted by B of A, Apollo agreed to provide B of A with web-based access through the URL address www.myeasypay.com[1] to Apollo's proprietary Intelligent Decisioning System ("IDS") software for use by B of A in providing certain debt settlement services to its customers (*see* Wassam Decl. Exh. 1 at ¶ 2.1). More specifically, the intent of the parties in entering into the Services Agreement was to provide B of A with an online collections site for *delinquent* credit card accounts, not loan accounts as stated in Ms. Wassam's Declaration (Imrey Decl. ¶ 4).  These delinquent accounts were of two types:  "collect" accounts, which were more than 30 days but less than 180 days past due, and "recovery" accounts, which were greater than 180 days past due (*id.*).  Although the parties anticipated that through force of habit certain previously delinquent customers might continue to use the site to make online payments even after they became current, the parties never intended that the site would be widely used for this purpose (*id.*).

---

[1] Later changed to www.myeasypayment.com

The fee schedule contained in the Services Agreement reflected the parties' understanding in this regard (*id.* ¶ 5). The fee schedule provides for a monthly base payment of $10,500 based on an assumption of up to 170,000 web hits per month (*see* Wassam Decl. Exh. 1 at Schedule C). In the event of volumes above this level, additional charges were to be negotiated (*id.*). B of A's assertions (Def. Mem. at 3, 5) that the Agreement provides for "unlimited" web hits and access to the IDS software simply ignores the express agreement of the parties set forth in the Agreement that the pricing was based on an assumption of 170,000 web hits per month and that additional costs for volumes in excess of these levels were to be mutually agreed by the parties.

The Services Agreement also provided that B of A would pay significant, additional monthly charges for "collect" and "recovery" transactions based on the volume of "decisions," "settlements," and "payments" with respect to these transactions each month (*id.*). As reflected in Schedule C to the Services Agreement, the additional monthly charges for "collect" and "recovery" transactions were expected to constitute the most significant source of earnings for Apollo under the Agreement – an estimated $160,000 per month at the time the Agreement was negotiated – far in excess of the monthly base payment of $10,500. Moreover, based on its discussions with B of A representatives, Apollo expected and understood that the amounts paid to it on account of "collect" and "recovery" transactions would increase over the course of the parties' relationship (Imrey Decl. ¶ 5).

From the beginning of the Service Agreement, however, B of A has prevented Apollo from obtaining the benefit of its bargain. As an initial matter, contrary to the parties' intention, B of A has used the IDS system as a key online payment portal for multiple B of A business divisions and account types rather than merely an online collections site for delinquent credit

card accounts (*id.* at ¶ 6).  As a result, usage of the site has been far in excess of the volumes contemplated by the fee schedule provided in the Services Agreement and has imposed substantial additional unreimbursed costs on Apollo (*id.*); *see also* Konowiecki Decl. ¶ 4.  The number of B of A hits on the Apollo server is currently running at a rate of over 52 million hits per month versus the 170,000 hits provided in the Service Agreement (Imrey Decl. ¶ 6). However, B of A has breached the agreement and refused to engage in good faith negotiations over the additional fees owed to Apollo as a result of these increased volumes notwithstanding frequent requests by Apollo that it do so.  Indeed, in one meeting Mr. Imery had with Bank of America supervisor Sharon Stockton in Delaware in 2008, *approximately a year prior to Moriah Growth Fund, L.P.'s investment in Apollo*, the supervisor warned him to stop complaining about B of A's nonpayment for the IDS system because he would "be surprised how quickly vendors could disappear around here,"[2] (Imrey Decl. ¶ 6).  Nevertheless, Apollo has continued to insist that it be paid what it is owed.

Ms. Wassam's assertion that "[a] web hit, as used in the Agreement, was understood by both B of A and Apollo to mean a unique visitor accessing the website" is incorrect and completely unsupported since she was not a participant in the negotiations.  The terms "web hit" and "unique visitor" are terms of art in the industry with different meanings (Imrey Decl. ¶ 7; Gluck Decl. ¶ 3).   A web hit is simply a request to a web server for a file. http://en.wikipedia.org/wiki/Web_hit.  The term "unique visitor," on the other hand, refers to a person who visits a Web site more than once within a specified period of time.  *See*

---

[2] B of A implies that the parties' current disagreements are the invention of Moriah, which made a substantial investment in Apollo in July 2009 (Def. Mem. at 4).  However, the fact that Mr. Imrey raised B of A's excessive usage of the IDS system at a meeting with Ms. Stockton in 2008, a year prior to Moriah Growth Fund, L.P.'s investment, puts the lie to this assertion (Def. Mem. at 4).

http://webopedia.com/TERM/U/unique_visitor.html.   A knowledgeable person in the industry would never use the term "web hit" to mean "unique visitor," and neither Ms. Wassam nor anyone else from B of A ever suggested in any conversation with Mr. Imery that the term "web hit" as used in Services Agreement meant "unique visitor" (*id.*).   To the contrary, in conversations with Mr. Konowiecki and Dr. Gluck, Ms. Wassam indicated her agreement with *Apollo's definition* of web hit (*see* Konowiecki Decl. ¶ 8; Gluck Decl. ¶ 3).[3]

In addition, although the Services Agreement clearly contemplates that payments to Apollo from "collect" and "recovery" transactions would be far in excess of the monthly base amount of $10,500, this has not been the case (Imrey Decl. ¶ 5).  Information contained in batch files provided to Apollo by B of A understated the volume of "collect" and "recovery" transactions being processed, something Apollo did not discover until an internal audit (*id.*).  B of A had the correct information on its main frame computer but did disclose and has never disclosed the correct information to Apollo (*id.*).  Prior to the internal audit, Apollo relied on the information contained in the batch files provided by B of A in billing it for "collect" and "recovery" transactions, and those amounts understated the amounts due under the Agreement (*id.*).

