IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

———————————————————————x
                              :   Civil Action No. 10-5707 (DLC)

BANK OF AMERICA, N.A.,          :
                              :

               Plaintiff,     :

                              :

      vs.                     :

                              :

APOLLO ENTERPRISE SOLUTIONS, LLC,  :
APOLLO ENTERPRISE SOLUTIONS, INC., and  :
MORIAH PARTNERS, LLC,     :

                              :

              Defendants.   :

                              :
———————————————————————x


**<u>DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**


                                        WHATLEY DRAKE & KALLAS, LLC
                                        1540 Broadway, 37th Floor
                                        New York, New York 10036
                                        (212) 447-7070
                                        *Attorneys for Defendants*

Of Counsel:

Joe R. Whatley, Jr.
Deborah Clark-Weintraub
Daniel Gleason

Defendants Apollo Enterprise Solutions, LLC and Apollo Enterprise Solutions, Inc., (collectively referred to as "Apollo")[1] respectfully submit the below proposed findings of fact and conclusions of law in connection with the hearing on the motion by Plaintiff Bank of America, N.A. ("B of A") for a preliminary injunction:

## I.   <u>DEFENDANTS' PROPOSED FINDINGS OF FACT</u>

1.     Apollo is a California corporation headquartered in Long Beach, California (Def. Exh. 7 at ¶ 2), and is the developer of a proprietary intelligent debt settlement system (the "IDS System").  (Pinchuk Dep. at 37:20-37:22).[2]

2.     B of A is a national banking association with its principal place of business in Charlotte, North Carolina.  (Dkt. # 15 (Amd. Cplt.) ¶ 7).

3.     On April 15, 2006, Apollo and Bank of America entered into an agreement entitled "Application Service Provider Agreement" (the "Services Agreement" or "Contract"). (Def. Exh. 1).[3]  The purpose of the Contract was to detail the rights and responsibilities of the parties with regard to B of A's use of the IDS System for servicing credit card accounts in pay, recover and collect status.  *Id.*

4.     "Pay," "Recover" and "Collect" refer to the account status of the debts paid using the Service.  "Pay" accounts are current accounts – *i.e.*, accounts that are not past due.  "Collect" accounts are those as to which payment is more than 30 days but less than 180 days past due. "Recover" accounts are accounts that are greater than 180 days past due.  (Imrey Dep. 45:3-

---

[1] Defendant Moriah Partners, LLC denies that this Court has jurisdiction over it and has moved to dismiss B of A's complaint against it on this basis.

[2] All deposition testimony cited herein has been submitted as an exhibit to the Declaration of Joe R. Whatley, Jr. dated September 30, 2010.

[3] All exhibits cited herein are contained in Defendants' Hearing Exhibits submitted herewith.

46:12; 104:18-106:5; Pinchuk Dep. at 38:3-38:9; Def. Exh. 7 at ¶ 4).

5.     The Contract, which was negotiated by Julie Whitmore ("Whitmore") and Ahn Gates ("Gates") for B of A and Christopher Imrey ("Imrey") and Corinne Miller ("Miller") for Apollo, is a standard B of A form which was modified in certain respects by the parties.  (Def. Exh. 1; Def. Exh. 7 at ¶ 3).

6.     The B of A form initially provided to Apollo by B of A provided that the Contract would "apply and remain in effect from the Effective Date and perpetually thereafter unless terminated" by B of A "for its convenience" or by either party upon the occurrence of a Termination Event as defined by the Contract including a breach.  (Def. Exh. 3 at ¶¶ 6.1-6.2). However, the Contract executed by the parties does not contain this provision providing for a perpetual term.  (Def. Exh. 1 at ¶ 6.1; Imrey Dep. at 26:11-27:7).  Instead, the Contract provides for an initial two (2) year term and provides that thereafter the Contract "shall renew automatically for successive one (1) year periods."  *Id.*  The executed Contract also provides that it may be terminated by B of A at any time for convenience or by either of the parties upon the occurrence of a Termination Event, including a breach.  (Def. Exh. 1 at ¶ 6.2).  Christopher Imrey, who was the primary negotiator of the Contract on Apollo's behalf, understood these provisions to mean that following the initial two year term, each party had a right to object to and prevent the renewal of the Contract each year.  (Def. Exh. 7 at ¶ 9).  Although she submitted a declaration in support of B of A's motion for a preliminary injunction, Ms. Gates, who negotiated the Contract for B of A, was unable to recall the intent of the parties regarding this or any other provision of the Contract.  (Gates Dep. at 16:8-18:10).