B of A's assertion that the Services Agreement would renew automatically by its terms each year even over Apollo's objection is not consistent with the intent of the parties or the terms of the Agreement.  As the primary negotiator of the Agreement on Apollo's behalf, it was Mr. Imery's understanding that following the initial two (2) year term, each party had a right to object to and prevent the renewal of the Agreement each year (*id.*).  Ms. Wassam was not

---

[3] B of A's assertion (Def. Mem. at 6-7) that Apollo has refused to provide the bank with support for its corrected invoicing based on the additional web hits and previously undisclosed collect and recovery transactions is patently false.

involved in the negotiation of the Agreement (*id.*), and her assertions that "[t]he 180 day termination period [in paragraph 6.3 of the Services Agreement] assumed B of A would have a replacement service in place" and "was premised on only B of A having the right to terminate the Agreement, other than for breach" are incorrect and completely unsupported.  As noted above, it was the intention of the parties that each side would have an annual right to elect not to renew the agreement.  In addition, paragraph 6.3 of the Service Agreement expressly states that [i]n no event shall said transition period be more than [180] calendar days."

As set forth in the declaration of Joseph S. Konowiecki, the Chief Executive Officer and Chairman of Apollo, on January 11, 2010, he sent a letter via Federal Express to the attention of Anh Gates at B of A providing notice that Apollo did not wish to renew the Services Agreement.[4]  On February 5, 2010, Mr. Konowiecki sent a second letter to Francisco J. Talvera of B of A[5] providing notice that Apollo was exercising its contractual right to terminate the Services Agreement due to numerous material breaches of the Agreement by B of A including:

    (a)    Failing to disclose its true and full usage of the IDS system;

    (b)    Failing to compensate Apollo for the substantially greater than agreed number of transactions being processed by the IDS system;

---

[4] A copy of Mr. Konowiecki's letter to Ms. Gates is attached as Exhibit 3 to the declaration of Dana Wassam.  Contrary to B of A's assertion (Def. Mem. at 4), Mr. Konowiecki's letter does not acknowledge that Apollo does not have the right to give notice of non-renewal.  The letter expressly states that Apollo was electing to exercise its contractual right to allow the Agreement to expire as of April 14, 2010.  *See* Wassam Decl. Exh. 3 at 1 ("Apollo gives notice that it wishes to terminate the Agreement as of April 12 [pursuant to Section 6.2] *or in the alternative* it wishes to allow the Agreement to expire as of April 14.  Apollo does not view the two-day difference as material and will abide by the choice of Bank of America in that regard, assuming no adverse implication to Apollo.").  As he states in his declaration (Konowiecki Decl. ¶ 7), Mr. Konowiecki never stated to Ms. Wassam that Apollo did not have the right to terminate or not renew the contract and, in fact, he has always had the contrary opinion.

[5] A copy of that letter to Mr. Talvera is attached as Exhibit 4 to Ms. Wassam's declaration.

(c)     Failing to disclose and pay the agreed fees for "collect" and "recovery" transactions that have been processed through the IDS system; and

(d)     Failing to upgrade its equipment to support the materially greater number of transactions being processed by the system, which has forced Apollo to incur greater costs and resulted in significant losses.

Apollo is incurring material losses each month as a result of B of A's misconduct which are unsustainable and threaten to render Apollo insolvent if they are not brought to an end (Konowiecki Decl. ¶ 4).  In response to Mr. Konowiecki's letters, B of A sent letters of its own disputing Apollo's right to not renew the Services Agreement and denying that it had materially breached the agreement in any respect.  Nevertheless, following this exchange of letters the parties held discussions in an effort to resolve their differences.  Although such communications would normally be considered protected settlement communications, an important factual assertion B of A has made in support of its application for a preliminary injunction is directly at odds with a statement Ms. Wassam made to representatives of Apollo during the course of these discussions and, therefore, is no longer subject to protection.  Specifically, in her declaration in support of B of A's motion for a preliminary injunction, Dana Wassam asserts that "it will take B of A a considerable amount of time – an estimated minimum of nine months – to transition to a fully functional substitute system" (Wassam Decl. ¶ 20).   In discussions with Apollo representatives, however, Ms. Wassam stated that the Apollo IDS system could be shut down 30 days from April 14, 2010 (the date the second renewal term ended) with no adverse affect to her business (Konowiecki Decl. ¶ 6; Gluck Decl.¶ 5).  Indeed, Apollo and B of A had negotiated an agreement to phase out B of A's use of the IDS system by October 2010, a short two months from now, but at the last minute, B of A refused to execute the agreement unless Apollo agreed

to release its claims for damages against B of A arising from its material breaches of the Services Agreement (*id.*). When Apollo refused to execute such a release, B of A filed this action and motion for a preliminary injunction (*id.*).