7.     In the event either party elects to terminate, the Contract provides "that upon the request of Bank of America, [Apollo] will, subject to pro-rated fees, continue uninterrupted

operations" for a period not to exceed 180 calendar days from the date of termination.  (Def. Exh. 1 at ¶ 6.3).

8.     The Contract contains a pricing schedule (Schedule C) based on projected utilization of "up to 170,000 web hits per month" and specifies that prices to support volumes above that level shall be mutually agreed upon.  (*Id.* at Schedule C).  Imrey, who negotiated the Contract for Apollo, understood the term "web hit" as used in the agreement to mean "a request made to a web server" such that "[i]f a Web page has five images on it when the page is loaded six 'hits' will be recorded . . . because the browser has to make six requests to the Web server – one for the HTML of the Web page and five for the images."   (Def. Exh. 7 at ¶ 7; Def. Exh. 20).

9.     Although Dana Wassam ("Wassam") of B of A submitted a declaration stating that B of A and Apollo understood the term "web hits" as used in the Contract to mean "a unique visitor accessing the Apollo website" (Def. Exh. 8 at ¶ 19), Ms. Wassam was not involved in negotiating the Contract and could not identify any documents contemporaneous with the Contract's execution demonstrating that B of A understood the term to mean "unique visitors accessing the website."  (Wassam Dep. at 45:18-46:11; 51:15-52:4).  Ms. Wassam's assertion in her declaration that both B of A and Apollo understood the term "web hits" as used in the Contract to mean "unique visitors accessing the site" was based solely on statements made to her by Steven Demarest.  (Wassam Dep. at 53:17-54:2).  However, Mr. Demarest submitted a declaration in support of B of A's motion for a preliminary injunction stating that he "does not recall any discussions regarding web hits" at the time the Contract was executed.  (Def. Exh. 10 at ¶ 6).  Ms. Wassam has admitted that Apollo's definition of "web hit" is a definition used in the industry.  (Def. Exh. 12 at ¶ 9).

10.     Although she submitted a declaration in support of B of A's motion for a

preliminary injunction, Ahn Gates, one of the two B of A representatives who was involved in the negotiations, testified at her deposition that she had no recollection of what she understood the term "web hits" to mean at the time she was negotiating the Contract or the intent of that provision, and she so informed her superiors at B of A at least six months prior to the date the motion for preliminary injunction was filed by B of A.  (Gates Dep. at 14:14-22:19; 56:22-57:15).  Indeed, Ms. Gates testified that she had no recollection of the intent of the parties with respect to any of the provisions of the Contract and that "all [she] can recall at this point is the actual language of the contract."  *(Id.* at 17:24-18:5; 18:13-18:16).

11.    Schedule C also contains estimated monthly recurring charges for "Pay," "Collect," and "Recover" transactions of $10,500, $3,075, and $157,143, respectively, based on December 2005 transaction data provided by B of A, as well as a grid reflecting tiered pricing for "Collect" and "Recover" transactions depending on the number of transactions each month. (Def. Exh. 1, Schedule C).  The grid reflects that monthly "Collect" charges are a function of the numbers of decisions and payments each month for accounts in "Collect" status, while monthly "Recover" charges are a function of the numbers of settlements and payments each month for accounts in "Recover" status.  *Id.*