B of A's contention that it will suffer irreparable harm in the event Apollo is not enjoined from shutting down B of A's access to the IDS system is completely meritless. As detailed in the declaration of Dr. Adrian Gluck, Apollo's Executive Vice President and Chief Operating Officer, B of A operates www.bankofamerica.com as its regular online customer payment site. The web sites Apollo operates are only used by a fraction of B of A's customer base: delinquent customers. As B of A concedes, in the event Apollo terminates B of A's access to the IDS system, these delinquent customers can make their payments via www.bankofamerica.com or other means. There is a bill pay feature on www.bankofamerica.com, and B of A can also obtain payments at branches, through the mail, by telephone, and by other means. In short, B of A's insistence on continuing to use the websites Apollo operates is purely profit-driven. It saves the bank money and is more efficient versus alternatives.

## ARGUMENT

## B OF A IS NOT ENTITLED TO A PRELIMINARY INJUNCTION

## I.    STANDARDS FOR ENTRY OF A PRELIMINARY INJUNCTION

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Moore v. Consolidated Edison Co. Of New York, Inc.*, 409 F.3d 506, 510 (2d Cir. 2005), *quoting Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis added). "[B]ecause preliminary injunctions prevent the litigants from taking actions that they are otherwise legally entitled to take *in*

*advance of an adjudication on the merits,* they should be issued cautiously…." *Uniformed Firefighters Assn. v. City of New York,* 79 N.Y.2d 236, 241 (1992).

To obtain a preliminary injunction, the moving party must show: "'(1) that [it] will be irreparably harmed if an injunction is not granted, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of hardships tipping decidedly in its favor.'" *Passlogix, Inc. v. 2FA Technology, LLC*, No. 08 Civ. 10986(PKL), 2010 WL 2505628, at * 7 (S.D.N.Y. Jun. 21, 2010), *quoting Lusk v. Viallge of Cold Spring*, 475 F.3d 480, 485 (2d Cir. 2007). B of A has failed to meet this high standard. Therefore, the Motion for Preliminary Injunction (the "Motion") should be denied.

## II.   B OF A HAS FAILED TO SUSTAIN ITS HEAVY BURDEN OF DEMONSTRATING IRREPARABLE HARM

"'The threat of irreparable injury is a *sine qua non*' of a preliminary injunction." *Passlogix, Inc. v. 2FA Technology, LLC*, 2010 WL 2505628, at * 7, *quoting Am. Airlines, Inc. v. Imhof*, 620 F. Supp. 2d 574, 579 (S.D.N.Y. 2009). "'If there is no irreparable injury, there can be no preliminary injunction.'" *Am. Airlines, Inc.*, 620 F. Supp. 2d at 579, *quoting Markowitz Jewelry Co., Inc. v.Chapal/Zenray, Inc.*, 988 F. Supp. 404, 406 (S.D.N.Y. 1997). Thus, "'the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered.'" *Grand River Enterprise Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007), *quoting Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005).

"To satisfy the irreparable harm requirement, [the moving party] must demonstrate that absent a preliminary injunction [it] will suffer 'an injury that is neither remote nor speculative, but actual and imminent', and one that cannot be remedied 'if a court waits until the end of trial

to resolve the harm'."  *Grand River Enterprise Six Nations, Ltd.*, 481 F.3d at 66.  "[I]t is inappropriate to issue a preliminary injunction 'based only on a *possibility* of irreparable harm.'" *Safety Management Systems, Inc. v. Safety Software Ltd.*, No. 10 Civ. 1593(RJH), 2010 WL 1837770, at *2 (S.D.N.Y. May 5, 2010), *quoting Winter v. Natural Resources Defense Council*, ___ U.S. ___, 129 S. Ct. 365, 375-76 (2008) (emphasis added).  Rather, it is incumbent on the moving party to make "a *clear showing* that irreparable harm is *likely*" before a preliminary injunction is granted.  *Safety Management Systems, Inc. v. Safety Software Ltd.*, 2010 WL 1837770, at *3 (emphasis in original).[6]

In this case, B of A has failed to make the requisite *clear* showing that irreparable harm is *likely* if its request for an injunction is denied.  Its entire claim of irreparable harm is premised on the conclusory assertions of its Senior Vice President, Dana Wassam, that B of A will suffer a loss of goodwill and reputational harm in the event Apollo is not enjoined from exercising its right not to renew the Services Agreement because B of A will no longer be able to offer a web-based payment system to its customer accounts in the event the contract is not renewed.  *See* Wassam Decl. ¶¶ 21-32.  However, Ms. Wassam's conclusory assertions are plainly insufficient to support issuance of an injunction.[7]  "Although the loss of good will can, in certain

---

[6] In *National Elevator Cab & Door Corp. v. H&B, Inc.*, 282 Fed. Appx. 887, No. 08-0808, 2008 WL 2595168, at *1 (2d Cir. June 27, 2008), cited by Bank of America, the contract at issue expressly provided that the plaintiff would be entitled to injunctive relief in the event of violation of the agreement's  non-compete clause because "money damages would not be a sufficient remedy."

[7] Numerous courts have held that a declaration of a corporate executive such as Ms. Wassam's which simply repeats the movant's conclusory allegations of harm without more is plainly insufficient to justify issuance of an injunction.  *.See The Miss America Organization v. Mattell, Inc.*, 945 F.2d 536, 546 (2d Cir. 1991) (affidavit of moving party's Vice President for Marketing "that repeat[ed] the allegations of harm but furnishe[d] no actual proof" that failure to issue a preliminary injunction would cause loss of goodwill held inadequate to support issuance of a preliminary injunction); *Shepard Indus., Inc. v. 135 East 57th Street, LLC*, No. 97 Civ. 8447(DAB), 1999 WL 728641, at *8 (S.D.N.Y. Sept. 17, 1999) (denying preliminary injunction

circumstances, equate with irreparable harm, simply invoking the phrase is insufficient to make the critical finding to support a preliminary injunction." *Doldo Bros, Inc.. v. Coors Brewing Co.*, No. 7:08 Civ. 206, 2008 WL 657252, at *6 (N.D.N.Y. Mar. 7, 2008). "[C]ursory statements – devoid of supporting evidence concerning affected product lines, lost business relationships, and why such losses cannot be quantified in monetary terms – [and] that it will lose goodwill and market share if a preliminary injunction is not granted, do not support finding that [the moving party] is in imminent danger of suffering irreparable harm." *Passlogix, Inc.*, 2010 WL 2505628, at *10.