12.    At the time the Contract was executed, it was contemplated that B of A's use of the IDS System would be primarily with respect to servicing delinquent accounts – *i.e.*, accounts in "Collect" and "Recover" status – by its Card Services division.  (Def. Exh. 7 at ¶ 8; Def. Exh. 13).  However, due to issues related to systems transitions arising out of B of A's acquisitions of Fleet and MBNA, many consumer credit card account customers in a current or "Pay" status were redirected by B of A to use the websites operated by Apollo to make payments on their accounts instead of using B of A's own online banking system.  (Def. Exh. 13).  In addition, in

December 2007, B of A's DFS (Dealer Financial Services) division commenced using the IDS System to process payments on secured loan products including auto loans, boat loans, and HELOCs. (Def. Exh. 9). As a result, the volume of transactions processed via the IDS System increased dramatically, straining the system's capacity and causing Apollo to incur substantial unreimbursed costs to keep the system operating. (Def. Exh. 18 at ¶ 9; Imrey Dep. 91:14-92:8).

13.     In June 2010, B of A utilized the IDS System at a rate of over 36 million web hits per month, a rate hundreds of times that projected by the Services Agreement. (Def. Exh. 8 at Exhibit 7 (June 2010 invoice)). In addition, B of A admits that the number of payments processed via the Apollo websites more than tripled from approximately 83,000 in January 2007 to over 314,000 in December 2009. (Def. Exh. 12 at ¶ 10). Further, Ms. Wassam admitted that even if the term "web hits" is understood to mean "unique visitor," the number of "unique visitors" who have accessed the Apollo websites would be in excess of the number of payments received each month and, therefore, has exceeded the 170,000 per month figure assumed in setting the pricing reflected in Schedule C. (Wassam Dep. 55:12-61:3; 188:17-22).

14.     In view of the foregoing, representatives of Apollo, including Mr. Imrey, who negotiated the Contract, endeavored to engage B of A in good faith negotiations to adjust the Contract's pricing with respect to "Pay" transactions. (Def. Exh. 7 at ¶ 6). However, notwithstanding the substantial increases in usage of the IDS System by B of A, B of A refused to engage in good faith negotiations and the monthly base charge of $10,500 for "Pay" transactions remained unchanged. *Id.* At the same time, B of A representatives warned Mr. Imrey to stop complaining about B of A's nonpayment for use of the IDS System because he "would be surprised how quickly vendors could disappear around here." *Id.*

15.     Following its acquisition by Moriah Partners in 2009, Apollo conducted a

compliance audit of the Contract and discovered that not only was B of A's level of usage far in excess of the levels assumed in the Contract's pricing, B of A was using the IDS System to process payments for accounts in "Collect" and "Recover" status without paying Apollo the contractually agreed amounts for these transactions.  (Imrey Dep. 93:23-99:24).  B of A's Dana Wassam admitted that payments on such accounts were processed using the Apollo system and that Apollo was not paid the IDS Collect and Recover charges specified in the Contract for these transactions.  (Wassam Dep. at 189:10-192:6).

16.    Beginning in 2010, Apollo began invoicing B of A for web hits in excess of 170,000 at the same rate assumed in the Contract's pricing and for the Collect and Recover transactions that had been processed through the IDS System without Apollo's knowledge. Corrected invoices issued for 2009 and the first half of 2010 reflect payments owed to Apollo by B of A totaling $56,298,642.24.  (Def. Exh. 8 at Exhibit 7).  Apollo contends that B of A also owes additional amounts for 2008, 2007 and part of 2006, and that the total amount owed under the Contract but not paid by B of A is approximately one hundred million dollars.  (Dkt. # 29 (Counterclaim) ¶ 7).

17.    B of A has refused to pay the corrected invoices that properly reflect the charges for B of A's undisclosed, unauthorized, and excessive use of the IDS System.  (Def. Exh. 7 at ¶ 6).