In any event, the factual predicate underlying B of A's allegations of irreparable injury – that it will be unable to offer its customers a web-based payment system if Apollo is not enjoined from exercising its right not to renew the Service Agreement – is patently false. As this Court has recognized, "[t]he cases involving irreparable harm from a loss of goodwill or business relationships typically involve a situation in which a dispute between parties leads to the inability of one party to provide its product or products to the market or its customers." *O.D.F. Optronics Ltd. v. Remington Arms Co.*, No. 08 Civ. 4746, 2008 WL 4410130, at *7 (S.D.N.Y. Sept. 26, 2008). This is not such a case.[8] Although B of A characterizes Apollo's IDS software as "a

---

when the moving party's "pleadings, affidavits, and exhibits consist only of conclusory allegations of harm to its goodwill or reputation in the absence of a preliminary injunction").

[8] The authorities cited by Bank of America are distinguishable on this basis. In *Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co. of New York, Inc.*, 749 F.2d 124, 125-26 (2d Cir. 1984), the plaintiffs faced the complete loss of their business. In *Travelers Int'l AG v. Trans World Airlines, Inc.*, 684 F. Supp. 1206, 1216 (S.D.N.Y. 1988), termination of the contract at issue would have resulted in a loss of 95% of the plaintiff's business. In *Reuters Limited v. United Press International, Inc.*, 903 F.2d 904, 907-8 (2d Cir. 1990), and *Jacobson & Company, Inc. v. Armstrong Cork Co.*, 548 F.2d 438 (2d Cir. 1977), the plaintiffs were faced with the loss of a unique product and customers who threatened to take their business elsewhere if the product could not be supplied. In this case, Bank of America has made no showing that Apollo's online-payment software is so preferred by Bank of America customers that a change to another platform would result in a loss of significant business.

unique product" (Def. Mem. at 11), there can be no serious dispute based on the record before the Court that B of A will continue to have the ability to provide online banking services to its customers in the event Apollo does not renew the Service Agreement.  As an initial matter, B of A uses the IDS system for only a fraction of its customer base – specifically, *delinquent customers*.  B of A operates its own proprietary website, bankofamerica.com, which says on its face that it provides for online bill paying capability.  *See* Imrey Decl. ¶ 10.  Thus, the implication that B of A will have no ability to provide online banking services in the event it does not have access to the IDS system is a gross misstatement.

Even as to delinquent customers, however, B of A can transfer the present function to its own website or to a new online payment software provider.[9]   Further, Ms. Wassam had stated that the Apollo IDS system could be shut down within 30 days with no adverse affect to her business (Konowiecki Decl. ¶ 6; Gluck Decl. ¶ 5).  While the transfer to a new software platform may cause some temporary inconvenience to B of A customers and cause B of A to incur some additional expenses, this does not constitute irreparable harm that cannot be compensated through monetary damages in the event Apollo's non-renewal of the Services Agreement is ultimately found to have been improper.  Preliminary injunctions are simply not available in a "typical contract dispute" such as this where "the harm [the moving party] alleges it will suffer is primarily financial and can be adequately [remedied] through monetary damages."  *Safety*

---

[9] Bank of America's reliance on  Judge Chin's decision in *Webadviso v. Bank of America Corp.*, No. 09-cv-5769, 2009 WL 5177997, at *3 (S.D.N.Y. Dec. 31, 2009), is misplaced for several reasons.  First, *Webadviso* involved "cybersquatting" and irreparable harm is presumed in such cases when a likelihood of success on the merits has been demonstrated.  *Id.*   Second, as noted above, non-renewal of the Services Agreement with Apollo will not preclude access to any proprietary Bank of America website.  Indeed, as noted in the Gluck Decl., Bank of America customers will still be able to make online payments using www.bankofamerica.com.

*Management Systems, Inc. v. Safety Software Ltd.*, 2010 WL 1837770, at \*3; *see also Shepard Indus., Inc. v. 135 East 57th Street, LLC*, 1999 WL 728641, at \*8 (holding that the plaintiff "failed to show a sufficient threat of irreparable harm" because it did not allege "that it face[d] imminent financial ruin, and because [p]laintiff's damages would be easily calculable at trial").[10]

Further, B of A's allegations of irreparable harm are undermined by its own delay in seeking a preliminary injunction. "'A district court should generally consider delay in assessing irreparable harm,' since a delay in seeking a preliminary injunction undercuts the movant's claim of irreparable harm." *Passlogix, Inc.*, 2010 WL 2505628, at \*8, *quoting Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 38 (2d Cir. 1995). In this case, Apollo gave B of A notice of its intent not to renew the Services Agreement in an overnight letter dated January 11, 2010 (*see* Wassam Decl. Exh. 3), and B of A was informed in a second overnight letter dated February 5, 2010 that Apollo did not consider the 180-day notice provision of the Service Agreement to be applicable due to B of A's material breaches of the Agreement (*id.* Exh. 4). Nevertheless, B of A waited five (5) long months before bringing its motion for a preliminary injunction. Courts have refused to grant preliminary injunctions in numerous cases in which the moving party delayed bringing suit for such an extended period. *See The Proctor & Gamble Co. v. Ultreo, Inc.*, 574 F. Supp. 2d 339, 354 (S.D.N.Y. 2008) (six month delay "weigh[ed] strongly against a finding of