18.    On January 11, 2010, Joseph Konowiecki, Apollo's CEO, gave B of A notice of Apollo's intent not to renew the Contract at the conclusion of its term on April 14, 2010.  (Def. Exh. 8 at Exhibit 3).  Thereafter, on February 5, 2010, Mr. Konowiecki gave notice of Apollo's intent to terminate the agreement on account of B of A's material breaches, including its failure to disclose its full and true usage of the IDS System and its direction of payment transactions

initiated by non-delinquent accounts to the Apollo service resulting in usage far greater than that contemplated by the Contract.  *Id.* at Exhibit 4.  Whether calculated from the date of Mr. Konowiecki's letter giving notice of non-renewal or the date of his letter giving notice of termination as a result of B of A's alleged material breaches, the 180 day transition period provided in the Contract has expired.  (Wassam Dep. at 68:6-70:5).  Nevertheless, Apollo has agreed to continue providing services under the Contract until October 15, 2010.

19.     After receiving Apollo's notice of termination, the two B of A divisions that use the Apollo service – Card Services and DFS – began contingency planning in late February 2010 for the possibility that Apollo might terminate its services immediately or at the conclusion of the 180 day transition period provided in the Contract.  Contingency plans for both divisions in the event of an immediate cessation of services by Apollo included (1) development of a "splash page," which would direct B of A customers signing into the Apollo site to a web page that would give customers instructions on alternate means available to make payments; and (2) removing the myeasypayment.com URL and other Apollo websites from customer communications.  DFS also began the process of engaging additional call center personnel to deal with any incremental increase in call volume that might arise.  (Wassam Dep. at 70:17-82:7).  Card Services, which accounts for 70% of the traffic across the Apollo websites, did not need to hire additional call center employees because all of its customers have had the ability to make payments online through B of A's own online banking website since August 2009.  (*Id.* at 66:6-66:12; 80:14-80:17; 86:19-88:22).  Half of DFS' customers also have had the ability to make payments online through B of A's own online banking website since August 2009 because they have a DDA account with the bank.  (*Id.* at 65:16-66:5).  Accordingly, if Apollo's services are terminated, only 15% of the customers currently using the site would not have another online

payment option although they would be able to make payments by phone, by dropping a check in the mail, or by stopping by a branch.  (*Id.* at 66:13-67:15).  Thus, Ms. Wassam's statement in paragraph 23 of her declaration that "customers would not be able to make online payments" in the event "access to the IDS software was terminated" is false as 85% of the customers using the Apollo websites would be able to make online payments through B of A's online banking website.  (*Id.* at 176:7-176:21).

20.     Longer term contingency planning for a cessation of Apollo's services also included enabling DFS customers who did not have the ability to make payments through B of A's online banking system to be able to do so.  (*Id.* at 82:8-82:24).  Ms. Wassam testified that as a result of a software modification, these customers will be able to make their payments online through B of A's online banking website beginning November 7, 2010.  (*Id.* at 88:23-90:21). Thus, by Ms. Wassam's own admission, the nine month period she claimed in her declaration in support of B of A's motion for a preliminary injunction was necessary to fully transition to a new system and drive customer acceptance will end in December 2010.  (*Id.* at 90:22-95:9).

21.     B of A's contingency plans have already resulted in a decrease in its customers' use of the Apollo websites.  (Def. Exh. 9; Wassam Dep. at 133:15-135:18).

22.     The approximately ten week period between October 15, 2010, the date Apollo has indicated it intends to cease providing services, and December 31, 2010, when all of B of A's customers currently using the Apollo websites will have another online payment option, is a period of just 77 days.  The disaster recovery provisions of the Contract provide Apollo with a period of up to 75 days to restore services in the event of a disaster.  (*Id.* at 159:2-161:20).

23.     B of A's contingency plans with respect to Apollo created in the ordinary course of business acknowledge that in the event of either a temporary or permanent cessation of

services by Apollo, customers have additional payment options, increased call center volume was expected to be minimal in light of past experience, and the financial impact to B of A would be low.  (*Id.* at 145:16-175:13).

## II.   DEFENDANTS' PROPOSED CONCLUSIONS OF LAW

### A.   GOVERNING STANDARDS

24.     On July 29, 2010, B of A petitioned the Court for entry of an injunction preventing Apollo from terminating its services under the Contract "so long as this action continues." Dkt. # 5 at 8).  B of A's motion is predicated on its assertion that the bank will suffer irreparable harm in the event Apollo is allowed to terminate the Contract on October 15, 2010.