---

[10] Two other cases relied on by Bank of America are distinguishable on this basis. In *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004), and *O.D.F. Optronics Ltd.*, 2008 WL 4410130, at \*8, preliminary injunctions were granted due to the difficulty in calculating the monetary loss due to the alleged breach. Further, in *O.D.F. Optronics Ltd.*, 2008 WL 4410130, at \*8, this Court held that the plaintiff had demonstrated irreparable harm because following termination of their agreement, it had specifically negotiated for a shortened sell-off period for the defendant to dispose of its remaining inventory of plaintiff's product in order to protect against the sale of outdated, non-working products to law enforcement and military customers. In this case, whether measured from the date of the letter giving notice of Apollo's intent not to renew or Apollo's letter terminating the agreement for material breach, Bank of

irreparable harm); *Magnet Communications LLC v. Magnet Communications, Inc.*, No. 00 Civ. 5746, 2001 WL 1097865, at *1 (S.D.N.Y. Sept. 19, 2001) (twelve week delay); *ImOn, Inc. v. ImaginOn, Inc.*, 90 F. Supp. 2d 345, 350 (S.D.N.Y. 2000) (18 weeks); *The Comic Strip, Inc. v. Fox Television Stations, Inc.*, 710 F. Supp. 976, 981 (S.D.N.Y. 1989) (three months).

In sum, B of A's motion for a preliminary injunction is nothing more than a transparent attempt to gain leverage in its contractual dispute with Apollo and its complaints of irreparable harm are contradicted by the undisputed factual record before this Court, including its own actions.  As a result, its motion for a preliminary injunction must be denied and the Court need not reach the other factors relevant to a determination whether a preliminary injunction should issue.

## III.    B OF A WILL BE UNABLE TO SUCCEED ON THE MERITS BECAUSE APOLLO IS ENTITLED TO END THE CONTRACT

Even assuming that it could show irreparable harm, which it cannot, in order to prevail on its motion for a preliminary injunction, B of A must clearly show that it is likely to succeed on the merits of its claims that Apollo has no right not to renew the Services Agreement at the conclusion of a term, and that B of A has not materially breached the Agreement.  However, as set forth more fully below, B of A's assertion that the Agreement would automatically renew each year by its terms even over Apollo's objection is inconsistent with the intent of the parties and the terms of the Agreement.  In addition, the evidence is overwhelming that B of A has materially breached its obligations under the Agreement giving Apollo the right to terminate the Agreement in any event.  Finally, even if the contract were not appropriately terminated, B of A would be enjoined from seeking injunctive relief under the unclean hands doctrine. For these

---

America has already received the benefit of the six month transition period provided in the contract and has not demonstrated why nine *additional* months are now required.

reasons, discussed further below, B of A will be unable to show a likelihood of success on the merits, and its Motion for Preliminary Injunction should therefore be denied.

### A.   APOLLO HAS APPROPRIATELY EXERCISED ITS RIGHT NOT TO RENEW THE CONTRACT

B of A asserts that under the terms of the Agreement, Apollo is obliged to continue providing service perpetually unless B of A chooses to terminate or materially breaches the Agreement.  Def. Mem. at 3.  This interpretation defies established principles of contract construction and ignores the intent of the parties.

### 1.   A Perpetual Term Was Not Provided Nor Intended

The role of the courts in interpreting a contract is to "ascertain the intention of the parties at the time they entered into the contract." *Evans v. Famous Music Corp.* 1 N.Y.3d 452, 458 (2004).  Courts must employ a "common sense approach" to determine what the parties intended, including consideration of "what liability the defendant fairly may be supposed to have assumed…." *Awards.com v. Kinko's, Inc.* 42 A.D.3d 178, 183 (N.Y. App Div. 1st Dep't 2007) (finding that it was unreasonable and highly speculative to infer an intent to assume the risk of loss profits in a joint venture).  Contrary to B of A's contention, nowhere in the Agreement is it stated that Apollo cannot choose to allow the Agreement to expire at the conclusion of a term when it is incurring significant losses under the Agreement.  B of A does not point to any language expressly providing that Apollo's term of service is perpetual absent a material breach by B of A, nor does it offer any evidence that Apollo intended to agree to such a term.  To the contrary, as set forth in the Declaration of Christopher Imrey, who negotiated the Agreement on Apollo's behalf, it was Apollo's understanding that following the initial two year term, each

party had a right to object to and prevent the renewal of the Agreement each year.  B of A has not come forward with any competent evidence to the contrary.[11]

Entering into a contract from which one cannot escape is an extremely risky proposition and this Court should not interpret the Agreement to provide for this result absent clear evidence that this was the parties' intent.  *See Bloor v. State*, 403 N.Y.S.2d 983, 989 (N.Y. Ct. Cl. 1978) ("A contract will not be construed so as to render it oppressive or inequitable as to either party, or as to place one of the parties at the mercy of the other, unless it is clear that such was their intention [at] the time the agreement was made.")  Such evidence is completely lacking here. This is especially true here where the Agreement is a standard B of A Service Provider Agreement drafted by B of A  (Imrey Decl. ¶ 4).  If B of A had intended for Apollo to agree to a perpetual term of service it could have included such language in the contract.  Its failure to do so weighs heavily against a finding that a perpetual term was intended.  *See Haines v. City of New York*, 41 N.Y.2d 769, 772 (1977) (where contract did not expressly provide for perpetual performance and there was no evidence that this was the parties' intent "the law will not imply that a contract calling for continuing performance is perpetual in duration").