25.     A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Moore v. Consolidated Edison Co. Of New York, Inc.*, 409 F.3d 506, 510 (2d Cir. 2005), *quoting Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis added); *see also Salinger v. Colting*, 607 F.3d 68, 79 (2d Cir. 2010), *quoting Winter v. Natural Resources Defense Council*, ___ U.S. ___, 129 S. Ct. 365, 376-77 (2008) ("'A preliminary injunction is an extraordinary remedy never awarded as of right.'").  "[B]ecause preliminary injunctions prevent the litigants from taking actions that they are otherwise legally entitled to take *in advance of an adjudication on the merits,* they should be issued cautiously…." *Uniformed Firefighters Assn. v. City of New York,* 79 N.Y.2d 236, 241 (1992).

26.     To obtain a preliminary injunction, the moving party must show: "'(1) that [it] will be irreparably harmed if an injunction is not granted; and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of hardships tipping decidedly in its favor.'" *Passlogix, Inc.*

*v. 2FA Technology, LLC*, No. 08 Civ. 10986(PKL), 2010 WL 2505628, at * 7 (S.D.N.Y. Jun. 21, 2010), *quoting Lusk v. Village of Cold Spring*, 475 F.3d 480, 485 (2d Cir. 2007).

###    B.    IRREPARABLE HARM

27.    "'The threat of irreparable injury is a *sine qua non*' of a preliminary injunction." *Passlogix, Inc. v. 2FA Technology, LLC*, 2010 WL 2505628, at * 7, *quoting Am. Airlines, Inc. v. Imhof*, 620 F. Supp. 2d 574, 579 (S.D.N.Y. 2009).  "'If there is no irreparable injury, there can be no preliminary injunction.'"  *Am. Airlines, Inc.*, 620 F. Supp. 2d at 579, *quoting Markowitz Jewelry Co., Inc. v. Chapal/Zenray, Inc.*, 988 F. Supp. 404, 406 (S.D.N.Y. 1997).  Thus, "'the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered.'"  *Grand River Enterprise Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007), *quoting Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005).

28.    "To satisfy the irreparable harm requirement, [the moving party] must demonstrate that absent a preliminary injunction [it] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm."  *Grand River Enterprise Six Nations, Ltd.*, 481 F.3d at 66. "[I]t is inappropriate to issue a preliminary injunction 'based only on a *possibility* of irreparable harm.'"  *Safety Management Systems, Inc. v. Safety Software Ltd.*, No. 10 Civ. 1593(RJH), 2010 WL 1837770, at *2 (S.D.N.Y. May 5, 2010), *quoting Winter*, 129 S. Ct. at 375-76 (emphasis added).  Rather, it is incumbent on the moving party to make "a *clear showing* that irreparable harm is *likely*" before a preliminary injunction is granted.  *Safety Management Systems, Inc.*, 2010 WL 1837770, at *3 (emphasis in original); *see also Salinger*, 607 F.3d at 79, *quoting Winter*, 129 S. Ct. at 375-76 ("'Issuing a preliminary injunction based only on the possibility of

irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'").

29.     "Although the loss of good will can, in certain circumstances, equate with irreparable harm, simply invoking the phrase is insufficient to make the critical finding to support a preliminary injunction." *Doldo Bros. v. Coors Brewing Co.*, No. 08 Civ. 206, 2008 WL 657252, at *6 (N.D.N.Y. Mar. 7, 2008). "[C]ursory statements – devoid of supporting evidence concerning affected product lines, lost business relationships, and why such losses cannot be quantified in monetary terms – [and] that it will lose goodwill and market share if a preliminary injunction is not granted, do not support finding that [the moving party] is in imminent danger of suffering irreparable harm." *Passlogix, Inc.*, 2010 WL 2505628, at *10. Moreover, "[t]he cases involving irreparable harm from a loss of goodwill or business relationships typically involve a situation in which a dispute between parties leads to the inability of one party to provide its product or products to the market or its customers." *O.D.F. Optronics Ltd. v. Remington Arms Co.*, No. 08 Civ. 4746, 2008 WL 4410130, at *7 (S.D.N.Y. Sept. 26, 2008).