## 2.     Defendant's Interpretation Renders Terms of the Agreement Superfluous and Nonsensical

B of A's proffered interpretation of the Agreement fails to give meaning to the plain language of the document.  Under New York law, a contract "should be construed so as to give full meaning and effect to all of its provisions."  *PaineWebber Inc. v. Bybyk*,  81 F.3d 1193, 1199 (2d 1996).[12]  Section 6.1 of the Agreement, titled "Term and Termination," specifies that the

---

[11] Ms. Wassam, who provides the only factual support for B of A's motion was not involved in the negotiations.  *See* Imrey Decl. ¶ 3.

[12] *See Galli v. Metz,* 973 F.2d 145 (1992) ("[u]nder New York Law an interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaningless… is not preferred

Agreement shall remain in effect from its effective date for a two year period and renew automatically thereafter for successive one year periods.  (*see* Wassam Decl. Exh. 1 at ¶ 6.1) The common sense meaning of this clause governing renewal periods is that the parties may elect not to renew the contract at those times.   Without this understanding the concept of "renewal" would be meaningless, as there is no reason to "renew" a contract which never expires.   Additionally, the initial two year period and subsequent one year periods would be meaningless demarcations of time with no effect under the Agreement.

The subsequent section of the Agreement goes on to specify additional points of time where termination is allowed under certain circumstances.   Section 6.2 permits B of A to terminate the Agreement for its convenience at any time, and permits either party to terminate the Agreement immediately in the event of a material breach of contract or other "termination event".  (*see* Wassam Decl. Exh. 1 at ¶ 6.2)  This is reasonably understood as offering ways through which the Agreement could be immediately terminated without the necessity of waiting for the renewal period to expire.

*Hurletron Inc. v. Eltex-Elektrostatic-Gesellschaft mbH,* 116 F.3d 1482, 1997 WL 345902 (7th Cir. 1997) (unpublished), is directly on point.   In *Hurletron*, plaintiff moved for a preliminary injunction in a contract dispute, claiming that defendant had no right to terminate the contract.  The contract in question indicated that the contract would renew from year to year, and in subsequent clauses offered particular conditions under which the contract could be promptly terminated.   Hurletron argued that the language pertaining to annual renewal did not create a right to terminate the contract at the annual renewal periods, and that termination was allowed

and will be avoided if possible") (quoting *Garza v. Marine Transport Lines, Inc.,* 861 F.3d 23, 27 (2nd Cir. 1988)).  *See also Corhhill Corp v. S.D. Plants, Inc.,* 9 N.Y.2d 595 (1961) ("[i]t is a

only if one of the subsequently defined termination events occurred. The court rejected Hurletron's arguments on the grounds that it would render the concept of year-to-year renewal meaningless, and found that both parties had the right to terminate the contract at the end of any renewal term. *Hurletron* at *4. B of A's strained interpretation of the termination language in the Agreement should be rejected here for the same reason.

### 3. Defendant's Interpretation Undermines the Obligation of the Parties to Negotiate in Good Faith Regarding Additional Costs

Schedule C of the Agreement provides that "[a]ll quoted and priced elements assume up to 170,000 web hits per month," and that "[c]osts to support volumes above this level shall be mutually agreed upon. These provisions clearly contemplate that the need might arise to negotiate new payment terms as use of the system increased. B of A currently utilizes the service at a rate of over 52 million hits per month, a rate greater than 300 times that projected by the Agreement[13]. The parties have been unable to agree on new pricing. Notwithstanding this fact, under B of A's interpretation of the Agreement, Apollo has no recourse and cannot allow the Agreement to expire even though B of A is refusing to negotiate in good faith and Apollo is sustaining substantial losses. As noted above, however, the law will not imply such an inequitable agreement. *See Bloor v. State*, 403 N.Y.S.2d 983, 989 (N.Y. Ct. Cl. 1978). Moreover, there would have been no need for language requiring that the costs of increased service would be mutually agreed upon if a perpetual agreement was intended by the parties.

---

cardinal rule of construction that a court should not 'adopt an interpretation' which will operate to leave a 'provision of a contract without force and effect')'.

[13] B of A urges that the standard definition of web hits is not applicable to this contract, and that the term was instead intended to measure the number of unique users accessing their accounts through the system. Def. Mem. at 5. The definition of web hits used by Apollo represents the industry standard definition and more accurately measures the cost to Apollo of delivering the service (Imrey Decl. ¶ 7, Gluck Decl. ¶ 3). In any event, B of A's current use of the system far exceeds 170,000 web hits per month regardless of the definition that is used.

The presence of such language is a clear indication that the intent of the parties when the Agreement was signed was that Apollo would retain the right to bargain and negotiate price increases for elevated use of the system and would be free to allow the Agreement to expire if such negotiations were unsuccessful.  *See Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105 (N.Y. 1981) (holding that where one party had a right to renew a contract, but where the price for such renewal was "to be agreed upon" a material term was undefined and contract was unenforceable for uncertainty).