30.     Preliminary injunctions are not available in a "typical contract dispute" where "the harm [the moving party] alleges it will suffer is primarily financial and can be adequately remedied through monetary damages." *Safety Management Systems, Inc.*, 2010 WL 1837770, at *3; *see also Shepard Indus., Inc. v. 135 East 57th Street, LLC*, No. 97 Civ. 8447 (DAB), 1999 WL 728641, at *8 (holding that the plaintiff "failed to show a sufficient threat of irreparable harm" because it did not allege "that it face[d] imminent financial ruin, and because [p]laintiff's damages would be easily calculable at trial").

31.     B of A has failed to demonstrate that it is likely to suffer an irreparable injury if an injunction is not issued.  To the contrary, the evidence demonstrates that any injury claimed by B of A is speculative at best.  Eighty-five percent of the customers who use the Apollo websites already have another online banking option available to them – B of A's own online banking system – and the fifteen percent of customers who cannot currently make an online payment using B of A's online banking system will be able to do so in less than a month.  B of A's assertion that it will suffer irreparable injury from the incremental increase in call center volume that it speculates may result from termination of Apollo's services in the three week period between October 15, 2010 and November 7, 2010, is completely unsupported.  Indeed, its own contingency plans reflect that past outages of Apollo's services due to technical issues have resulted in only an "incremental" increase in call volume.   Merriam-Webster defines "incremental" as "of, relating to, being, or occurring in especially small increments." http://www.merriam-webster.com/dictionary/incremental.  That the Apollo IDS System is not considered mission critical by the bank is best illustrated by the fact that in the event of a disaster, the Contract provides that it may take Apollo a period of up to 75 days to restore services.  Thus, B of A has failed to show that "irreparable injury is *likely* in the absence of an injunction."  *Salinger*, 607 F.3d at 79, *quoting Winter*, 129 S. Ct. at 375.

32.     B of A's delay in seeking an injunction also undermines its claim of irreparable harm.  *See Passlogix, Inc.*, 2010 WL 2505628, at *8, *quoting Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 38 (2d Cir. 1995).

## C.     BALANCE OF HARDSHIPS

33.     B of A argues that it need only demonstrate serious questions going to the merits rather than a likelihood of success on the merits because "the equities tip in favor of granting a

preliminary injunction." *See* Dkt. # 27 at 4.  However, this Court finds that the balance of hardships does not tip in favor of B of A.  Apollo has presented evidence that B of A's excessive usage of the IDS System and its failure to maintain equipment has caused Apollo serious financial harm.  (Def. Exh. 18 at ¶ 9; Imrey Dep. at 91:14-92:8).  In contrast, B of A's own contingency planning document assesses the financial risk to B of A of a permanent loss of Apollo's services as "Low;" *i.e.*, in the range of $0-$500,000.  (Def. Exh. 11 at p. 15 of 30).  As a result, the balance of hardships does not favor B of A and it must demonstrate a likelihood of success on the merits.

### D.  LIKELIHOOD OF SUCCESS ON THE MERITS

34.  The role of the courts in interpreting a contract is to "ascertain the intention of the parties at the time they entered into the contract." *Evans v. Famous Music Corp.* 1 N.Y.3d 452, 458 (2004).  Courts must employ a "common sense approach" to determine what the parties intended, including consideration of "what liability the defendant fairly may be supposed to have assumed…." *Awards.com, LLC, v. Kinko's, Inc.*, 42 A.D.3d 178, 183 (1st Dep't 2007) (finding that it was unreasonable and highly speculative to infer an intent to assume the risk of lost profits in a joint venture).