### B.   APOLLO HAS APPROPRIATELY EXERCISED ITS RIGHT TO TERMINATE THE CONTRACT IN THE FACE OF B OF A'S MATERIAL BREACHES

Regardless of whether the contract provides Apollo with a right not to renew at the conclusion of a term, it undoubtedly contains a provision stating that if one party "materially breaches its obligations," the other party may "immediately terminate" the Agreement.  (*see* Wassam Decl. Exh. 1 at ¶ 6.2)  Apollo notified B of A in February 2010 that it was in material breach of the Agreeement and B of A failed to take curative action.  Consequently, B of A has materially breached its obligations, and Apollo therefore has the right to terminate the Agreement.

"A material breach is one that goes to the essence and frustrates substantially the purpose for which the contract was agreed to."  *Cevasco v. Nat'l R.R. Passenger Corp.*, 606 F. Supp. 2d 401, 418 (S.D.N.Y. 2009).  In this case, payments by B of A were the primary consideration by which Apollo was induced to enter into the Agreement and B of A's failure to make the agreed upon payments as described in the Agreement constitutes a breach that "frustrates substantially the purpose for which the contract was agreed to."  *See C3 Media & Mktg. Group, LLC v. Firstgate Internet, Inc.*, 419 F. Supp. 2d 419 (S.D.N.Y. 2005) (finding that failure to make

payments constituted material breach).  Apollo entered into the contract expecting to receive payment for the service it provided based on the actual level of usage that the IDS system received.  B of A has made a conscious decision to continue using the service at a rate far in excess of the level contemplated in the Agreement while failing to negotiate a price to compensate Apollo for that excess level of usage.[14]  B of A's use of the service at a level exceeding that contemplated in the Agreement, coupled with its refusal to negotiate payment for that increased level of service, constitutes a failure to pay, and thus a material breach of the Agreement.

B of A also materially breached the Agreement by providing false information to Apollo regarding the type of transactions that were being processed (Imery Decl. ¶ 8; Konowiecki Decl. ¶ 3).  Apollo relied upon the information provided by B of A to produce invoices based on B of A's use of the system (Decl. Imery ¶ 8).  This resulted in significant underbilling which enriched B of A at Apollo's expense.  As a general matter, a covenant of good faith and fair dealing is implicit in all contracts. *See Dalton v. Educ. Testing Serv*., 87 N.Y.2d 384, (N.Y. 1995).  The covenant "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  *Id*. at 389. (internal quotation marks omitted). Under the Uniform Commercial Code, which has been adopted in New York, good faith is defined as "honesty in fact in the conduct or transaction concerned."  107 N.Y. Jur. 2d Uniform Commercial Code § 35.  "A failure to act in good faith as to a material part of the agreement could be considered a material breach of the agreement.*"*

---

[14] B of A argues that because Apollo did not object to the lower payments previously, the "course of dealings" between the parties disproves Apollo's contention that it has been underpaid.  However, B of A mischaracterizes the course of dealings.  Apollo has in fact frequently noted and objected to Bank of America's underpayments from the moment they were discovered  (Imery Decl. ¶ 6).

*Designers North Carpet, Inc. v. Mohawk Indus., Inc.,* 153 F. Supp. 2d 193 (E.D.N.Y. 2001).  B of A's false statements regarding its use of the Apollo system injured or destroyed Apollo's rights to receive the fruit of the contract.  This constitutes a breach of the covenant of good faith and fair dealing and a material breach of the Agreement, thus activating Apollo's right to immediately terminate the agreement.

### C.    UNCLEAN HANDS

Finally, even if Apollo did not have the right to terminate the contract, B of A is barred from seeking equitable relief under the doctrine of unclean hands.  "A court may deny injunctive relief based on the defense of unclean hands where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue to the detriment of the other party."  *Estate of Lennon by Lennon v. Screen Creations*, Ltd., 939 F. Supp 287 (S.D.N.Y. 1996) (denying a motion for a preliminary injunction on the grounds that movant showed bad faith in negotiations) (citations omitted).  "The misconduct which will bar equitable relief need not be sufficient to constitute the basis of a legal action; any willful conduct 'which would be condemned and pronounced wrongful by honest and fair-minded men, will be sufficient to make the hands of the applicant unclean' as long as the conduct pertains to the matter in litigation."  *Pecorella v. Greater Buffalo Press, Inc*., 107 A.D.2d 1064, 1065 (N.Y. A.D., 1985) (quoting 20 N.Y. Jur., Equity, § 107).  *See also Wheeler v. Sage* 68 U.S. 518, 529 (1863) ("if a party seeks relief in equity, he must be able to show that on his part there has been honesty and fair dealing").

In the instant case, B of A has acted unconscionably and with bad faith towards Apollo with regard to the Agreement.  B of A has knowingly increased its usage of the Apollo service to levels far beyond that envisioned in the Agreement, causing great financial burdens to Apollo,

while simultaneously refusing to negotiate in good faith new pricing to compensate Apollo for the increased usage.  B of A now seeks equitable relief in the form of a preliminary injunction in an attempt to bind Apollo to provide this elevated level of service without additional compensation.  Granting a preliminary injunction would increase the financial pressure on Apollo and unfairly increase B of A's bargaining power over a struggling vendor.  Even more egregiously, B of A has acted fraudulently in the course of dealings at issue in this case.  B of A has regularly misrepresented the number and types of "collect" and "recovery" transactions that it was processing through the Apollo system, which lead to B of A being invoiced for usage far below the actual level (Imery Decl. ¶ 8).  This dishonesty worked to B of A's financial benefit in a material manner in the very course of dealings at issue in this case. It would be a perversion of the principles of equity to allow B of A to seek equitable relief binding Apollo to continue providing service at the extremely elevated levels of use but at the original, base-level pricing. Because B of A has unclean hands it is not entitled to equitable relief in the form of a preliminary injunction now, and it will ultimately be unable to succeed on the merits of its demand for a permanent injunction.