35.  B of A cannot demonstrate a likelihood of success on the merits.  In particular, B of A has not carried its burden of demonstrating that it is likely to succeed with respect to its assertion that Apollo did not have a right to elect not to renew the Contract when its term expired on April 14, 2010.  B of A's request that Apollo enter into a contract with a perpetual term was rejected by Apollo and the Contract as executed had an initial term of two years followed by successive one year terms.  (*Compare* Def. Exh. 3 at ¶ 6.1, *with* Def. Exh. 1 at ¶ 1).  Mr. Imrey of Apollo testified that it was his understanding as the primary negotiator of the Contract for

Apollo, that it was the intent of the parties that each would have a right to object to and prevent the renewal of the Contract each year.  (Def. Exh. 7 at ¶ 9).  B of A has not come forward with any evidence refuting Mr. Imrey's testimony.  None of B of A's witnesses, including Ms. Gates, who negotiated the agreement for B of A, were able to testify based on personal knowledge concerning the intent of this provision.  (Gates Dep. at 17:24-18:5; 18:13-18:16).

36.     Moreover, B of A's interpretation of the Contract's term provisions would render the renewal provisions of the Contract meaningless as there is no reason to "renew" a contract which never expires.  Under New York law, a contract "should be construed so as to give full meaning and effect to all of its provisions."  *PaineWebber Inc. v. Bybyk,*  81 F.3d 1193, 1199 (2d Cir. 1996).  *See Galli v. Metz,* 973 F.2d 145, 149 (2d Cir. 1992) ("[u]nder New York Law an interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaningless… is not preferred and will be avoided if possible"), *quoting Garza v. Marine Transport Lines, Inc.,* 861 F.2d 23, 27 (2d Cir. 1988).  *See also Corhill Corp v. S.D. Plants, Inc.,* 9 N.Y.2d 595, 599 (1961) ("[i]t is a cardinal rule of construction that a court should not adopt an interpretation which will operate to leave a provision of a contract without force and effect").

37.     In addition, B of A has not carried its burden of demonstrating that it is likely to succeed on its claim that it did not materially breach the Contract by, *inter alia*, failing to disclose its full and true usage of the IDS System and by directing payment transactions initiated by non-delinquent accounts to the Apollo service resulting in usage far greater than that contemplated by the Contract.  "A material breach is one that goes to the essence and frustrates substantially the purpose for which the contract was agreed to."  *Cevasco v. AMTRAK*, 606 F. Supp. 2d 401, 418 (S.D.N.Y. 2009).  It appears undisputed that B of A's usage of the Apollo websites is currently far in excess of the levels contemplated at the time the Contract was signed.

- 14 -

Although B of A maintains that the Contract entitled it to unlimited usage, B of A's own witnesses testified that the Contract was ambiguous on its face in this regard.  (Wassam Dep. at 186:10-187:20).

38.    Ms. Wassam's assertion in her declaration that both B of A and Apollo understood the term "web hits" as used in the Contract to mean "unique visitors accessing the site" was based solely on statements made to her by Steven Demarest.  (Wassam Dep. at 53:17-54:2).   However, Mr. Demarest submitted a declaration in support of B of A's motion for a preliminary injunction stating that he "does not recall any discussions regarding web hits" at the time the Contract was executed.   (Def. Exh. 10 at ¶ 6).    The only witness with personal knowledge of the negotiation of the agreement, Christopher Imrey of Apollo, testified that he understood the term 'web hits" to mean a request to a web server for a file (Def. Exh. 7 at ¶ 7), and Ms. Wassam conceded that this is a definition of the term used in the industry (Def. Exh. 12 at ¶ 9).

39.    Apollo has also presented evidence supporting its contention that B of A concealed its usage of the IDS System to process "Collect" and "Recover" transactions without compensating Apollo.  (Def. Exh. 7 at ¶ 8; Imrey Dep. at 93:23-99:24).

40.    As a general matter, a covenant of good faith and fair dealing is implicit in all contracts. *See Dalton v. Educ. Testing Serv*., 87 N.Y.2d 384, 389 (N.Y. 1995).  The covenant "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  *Id*.  (internal quotation marks omitted). Under the Uniform Commercial Code, which has been adopted in New York, good faith is defined as "honesty in fact in the conduct or transaction concerned." 107 N.Y. Jur. 2d Uniform Commercial Code § 35.  "A failure to act in good faith as to a material

part of the agreement could be considered a material breach of the agreement*." Designers North Carpet, Inc. v. Mohawk Industries, Inc.,* 153 F. Supp. 2d 193, 196 (E.D.N.Y. 2001).