## IV.    THE BALANCE OF HARDSHIPS DOES NOT FAVOR GRANT OF A PRELIMINARY INJUNCTION

B of A has failed to establish that the balance of hardships favors the grant of a preliminary injunction.  "There must be a clear balance of convenience in favor of the grant before a court will issue a preliminary injunction."  *Garland v. Ruskin* 249 F. Supp. 977, 980 (D.C.N.Y. 1965).   B of A claims that because the current contract has been in force for four years under the current payment terms, Apollo cannot make a persuasive showing that enforcement of the Agreement during the pendency of the lawsuit would result in serious harm. Def. Mem. at 18.  However, the duration over which this underpayment has occurred actually

tilts the balance of hardships in Apollo's favor.  Apollo is a small company which is struggling under the significant monthly expenses to maintain the greater services being used by B of A at the inadequate prices set forth in the Agreement.  Because of the substantial overutilization of the services by B of A, and the concurrent underpayment therefore, Apollo's finances have been increasingly strained to the point that continuing to provide services to B of A at the current rate of remuneration is an extreme financial burden and threatens to render Apollo insolvent (Konowiecki Decl. ¶ 4).  A small service provider such as Apollo is less capable of dealing with prolonged financial burdens than is B of A.

B of A further argues that the balance of hardships tilts in its favor because it would be unable to provide an alternative online payment system should Apollo terminate the contract.  This is false, however, because many alternative systems exist.  Apollo is not the exclusive provider of online payment services.  Further, B of A has access to its own internal systems to process online payments (*see* Imery Decl. Exh. 1)..  Indeed, B of A's non-delinquent customers currently pay online through the portal at [www.bankofamerica.com](www.bankofamerica.com), and B of A could use this portal to handle the online payments currently handled through Apollo's system.  B of A simply prefers to continue utilizing Apollo's system because Apollo rather than B of A must bear the cost of such use.  Finally, B of A could invest in upgrading its alternative means of payment processing, such as by increasing customer service staffing to process more payments via telephone.  These alternatives are more than enough to provide for B of A's online payment processing needs and to prevent the "deteriorating public good will" and "frustrating" customer experiences that B of A has speculated might occur.  Def. Mem. at 19.

Further, B of A has been on notice of Apollo's intent to terminate the contract since January, a period of over seven months.  This period is longer than the 180 day "transition

period" allowed for in the Agreement (*see* Wassam Decl. Exh. 1 at ¶ 6.3) and is more than sufficient for B of A to have made preparations to facilitate the transition.  If B of A has needlessly delayed taking self-protective steps since receiving notice of Apollo's intent to terminate then any harm it might incur rests clearly on its own shoulders.  Apollo cannot bear the burden of protecting B of A from harm that B of A brought upon itself.

Finally, it cannot be ignored that B of A has available a solution that would prevent the termination of the Agreement.  Apollo has repeatedly stated its desire to negotiate a payment solution which allows the contract to remain viable and specified that termination is a last resort that it employs only with reluctance (*see* Wassam Decl. Exh. 4).  B of A could simply negotiate in good faith and reach an agreement with Apollo to pay for the service that it wishes to use at a rate that is acceptable to Apollo and which does not cause Apollo to incur further debt.  *See Snecma v. Turbine Engine Components Technologies Corp.*, 531 F. Supp. 2d 354 (N.D.N.Y. 2008) (denying a motion for preliminary injunction and holding that the balance of hardships did not favor an injunction where plaintiff could simply pay a higher price than that to which the parties allegedly agreed).

In summary, the potential damages B of A and its customers face are greatly exaggerated because adequate alternatives to the Apollo online payment system are available.  Further, B of A is a larger and substantially better funded company and is far better situated to bear the costs of providing online payment services during the pendency of this litigation.  The balance of hardships therefore favors Apollo and does not support the grant of a preliminary injunction.

DATED:   August 16, 2006               Respectfully submitted,

WHATLEY DRAKE & KALLAS, LLC


By:   /s Joe R. Whatley, Jr.

Joe R. Whatley, Jr.
Deborah Clark-Weintraub
1540 Broadway, 37th Floor
New York, NY  10036
Telephone: (212) 447-7070
Facsimile:  (212) 447-7077

Daniel P. Gleason
2001 Park Place North, Suite 1000
Birmingham, Alabama 35203
Tel: (205) 328-9576
Fax: (205) 328-9669

*Attorneys for Defendants Apollo Enterprise Solutions, LLC, Apollo Enterprise Solutions, Inc., and Moriah Partners, Inc.*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 16, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on August 16, 2010.

  /s JOE R. WHATLEY, JR.           
JOE R. WHATLEY, JR.

WHATLEY DRAKE & KALLAS, LLC
1540 Broadway, 37th Floor
New York, New York 10036
Tel: (212) 447-7070
Fax: (212) 447-7077
jwhatley@wdklaw.com