41.      B of A's false statements regarding its use of the Apollo system injured or destroyed Apollo's rights to receive the fruits of the Contract.  This constitutes a breach of the covenant of good faith and fair dealing and a material breach of the Agreement, thus activating Apollo's right to immediately terminate the agreement.

42.      In view of the foregoing, B of A has not demonstrated a likelihood of success on the merits of its claims against Apollo.

### E.      UNCLEAN HANDS

43.      "A court may deny injunctive relief based on the defense of unclean hands where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue to the detriment of the other party." *Estate of Lennon by Lennon v. Screen Creations, Ltd.*, 939 F. Supp 287 (S.D.N.Y. 1997) (denying a motion for a preliminary injunction on the grounds that movant showed bad faith in negotiations) (citations omitted).  "The misconduct which will bar equitable relief need not be sufficient to constitute the basis of a legal action; any willful conduct 'which would be condemned and pronounced wrongful by honest and fair-minded men, will be sufficient to make the hands of the applicant unclean' as long as the conduct pertains to the matter in litigation." *Pecorella v. Greater Buffalo Press, Inc*., 107 A.D.2d 1064, 1065 (4th Dep't 1985), *quoting* 20 N.Y. Jur., Equity, § 107.  *See also Wheeler v. Sage* 68 U.S. 518, 529 (1863) ("if a party seeks relief in equity, he must be able to show that on his part there has been honesty and fair dealing").

44.      B of A has acted unconscionably and with bad faith towards Apollo with regard to the Agreement.  B of A has knowingly increased its usage of the Apollo service to levels far

beyond that envisioned in the Agreement, causing great financial burdens to Apollo, while simultaneously refusing to negotiate in good faith new pricing to compensate Apollo for the increased usage.  (Def. Exh. 7 at ¶ 6; Def. Exh. 18 at ¶ 9; Imrey Dep. at 91:14-92:8).  B of A has acted fraudulently in the course of dealings at issue in this case.   B of A has regularly misrepresented the number and types of "collect" and "recovery" transactions that it was processing through the Apollo system, which lead to B of A being invoiced for usage far below the actual level.  (Def. Exh. 7 at  ¶ 8).

45.     Because B of A has unclean hands it is not entitled to equitable relief in the form of a preliminary injunction now, and it will ultimately be unable to succeed on the merits of its demand for a permanent injunction.

DATED:   September 30, 2010                         Respectfully submitted,

WHATLEY DRAKE & KALLAS, LLC


By:   /s Joe R. Whatley, Jr.
Joe R. Whatley, Jr.
Deborah Clark-Weintraub
1540 Broadway, 37th Floor
New York, NY  10036
Telephone: (212) 447-7070
Facsimile:  (212) 447-7077

Daniel P. Gleason
2001 Park Place North, Suite 1000
Birmingham, Alabama 35203
Tel: (205) 328-9576
Fax: (205) 328-9669

*Attorneys for Defendants Apollo Enterprise Solutions, LLC, Apollo Enterprise Solutions, Inc., and Moriah Partners, Inc.*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 30, 2010, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which will send notification of such filing to the

following:

Richard Raysman, Esq.
Francesca Morris, Esq.
Christine Tramontano, Esq.
HOLLAND & KNIGHT, LLP
31 West 52nd Street
New York, New York 10019
richard.raysman@hklaw.com
francesca.morris@hklaw.com
christine.tramontano@hklaw.com


  /s JOE R. WHATLEY, JR._____
JOE R. WHATLEY, JR.

WHATLEY DRAKE & KALLAS, LLC
1540 Broadway, 37th Floor
New York, New York 10036
Tel: (212) 447-7070
Fax: (212) 447-7077
jwhatley@wdklaw.com