**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BANK OF AMERICA, N.A.,<br><br>      Plaintiff,<br><br>-against-<br><br>APOLLO ENTERPRISE SOLUTIONS, LLC, APOLLO ENTERPRISE SOLUTIONS, INC., and MORIAH PARTNERS, LLC,<br><br>      Defendants. | Civ. Action No.: 10-5707 (DLC) |

**PLAINTIFF BANK OF AMERICA N.A.'S DIRECT TESTIMONY
DEPOSITION DESIGNATIONS OF G. CHRISTOPHER IMREY**

   Pursuant to the Court's August 27, 2010 Order, plaintiff Bank of America, N.A.,  ("Bank of America" or the "Bank") respectfully submits the following deposition testimony it offers as substantive evidence in the hearing on its motion for a preliminary injunction scheduled for October 14, 2010.   The Bank intends to offer the deposition testimony of Mr. G. Christopher Imrey, who is a representative of the defendants Apollo Enterprise Solutions, LLC and Apollo Enterprise Solutions, Inc. (collectively, "Apollo").  A brief synopsis, with citation to the deposition transcript, for the testimony of Mr. Imrey is as follows (with a copy of relevant deposition transcripts in the schedules submitted herewith).

   **SYNOPSIS OF DEPOSITION DESIGNATION OF G. CHRISTOPHER IMREY**

   Excerpts of the Transcript of the  Deposition of G. Christopher Imrey, dated September 23, 2010 ("Imrey Depo.") are attached hereto as Schedule A.

   Mr. Imrey will testify about the negotiation of the Agreement, and the course of performance of the Agreement between Bank of America and Apollo between April 2006 and November 2009.  Mr. Imrey's testimony will specifically explain Apollo Enterprise Solutions'

"IDS Pay", "IDS Collect" and "IDS Recover" tools and how these tools comprise the "Apollo IDS Self-Settlement" product as negotiated in the Agreement.  Mr. Imrey's testimony will also establish Apollo Enterprise Solutions' billing practices and how invoices to Bank of America were calculated from the beginning of the contractual relationship, through discussions for renegotiation of pricing arrangements, and also the new methods used by Apollo after the investment by Moriah to calculate "revised" invoices to Bank of America.  Specifically:

- he is the founder and Chief Strategic Officer of Apollo and, prior to 2009, Apollo did not believe that the Agreement permitted Apollo to invoice the Bank for use of Apollo's services based upon "web hits." Imrey Depo. at 83:7-84:10.  Mr. Imrey and his company were unaware that the Agreement could be interpreted to allow Apollo to charge the Bank based on web hits.  (Imrey Depo. at 10:17-11:19; 20:16-22:14; 26:2-5; 83:7-84:19.)
- That Schedule C to the Agreement, wherein Apollo claims its right to invoice based on the number of "web hits"—was actually drafted by Apollo. (*Id*. at 37:12-39:17.)
- That Mr. Imrey identified Mr. Evan Pinchuk as the Apollo representative who reviewed the contract to determine if the Bank was in compliance (88:17-22), which is when Apollo allegedly discovered the clause referring to 170,000 web hits (84:11-84:19).
- Moriah conducted an audit of the Bank's Agreement and other customers' contracts as a part of its takeover (*Id*. at 83:7-15, 84:4-19; 88:6 - 91:2.)  The audit was conducted at the direction of Apollo's new management team from Moriah.  (*Id*.; Pinchuk Depo. at 88:17-22.)
- It was only when Evan Pinchuk, who came in with the Moriah management, audited the Agreement that the new interpretation of web hits was "discovered."  (Imrey Depo. at 84:11-19; 88: 17-22.)
- Mr. Imrey agrees that IDS Pay is intended to be used by current customers.  (Imrey Depo. at 45:2-7.)
- Mr. Imrey explained in his deposition that Bank of America has been charged six cents a web hit for web hits over 170,000 but that calculation is not supported by the Agreement. (Imrey Depo.at 84:20-85:15)
- Mr. Imrey confirmed at his deposition that Apollo's contracts were made available to Moriah to review for due diligence purposes prior to Moriah's investment and Mr. Pinchuk agreed.   (Imrey Depo. at 88:6-89:4; Pinchuk Depo. at 31:7-33:9.)
- The definition ostensibly relied upon is no longer available on Wikipedia. (Imrey Depo. at 81:19-25).

## DESIGNATIONS OF THE SEPTEMBER 23, 2010
## DEPOSITION TESTIMONY OF MR. G. CHRISTOPHER IMREY

| TESTIMONY FROM | TO |
|---|---|
| Page 5, line 2 | Page 5, line 11 |
| Page 7, line 10 | Page 8, line 22 |
| Page 9, line 21 | Page 16, line 19 |
| Page 17, line 2 | Page 18, line 5 |
| Page 18, line 8 | Page 18, line 11 |
| Page 18, line 14 | Page 21, line 17 |
| Page 22, line 15 | Page 22, line 23 |
| Page 23, line 6 | Page 24, line 10 |
| Page 24, line 14 | Page 24, line 25 |
| Page 25, line 7 | Page 25, line 9 |
| Page 25, line 12 | Page 27, line 7 |
| Page 27, line 14 | Page 27, line 22 |
| Page 28, line 4 | Page 28, line 19 |
| Page 29, line 2 | Page 29, line 24 |
| Page 37, line 12 | Page 42, line 17 |
| Page 43, line 13 | Page 47, line 13 |
| Page 47, line 16 | Page 47, line 20 |
| Page 47, line 25 | Page 50, line 16 |
| Page 50, line 19 | Page 52, line 13 |
| Page 52, line 19 | Page 52, line 23 |
| Page 53, line 5 | Page 54, line 6 |
| Page 54, line 10 | Page 54, line 10 |
| Page 54, line 23 | Page 55, line 3 |
| Page 55, line 9 | Page 55, line 20 |
| Page 55, line 23 | Page 57, line 4 |
| Page 57, line 9 | Page 57, line 19 |
| Page 57, line 22 | Page 62, line 23 |
| Page 63, line 2 | Page 63, line 21 |
| Page 63, line 24 | Page 64, line 6 |
| Page 64, line 22 | Page 65, line 6 |
| Page 66, line 7 | Page 69, line 9 |
| Page 71, line 21 | Page 78, line 12 |
| Page 78, line 16 | Page 79, line 13 |
| Page 79, line 18 | Page 80, line 6 |
| Page 80, line 9 | Page 81, line 5 |
| Page 81, line 19 | Page 81, line 25 |
| Page 83, line 7 | Page 83, line 18 |
| Page 84, line 4 | Page 89, line 4 |
| Page 89, line 12 | Page 91, line 2 |
| Page 92, line 19 | Page 93, line 22 |

#9806935_v1

Dated:     New York, New York
             September 30, 2010

                             HOLLAND & KNIGHT LLP

                  By: */s Richard Raysman*
                       Richard Raysman
                       Francesca Morris
                       Christine Tramontano
                       31 West 52nd Street
                       New York, New York 10019
                       Tel: (212) 513-3200
                       Fax: (212) 385-9010
                       richard.raysman@hklaw.com
                       francesca.morris@hklaw.com
                       christine.tramontano@hklaw.com
                    *Attorneys for Plaintiff Bank of America, N.A.*

#9806935_v1

# SCHEDULE A

#9806935_v1

1  IN THE UNITED STATES DISTRICT COURT
   FOR THE SOUTHERN DISTRICT OF NEW YORK
2  Civil Action No. 10-5707 (DLC)
   -------------------------------------x
3  BANK OF AMERICA, N.A.,
                       Plaintiff,
4
         -vs-
5
   APOLLO ENTERPRISE SOLUTIONS, LLC,
6  APOLLO ENTERPRISE SOLUTIONS, INC.,
   and MORIAH PARTNERS, LLC,
7                      Defendants.
   -------------------------------------x
8              Videotape deposition of G.

9        CHRISTOPHER IMREY, taken by the

10       Plaintiff, at the law office of

11       Whatley Drake & Kallas, LLC, 1540

12       Broadway, New York, New York, on

13       September 23, 2010, at 10:13 a.m.,

14       before Robert M. Levine, a Shorthand

15       Reporter and Notary Public of the

16       State of New York.

17

18

19

20            ROSENBERG & ASSOCIATES, INC.

21       Certified Court Reporters & Videographers

22  425 Eagle Rock Ave., Suite 201     575 Madison Ave.

23  Roseland, NJ 07068              New York, NY 10022

24   (973) 228-9100    1-800-662-6878    (212) 868-1936

25            www.rosenbergandassociates.com

2

```
1  A P P E A R A N C E S:

2

3  HOLLAND & KNIGHT, LLP.

4  Attorneys for Plaintiff

5  31 West 52nd Street

6  New York, New York  10019

7  BY:   FRANCESCA A. MORRIS, ESQ.

8  (212) 513-3280

9  francesca.morris@hklaw.com

10

11 WHATLEY DRAKE & KALLAS, LLC.

12 Attorneys for Defendants

13 1540 Broadway, 37th Floor

14 New York, New York  10036

15 Attorneys for Defendant

16 BY:   DEBORAH CLARK-WEINTRAUB, ESQ.,

17 DANIEL P. GLEASON, ESQ.

18 (212) 447-7070

19 dweintraub@wdklaw.com

20

21 ALSO PRESENT:

22 JOE BARRION, Videographer

23

24

25
```

3

1

2          IT IS HEREBY STIPULATED AND

3     AGREED, by and between the attorneys for the

4     respective parties herein, that the sealing,

5     filing and certification of the within

6     deposition be waived; and sworn to before an

7     officer authorized to administer an oath, with

8     the same force and effect as if signed and

9     sworn to before the officer before whom said

10    deposition is taken.

11          IT IS FURTHER STIPULATED AND

12    AGREED that all objections except as to form,

13    are reserved to the time of trial.

14

15

16

17

18

19

20

21

22

23

24

25

1        G. Christopher Imrey - September 23, 2010

2                THE VIDEOGRAPHER:  This is the

3        video operator speaking, Joe Barrion, of

4        Rosenberg & Associates, 575 Madison Avenue,

5        New York, New York.

6                Today's date is September 23,

7        2010.  The time on the video monitor is

8        10:13.  We are here at the office of Whatley

9        Drake & Kallas, located at 1540 Broadway,

10       New York, New York, to take the videotaped

11       deposition of Christopher Imrey in the matter

12       of Bank of America, N.A. versus Apollo

13       Enterprise Solutions, LLC; Apollo Enterprise

14       Solutions, Inc.; and Moriah Partners, LLC, in

15       the United States District Court for the

16       Southern District of New York.  Civil action

17       No. 10-5707 (DLC).

18                Will counsel please identify

19       yourselves and state whom you represent.

20                MS. MORRIS:  Francesca Morris of

21       Holland & Knight LLP for plaintiff Bank of

22       America, N.A..

23                MS. CLARK-WEINTRAUB:  Deborah

24       Clark-Weintaub from Whatley Drake & Kallas

25       for the defendants.

5

```
 1            G. Christopher Imrey – September 23, 2010
 2                      THE VIDEOGRAPHER:  Will the court
 3         reporter please swear in the witness.
 4  G.     C H R I S T O P H E R    I M R E Y,   being
 5         first duly sworn by the Notary Public (Robert
 6         M. Levine), testified as follows:
 7                      THE REPORTER:  Full name and
 8         address for the record.
 9                      THE WITNESS:  G. Christopher
10         Imrey, 3009 Rivoli, Newport Beach, California
11         92663.
12  EXAMINATION BY MS. MORRIS:
```

1          G. Christopher Imrey – September 23, 2010

10          Q.     You are the founder of Apollo

11   Enterprise, LLC?

12          A.     Apollo Enterprise Solutions, LLC.

13          Q.     When was that founded?

14          A.     In January of 2003.

15          Q.     And what was the capitalization at that

16   time?

17          A.     I put the first million dollars in

18   myself.  And then investor money.

19          Q.     What was your ownership of Apollo

20   Enterprise Solutions, LLC?

21          A.     At its founding I owned 100 percent.

22          Q.     And --

23          A.     And --

24          Q.     Sorry.  Go ahead.

25                 At the time it was sold, what was your

1          G. Christopher Imrey – September 23, 2010

2     percentage?

3          A.    I don't understand the question.

4          Q.    So what is the ownership of Apollo

5     Enterprise Solutions, Inc.?

6          A.    I can't give you a detailed description

7     of the cap.  I don't know.

8          Q.    What's your position in Apollo

9     Enterprise, Inc.?

10         A.    I am founder and chief strategy

11    officer.

12         Q.    Do you have any ownership?

13         A.    Yes.

14         Q.    How much is your ownership?

15         A.    It's depending upon incentives and

16    bonuses.  It varies.

17         Q.    Do you own any shares in the company?

18         A.    Yes.

19         Q.    How many shares do you own?

20         A.    About 25 million.

21         Q.    How many shares are there?

22         A.    I couldn't tell you the exact figure.

1          G. Christopher Imrey – September 23, 2010

21          Q.    Apollo Enterprise entered into a
22   contract with Bank of America?
23          A.    No.
24          Q.    What was the arrangement with Bank of
25   America?

```
 1              G. Christopher Imrey - September 23, 2010
 2         A.    Apollo Enterprise Solutions, not Apollo
 3    Enterprise entered into a contract with Bank of
 4    America.
 5         Q.    What is Apollo Enterprise?
 6         A.    I don't know.  You were the one who
 7    referenced it.
 8         Q.    Well, when I meant Apollo Enterprise
 9    Solutions, AES entered into a contract with Bank of
10    America.  When was that?
11         A.    It was in April 2006.
12         Q.    How did that relationship come about?
13         A.    I don't understand the question.
14         Q.    Did you first contact Bank of America
15    regarding providing online services for them?
16         A.    No.
17         Q.    Did someone at Bank of America contact
18    Apollo Enterprise Solutions regarding providing
19    services for Bank of America?
20         A.    I don't know.
21         Q.    Who would know?
22         A.    Our senior VP of sales.
23         Q.    Who is that?
24         A.    Ed Dewispelare.
25         Q.    Is he still with Apollo Enterprise
```

1          G. Christopher Imrey - September 23, 2010

2     Solutions?

3          A.     No.

4          Q.     At what time did you first have contact

5     with Bank of America?

6          A.     Ed called me and said that Bank of

7     America reached out to him looking for a Web-based

8     collection solution.  And had set up a meeting with

9     Julie Gonzales in Phoenix in 2005.

10          Q.     Do you remember when in 2005 that was?

11          A.     October 2005.

12          Q.     Did you go to a meeting in Phoenix?

13          A.     Yes.

14          Q.     What happened at the meeting in

15     Phoenix?

16          A.     We presented our solution.

17          Q.     What was the solution?

18          A.     A Web-based collection application that

19     provided multi-channel services.

20          Q.     What services did it provide?

21          A.     I just described it.

22          Q.     What were the multi-services that were

23     provided?

24          A.     The ability to contact debtors or

25     customers via IVR letters, E-mail, text, et cetera.

1      G. Christopher Imrey – September 23, 2010
2      Q.    When you say the ability to contact,
3  the online service sends out that contact?
4      A.    The system has, yes.  The system can do
5  it.
6      Q.    Does the system do that for Bank of
7  America?
8      A.    No.
9      Q.    What other multi-services were
10  presented at that meeting in October 2005?
11      A.    Real-time decisioning.  Credit bureau
12  retrieval.  And parsing, scoring.  Decisioning.
13      Q.    The real-time decisioning, what does
14  that involve?
15      A.    It involves the real-time decision
16  engine that is incorporated to the software.  That
17  presents the offers and the work flow and the look
18  and feel of the Web site to the customer.
19      Q.    How is the decision reached before it's
20  presented to the customer?
21      A.    It's calculated based on a set of
22  rules.
23      Q.    Where do the rules come from?
24      A.    They are configured in the system and
25  programmed by engineers.

                    G. Christopher Imrey - September 23, 2010
 1
 2          Q.      Who provides the parameters of those
 3   programs?
 4          A.      Depends.   In the case of Bank of
 5   America it was all Bank of America's specifications.
 6          Q.      Does the Bank of America site contain
 7   real-time decision-making?
 8          A.      Yes.
 9          Q.      And all of the parameters for that come
10   from Bank of America?
11          A.      Yes.
12          Q.      You mentioned also the credit bureau
13   facility.
14                  What is that?
15          A.      The system's ability to retrieve
16   information from the credit bureaus or any third
17   party entity and parse that information and
18   incorporate it into the decision process and/or the
19   work flow.
20          Q.      For Bank of America is that facility
21   used?
22          A.      Yes.
23          Q.      In what way is it used?
24          A.      When a customer logs in, Bank of
25   America customer, the system will retrieve an

1        G. Christopher Imrey - September 23, 2010

2    authentication score from Experian.  And if the

3    score is above a certain threshold, then the

4    customer is authenticated and allowed into the

5    system.

6        Q.    What happens if it's below a certain

7    threshold?

8        A.    The customer is not allowed access to

9    the system.

10       Q.    What's the purpose of that?

11       A.    For multi-factor authentication.

12       Q.    For multi?

13       A.    Multi-factor authentication.

14       Q.    Multi-factor.  What are the other

15   factors?

16       A.    I don't understand the question.

17       Q.    You said it's for multi-factor

18   authentication.

19       A.    Yes.

20       Q.    Explain what multi-factor means?

21       A.    It's what you have and what you know.

22   An example of multi-factoring.  So you have to have

23   more than one level of authentication.

24       Q.    What other levels of authentication are

25   there?

1              G. Christopher Imrey – September 23, 2010

2         A.      Single factor identification.

3         Q.      What does that involve?

4         A.      One element of authentication.

5         Q.      In the case of Bank of America does it

6    use single factor authentication?

7         A.      No.

8         Q.      Bank of America uses multi-factor

9    authentication?

10        A.      Yes.

11        Q.      One of those factors is through the

12   Experian credit bureau; is that right?

13        A.      No.

14        Q.      What are the factors that Bank of

15   America uses for authentication?

16        A.      What you have, which is your card

17   number, and what you know, which is your Social

18   Security number and your street address and your

19   name.

20        Q.      And each of those elements is put in in

21   order to authenticate a customer?

22        A.      Yes.  Along with the zip code, I

23   believe.

24        Q.      And the Web site itself accesses

25   Experian.  And only let's them in if they have a

1          G. Christopher Imrey – September 23, 2010
2     credit score above a certain number?
3          A.    No.
4          Q.    What's the Experian part of it then?
5          A.    It sends the what you know information
6     to Experian.  And if it matches and passes an
7     authentication score, then you're allowed into the
8     system.
9          Q.    Then authentication score is actually
10    where the information provided agrees with the
11    information that Experian had; is that correct?
12         A.    That's correct.
13         Q.    What other of the multi-factors?  Is
14    that all of it?  All of it is just information
15    provided and then matched up against Experian?
16         A.    Yes.
17         Q.    And that's for --
18         A.    An account number matched up against
19    the bank's information.

1          G. Christopher Imrey – September 23, 2010

2          Q.    Have you dealt with the Dealer

3   Financial Services people?

4          A.    I don't understand the question.

5          Q.    Do you know Betsy Williams?

6          A.    Yes.

7          Q.    Do you know that she works for Dealer

8   Financial Services?

9          A.    Yes.

10         Q.    Do you know Blesita Tanovitch?

11         A.    Yes.

12         Q.    Do you know she works for Dealer

13  Financial Services?

14         A.    Yes.

15         Q.    Do you speak with them about the use of

16  Dealer Financial Services' Web site?

17         A.    I'm sorry.  I don't understand the

18  question.

19         Q.    Do you speak with Blesita Tanovitch and

20  Betsy Williams?

21         A.    I don't understand the question.

22         Q.    Do you understand what "speak" means?

23         A.    Yes.

24         Q.    So using the telephone, do you pick it

25  up and talk to Betsy Williams?

1        G. Christopher Imrey – September 23, 2010

2                Have you done that?

3        A.    I don't know what reference period.

4   Today?  No.

5        Q.    Ever.


8        A.    Right.  Maybe it's the English versus

9   American phrase.  Have I ever?  I didn't understand

10  the question.  What are you trying to ask?  Have I

11  ever spoken to them?


14       A.    Or do I speak with them regularly?

15       Q.    Have you ever?

16       A.    Or do I have monthly conference calls

17  with them.  Or, I mean -- I don't understand the

18  question.

19       Q.    Apollo Solutions does have conference

20  calls with the Bank of America people regarding the

21  use of the Web site regularly?

22       A.    No.

23       Q.    It does not have Friday conference

24  calls with people at Bank of America to discuss the

25  use of the Web site?

1          G. Christopher Imrey - September 23, 2010

2          A.    No.

3          Q.    Am I using the wrong name?

4                Is it because I didn't say Apollo

5    Enterprise Solutions?

6          A.    Yes.

7          Q.    Apollo Enterprise Solutions has regular

8    telephone calls every Friday to discuss the use of

9    the Web site?

10         A.    I believe so.

11         Q.    Were you ever involved in those

12   telephone calls?

13         A.    No.

14         Q.    You're not involved in them now?

15         A.    No.

16         Q.    Have you ever met with Betsy Williams

17   of Dealer Financial Services?

18         A.    Yes.

19         Q.    Have you ever met with Blesita

20   Tanovitch of Dealer Financial Services?

21         A.    Yes.

22         Q.    Do you know that Dealer Financial

23   Services uses My Easy Payment Web site?

24         A.    Yes.

25         Q.    Do you know how customers are

1          G. Christopher Imrey - September 23, 2010
2    authenticated for Dealer Financial Services' use of
3    the My Easy Payment Web site?
4          A.    No.
5          Q.    Do you know if there are other
6    departments that use the My Easy Payments Web site?
7          A.    Currently?
8          Q.    Currently.
9          A.    No.
10          Q.    No, you don't know?
11          A.    I don't understand the question.
12          Q.    You said no.  But does that mean, no,
13    you don't know; or, no, nobody else uses the Web
14    site?
15          A.    No, I don't know.
16          Q.    What else was discussed at the October
17    2005 meeting?
18          A.    Their existing solution.
19          Q.    What were you told about that?
20          A.    That it was a Web-based collections
21    portal.  That it was very inflexible and hard-coded.
22    And that our design architecture and solution were
23    not hard-coded.  And were configurable.  And one
24    could program in rules and decision elements very,
25    very easily.  And so Bank of America could control

```
 1           G. Christopher Imrey – September 23, 2010
 2      that process.  So they became very excited about
 3      working with Apollo.
 4           Q.    Who was at that meeting?
 5           A.    Julie Gonzales and Ed Dewispelare.
 6           Q.    And you?
 7           A.    And me.
 8           Q.    Just the three of you?
 9           A.    Hmm-hmm.
10           Q.    Was anything else discussed at that
11      meeting?
12           A.    I don't recall.
13           Q.    Was pricing discussed at that meeting?
14           A.    No.
15           Q.    Was there a discussion at that meeting
16      about which customers would use the Web site?
```

G. Christopher Imrey – September 23, 2010

15      Q.     I'm going to show you a document that

16 was marked yesterday at Ms. Gates' deposition.  It's

17 Exhibit 3.

18              Do you recognize that document?

19      A.     Yes.  Actually, I'm sorry.  There's an

20 E-mail on the top of this document.  And I haven't

21 read through the entire document.  So I can't say

22 that I recognize everything.  I recognize the first

23 page, the E-mail.  That's it.

G. Christopher Imrey - September 23, 2010

    Q.    Mr. Imrey, now that you've had a chance
to look at it, do you recognize that document?  You
recognize the E-mail.  Do you recognize the
attachment?  And if it's any help to you, this came
from Apollo's file as I understand.

            MS. CLARK-WEINTRAUB:  It's my
        understanding, as well.

    A.    I don't know.

    Q.    You don't know if that is the document
that was attached to the E-mail from Ed Dewispelare
to Mike Walker, cc'ing you and some other people?

    A.    Correct.

    Q.    On November 17, 2005, Ed sent you this
E-mail that is in front of you as Exhibit 3 to the
Gates deposition; is that correct?

    A.    I don't know.  I don't know if this
version, this was.

    Q.    I'm not asking about that.  I'm asking
about the E-mail.  He sent you this E-mail?

    A.    Yes.

1       G. Christopher Imrey - September 23, 2010

2       Q.    Was that the first time that you had

3   seen a draft of the Bank of America contract where

4   Apollo --

5       A.    Yes.

6       Q.    Assuming that this is the attachment

7   which is what it has been represented to us by your

8   counsel as presented to them by Apollo, this would

9   have been the first draft of the Bank of America

10  contract that came to Apollo Enterprise Solutions?


14                    THE WITNESS:  Please restate the

15       question.

16       Q.    You said you can't be sure that this

17  attachment is the attachment that was for this

18  particular E-mail?

19       A.    Correct.

20       Q.    Is that true for every E-mail that you

21  see that is in a hard copy?

22       A.    No.

23       Q.    Do you keep electronic copies of

24  E-mails at Apollo Enterprise Solutions?

25       A.    Yes.

1          G. Christopher Imrey – September 23, 2010


7          Q.    If you could turn to the schedules in
8    this attachment.   Schedule C, the servicing levels
9    is blank; is that correct?   Schedule D.
12                    MS. MORRIS:   Schedule D, the
13              service levels.   Then it says reproduced on
14              following pages.
15          A.    Right.
16          Q.    But there's nothing there.
17          A.    Yes.
18          Q.    And Schedule C, service fees and
19    training, do you know if that is the form that was
20    used in the final contract?
21          A.    No.
22          Q.    No, you don't know?
23          A.    No.   I recall that it was a different
24    schedule; not necessarily this Schedule C.   And then
25    not necessarily this form.

1          G. Christopher Imrey - September 23, 2010
2          Q.     Who negotiated the pricing for the
3  agreement between Apollo Enterprise Solutions and
4  Bank of America?
5          A.     Myself and Ed Dewispelare.
6          Q.     And who for Bank of America?
7          A.     Julie Gonzales and Ahn Gates.
8          Q.     If you could turn to page 8 of the
9  attachment there, 6.1.
10         A.     Yes.
11         Q.     It states that this agreement shall
12 apply and remain in effect from the effective date
13 and perpetually thereafter unless terminated
14 pursuant to the following section; is that right?
15         A.     Yes.
16         Q.     Was that the final agreement for the
17 term of the contract?
18         A.     No.
19         Q.     Do you know who suggested the change to
20 that?
21         A.     It was mutually agreed upon.
22         Q.     Do you know who first suggested the
23 change to that?
24         A.     No.  Actually, I believe it was the
25 bank, now that I think about it.  Because they

1          G. Christopher Imrey – September 23, 2010

2   wanted to limit it to a two-year term.

3          Q.     What did Apollo want?

4          A.     Apollo wanted a five-year term.

5          Q.     And you mutually agreed on a two-year

6   term with renewal?

7          A.     Correct.

14         Q.     Section 6.2 states, Bank of America may

15  terminate this agreement for its convenience; is

16  that correct?

17         A.     Well, it says a lot more than that.

18         Q.     Does it also say that?

19         A.     Part of the first sentence says that.

20         Q.     Does it say that Apollo Enterprise

21  Solutions can terminate for convenience?

22         A.     No.

G. Christopher Imrey - September 23, 2010

Q.    I'm going to show you what was marked
as Exhibit 1 at Ahn Gates' deposition yesterday and
ask if you recognize that document?

A.    Yes.

Q.    What is it?

A.    This is a final version of the
financial service provider agreement signed by both
parties.

Q.    And is that your signature on the front
page?

A.    Yes.

Q.    I'm going to show you another document
that has been marked Apollo 628 to 643.  And ask if
if you --

            MS. MORRIS:  Actually, we need to
        have that marked Exhibit 9.

1          G. Christopher Imrey – September 23, 2010

2          A.    Yes.

3          Q.    What is that document?

4          A.    It's entitled, "Intelligent Debt

5    Settlement, IDS System Implementation, Statement of

6    Work."

7          Q.    What was it used for?

8          A.    This looks like a template that we

9    started from and describing a statement of work.

10         Q.    The statement of work for Bank of

11   America's online payment project?

12         A.    Yes.  Well, you said Bank of America's

13   online payment project?  I don't believe that is the

14   title of it.

15         Q.    This is for the statement of work for

16   what became the application service provider

17   agreement; is that right?

18         A.    Yes.  I believe so.

19         Q.    Was this statement of work ever

20   finalized?

21         A.    I don't know.

22         Q.    Do you know if there is a copy of this

23   statement of work?

24         A.    I don't know.

```
 1              G. Christopher Imrey - September 23, 2010
12                    MS. MORRIS:  I'm going to ask the
13         court reporter to mark this document as the
14         next exhibit which, I believe, is Exhibit 10.
15                    (Document entitled, "Intelligent
16         Debt Settlement" marked Exhibit 10 for
17         identification as of this date.)
18         Q.    Do you recognize that document?
19               Would you like to go off the record
20   while you read it?
21         A.    No.  It's not that many pages.  Yes.
22         Q.    What is that?
23         A.    This is a more fleshed out version of
24   the Intelligent Debt Settlement IDS System
25   Implementation, Statement of Work.
```

```
 1              G. Christopher Imrey - September 23, 2010
 2         Q.    And is this a document that was
 3    prepared by Apollo Enterprise Solutions?
 4         A.    Yes.
 5         Q.    Can you turn to page 3 under number 2,
 6    objective.  The fourth subparagraph states, project
 7    to be completed within the estimated costs levels
 8    agreed to by both parties.  See Exhibit B, project
 9    financial model; is that right?
10         A.    Yes.
11         Q.    What is the project financial model?
12         A.    The project financial model was a
13    delineation of the costs and charges that will be
14    incurred by Bank of America for installation,
15    configuration, licensing transactions.
16                   MS. MORRIS:  Can you mark that as
17         the next Exhibit 11.
18                   (Document bearing production Nos.
19         Apollo 600 and 601 marked Exhibit 11 for
20         identification as of this date.)
21         Q.    Do you recognize that document?
22         A.    It seems to be a version of the
23    document.
24         Q.    Of which document?
25         A.    Exhibit B.  Pricing financial model.
```

1          G. Christopher Imrey - September 23, 2010

2          Q.    That's Exhibit B to the document that's

3    marked as Exhibit 10?

4          A.    I'm not sure.

5          Q.    Going back to page 3 in number 2, the

6    objective that refers to Exhibit B, quote, project

7    financial model, end quote; does it not?

8          A.    Yes.

9          Q.    And this document at Apollo 601 has at

10   the top of it, Exhibit B, project financial model?

11         A.    Yes.

12         Q.    Do you know if this document which has

13   been marked as Exhibit --

14                    MS. CLARK-WEINTRAUB:   11.

15         Q.    -- 11, is Exhibit B to the document

16   that is Exhibit 10 to this deposition?

17         A.    It appears to be a version of it.

18                    MS. MORRIS:  I'm going to ask the

19         court reporter to mark the next exhibit which

20         is Exhibit 12.

21                    (Copy of a PowerPoint

22         presentation marked Exhibit 12 for

23         identification as of this date.)

24         Q.    Do you recognize that document?

25         A.    Yes.

1        G. Christopher Imrey - September 23, 2010

2        Q.    What is that?

3        A.    This is a PowerPoint presentation that

4   was given to Julie Gonzales for presentment for her

5   internal group.

6        Q.    And who gave that PowerPoint

7   presentation?

8        A.    Who gave it to Julie Gonzales?

9        Q.    Yes.

10        A.    Oh, I think it was either myself or Ed.

11        Q.    On the bottom of the first page and

12   actually on every page it says, February 22, 2006.

13             Do you recall if that was about the

14   time the presentation was given?

15        A.    Yes.

16        Q.    Yes, it was about that time?

17        A.    When you say "presentation given," we

18   showed this to Julie Gonzales.  We gave her the

19   presentation.  And then, apparently, she internally

20   presented it within Bank of America.  And I don't

21   know the specific date of her presentation so...

22        Q.    What was the date of your presentation?

23        A.    Around this time frame.

24        Q.    At the bottom of the last entry on the

25   first page states, "The Apollo system incorporates

1        G. Christopher Imrey – September 23, 2010
2    bureau data and analytics in order to present
3    customers with intelligent payment or settlement
4    offers that best fit their current ability to pay."
5        A.    Yes.
6        Q.    As it is used now, does the Apollo
7    system incorporate bureau data and analytics to
8    present customers with an intelligent payment or
9    settlement offer?
10        A.    I'm sorry.  Repeat the question,
11    please.
12        Q.    As the Apollo system is used now, does
13    it incorporate bureau data and analytics in order to
14    present customers with intelligent payment or
15    settlement offers?
16        A.    Yes.
17        Q.    What's the bureau data that is
18    incorporated?
19        A.    Scores.
20        Q.    What are the scores used for?
21        A.    Scores are used for a variety of
22    features and functionality.  They can be work flows.
23    Different sets of offers.  Different look and feel
24    different trigger multi-life cycle events.
25        Q.    Has Bank of America provided

1          G. Christopher Imrey - September 23, 2010

2     authorization to Apollo to access the scores of its

3     individual customers?

4          A.    No.

5          Q.    Are the scores used by Apollo to

6     develop an intelligent payment or settlement offer?

7          A.    I don't -- Apollo doesn't offer any

8     settlement offers because Apollo is not a collection

9     agency or a licensed agent of the bank.  Apollo

10    simply is a solutions provider.

11         Q.    Who uses the scores from the bureaus to

12    develop an intelligent payment or settlement offer

13    to make to the customer?

14         A.    The client.

15         Q.    Bank of America?

16         A.    No.

17         Q.    Which client?

G. Christopher Imrey – September 23, 2010

13      A.      Okay.  All right.

14              Bank of America, from what we were led

15      to believe, incorporates bureau data as part of its

16      scoring and analytics and an account segmentation

17      and status codes.

18      Q.      When Apollo Enterprise Solutions was

19      offering its services to Bank of America was Apollo

20      Enterprise Solutions offering to do those analytics

21      to present the customers with an intelligent payment

22      or settlement offer?

23      A.      Well, the system is configurable.  So

24      either, you know, the bureau data could be retrieved

25      by the bank passed to, the credit report could be

1        G. Christopher Imrey - September 23, 2010

2   passed to Apollo.  The Apollo system can go retrieve

3   the credit report independently using the bureau

4   codes of the bank on behalf of the bank.  Since

5   they're the owner of the credit report and have

6   permissible purpose to pull the credit report.  The

7   credit report could be pulled by the bank and used

8   to compile and segment accounts.  And then, you

9   know, give a code of 1 to 5, for example.

10              And then, you know, the accounts, you

11  know, everybody -- that's a 2, had some bureau data

12  or analytics to used to calculate what a 2 is.  And

13  then the system could be configured to go present

14  different offers to somebody's who's categorized as

15  a 2.

16              So there's many different methods of

17  implementation that can be used.  And so it's simply

18  configurable.

19          Q.    Which method is used now?

20          A.    I believe that Bank of America

21  incorporates bureau data or they pull the credit

22  report themselves.  They do not pass it to us.  And

23  they use it to mark and segment accounts internally.

24          Q.    Moving to page 3.

25          A.    Yes.

1           G. Christopher Imrey - September 23, 2010

2           Q.    IDS Pay.  It states, "The IDS Pay," and

3    then the trademark symbol there, "System, provides a

4    secure platform for customers to pay their current

5    accounts on line."

6                 Is that what it says?

7           A.    Yes.

8           Q.    Is that your understanding of IDS Pay?

9           A.    Yes.

10          Q.    IDS Collect.  The IDS Collect system

11   uses account history scoring an analytic and bureau

12   data to provide intelligent offers to customers to

13   self-secure their delinquent accounts with

14   individualized payment terms.

15                Is that your understanding of IDS

16   Collect?

17          A.    Not exactly.

18          Q.    What is your understanding of IDS

19   Collect?

20          A.    Well, it can use account history

21   scoring and analytics.  And can use bureau data.  So

22   those are options at the customers, you know, or the

23   clients -- sorry.  The client's request.

24          Q.    When IDS Collect is not using those

25   options, what is it doing?

1          G. Christopher Imrey - September 23, 2010

2          A.     It decisions the customers to determine

3    their status.  And then presents options that don't

4    use account history, scoring and analytics.  But the

5    IDS Collect refers to an account in a status which

6    is greater than 30 days delinquent and less than a

7    pre-charge off.

8               IDS Recover refers to an account that

9    is charged off or post-180 days.  So the difference

10   between Pay, Collect and Recover is the status of

11   the customer and the level of delinquency, which

12   system is being used.

13         Q.     And what do you rely on for your

14   definitions?

15         A.     The industry standard definitions.

16   Federal Reserve Board definitions, government

17   agencies, credit bureau reporting, and fact

18   definitions.

19         Q.     And do those different definitions

20   include the term IDS Collect or just collect?

21         A.     Well, just collect or collections.

22         Q.     And do they include the term IDS

23   Recover or just recover?

24         A.     Recover or charge-off or recovery.

25         Q.     On page 18 in the box, the phrase in

1        G. Christopher Imrey - September 23, 2010
2   there says, "The Apollo IDS self-settlement system
3   authenticates the user and pulls a real-time credit
4   report."
5        A.    Yes.
6        Q.    What is the Apollo IDS Self-Settlement
7   system?
8        A.    That's the application.
9        Q.    Which application?
10       A.    The Intelligent Debt Solution system.
11       Q.    So the Intelligent Debt Solution,
12  Intelligent Debt Solution system authenticates the
13  user?

16       A.    No.  The Apollo Intelligent Debt
17  Solution Self-Settlement system authenticates the
18  user.
19       Q.    How is the self-settlement system
20  different or added to the term IDS?

23                 THE WITNESS:  Repeat the
24       question, please.
25       Q.    What does self-settlement mean?

1        G. Christopher Imrey - September 23, 2010

2      A.   Self-settlement means that a customer

3 or end-user interacts with any type of electronic

4 device and does not involve a human.

5      Q.   Does the Apollo IDS system as used for

6 Bank of America, pull a real-time credit report when

7 a customer logs on?

8      A.   No.  But it does pull the Experian

9 authentication scores.

10      Q.   Page 19 the IDS decision engine.  And

11 there's an explanation that says, "The IDS decision

12 engine computes, calculates and generates multiple

13 settlement offers for the customers based on the

14 customer's current ability to pay and customer's

15 account history."

16         Did I read that correctly?

17      A.   Yes.

18      Q.   Does the IDS decision engine do those

19 things for Bank of America?

20      A.   It does portions of those things.

21      Q.   Which portions of those things does it

22 do?

23      A.   The decision engine computes,

24 calculates and generates multiple offers for the

25 customer.  And it's not necessarily based on the

G. Christopher Imrey - September 23, 2010

customer's current ability to pay.  But it is based
upon the customer's account history.

Q.    And that information that is used to
compute that is provided by Bank of America; is that
right?

A.    Yes.

Q.    The IDS parser on page 19 is described
as, quote, The IDS parser, extracts and calculates
user defined credit report items and up to the
minute account data.  The IDS parser then submits
both the calculated bureau and account data to the
IDS decision engine for decisioning intelligence,
end quote.

Did I read that correctly?

A.    Yes.

Q.    Does the Apollo Web site provide that
service for Bank of America?

A.    Yes, in part.

Q.    In what part?

A.    Well, the parser extracts and
calculates the credits, the authentication scores.
It brings in up to the minute another account data.
Submits those to the decision engine for
authentication.  Once the customer's authenticated,

```
 1          G. Christopher Imrey - September 23, 2010
 2    the account data is submitted to the decision engine
 3    for decisioning intelligence.
 4          Q.    What is decisioning intelligence?
 5          A.    Decisioning intelligence is the ability
 6    to create a decision and to present different offers
 7    for different types of accounts and different
 8    statuses, different work flows.
 9          Q.    Okay.
10          A.    Different presentment of screens or
11    pages and different content.  Look and feel.  Layout
12    of pages.  And also, you know, pre or
13    post-processing of accounts.
14          Q.    And all of that is determined by Bank
15    of America, if at all?
16          A.    Yes, yes.


19                I'm going to show you what was marked
20    as Exhibit 2 at Gates' deposition.  And I realize
21    maybe you have seen that declaration before.
22                Have you seen that declaration before?
23          A.    Yes.
24          Q.    Attached to it there are four exhibits
25    which are described in paragraph 4 of red line
```

1          G. Christopher Imrey - September 23, 2010
2    versions of the agreement.
3          A.    Yes.
4          Q.    Do you agree that those are red-lined
5    versions of the agreement?
6          A.    Which exhibits are you referring to?
7          Q.    Exhibit 1, 2, 3 and 4?
8          A.    Yes.
9          Q.    In Exhibit 1, 2, that declaration on
10   page 7, there's a red-lined change to paragraph 6.2.
11              Do you know who made that change?
12         A.    I don't know if this would have been
13   either Ahn Gates or Corinne Miller.
14         Q.    Do you know whether Ahn Gates or
15   Corinne Miller suggested a termination fee should be
16   inserted?
17         A.    This is pretty standard if there's a
18   termination prior to the end of the contract.
19   That's usually what is used to calculate it.  And it
20   looks like this one seems to be one of the
21   mid-interim revisions because we, Bank of America
22   had put, wanted a two-year term.  And so this is
23   1/24th, which would have been and then deleted is
24   36th, okay.  So the revision says deleted 1/36th.
25   So that the contract either goes in perpetuity where

1        G. Christopher Imrey – September 23, 2010

2    there's no termination, or it has an effective

3    termination date.  And then either party can choose

4    to or elect to renew the contract.  This version had

5    a three-year period for the termination of the

6    contract.

7        Q.    You know, I'm going to stop you

8    because my question was do you know who asked for

9    the termination fee to be inserted into the

10   contract?

11       A.    Well, this is a modification from 36

12   which would correspond to a termination in the

13   middle of the contract of a three-year agreement.

19       Q.    Did Apollo ask for a termination fee?

20       A.    It was pretty standard that termination

21   fee would be negotiated.

22       Q.    Let's go back to Exhibit 3 to the Gates

23   deposition on page 8.

G. Christopher Imrey - September 23, 2010

1

5          Q.     On page 8 is the attachment at 6.2.

6          Would you agree there is a no

7   termination fee in 6.2 in that contract?

8          A.     Yes.

9          Q.     Do you know who suggested that the

10  termination fee should be inserted into the

11  contract?

12         A.     No.  And now that I see this language,

13  I do recall that this was, a 6.2 was a clause that

14  Bank of America which is a nonstandard clause that

15  they could terminate for convenience.  And

16  typically, if the bank were, if we were to strike

17  that out and say we'll remove it entirely, 6.2, the

18  bank may come back with an offer to mitigate that

19  sentence with an offer to a termination fee if they

20  do decide to terminate for convenience.  So it may

21  have been introduced by Bank of America as a

22  concession.

23              MS. MORRIS:  I'm going to ask for

24         this to be marked as the next exhibit.

25              (Three-page document dated April

 1          G. Christopher Imrey – September 23, 2010
 2          4, 2006 marked Exhibit 13 for identification
 3          as of this date.)
 4          Q.    This is taken from the electronic
 5    version.  The April 4, 2006 version of the red line
 6    which is Exhibit 2 to the Gates declaration.

10          Q.    And if you go to page 7, 6.1 and 6.2.

23          Q.    Exhibit 2, it shows the red line
24    changes to those paragraphs.
25          A.    Which page?

1          G. Christopher Imrey - September 23, 2010

2          Q.     Page 7.

3          A.      Page 7.   Okay.


9          Q.     If you look at Exhibit 13, you will see

10   at the top there are a list of changes that are made

11   to page 7.   And as you suggested, there are some

12   changes here by Ahn Gates regarding the two and

13   three years!

14              Would you agree with me on that?

15          A.     Yes.

16          Q.     And then it states, page 7 inserted.

17   Corinne, quote, Bank of America shall also be

18   subject to a termination fee equal to one.

19              Would you agree that that shows that

20   Corinne Miller asked for that insertion?


23          A.     I don't know if she asked for it.

24   Typically somebody would be documenting a change

25   that was discussed.   So they may have agreed to it

1        G. Christopher Imrey - September 23, 2010

2  and then Corinne said, I'll insert the language or

3  Ahn agrees to it and she says I'll insert the

4  language.

5                So I couldn't tell you who requested

6  it.  But Corinne was clearly the inserter of that

7  information.  And if you look below, Ahn Gates

8  removes 36th.  She changes it to 24th.  So

9  therefore, they must have been in agreement to this

10  clause.  Because they wouldn't be negotiating if she

11  was not agreed to.  And if it was a request by

12  Apollo solely and not agreed to, it would have been

13  stricken.  The entire sentence would not have a

14  revision on it in the middle of 36 to 24th.  It

15  would have been stricken completely by Ahn Gates.

16                So the fact that she actually changes

17  the term, if you look at that date, the 4/7, she

18  changes the term from 3 to 2.  And she changes the

19  36 to 24 to correspond with the term.

20        Q.    So...

21        A.    Thereby signifying that this must have

22  been something that they were negotiating together

23  and were in agreement at that time.

24        Q.    So they were negotiating 6.1 and 6.2?

25        A.    Yes.  These are revisions to that

1       G. Christopher Imrey - September 23, 2010

2    paragraph.

3           What's interesting is that she makes a

4    revision of the --

8                MS. MORRIS:  I am.

9                I'm going to ask the court

10       reporter to mark this as Exhibit 14.

11                (Document bearing production Nos.

12       Apollo 155 through 204 inclusive, marked

13       Exhibit 14 for identification as of this

14       date.)

15       Q.    Do you recognize that document?

16       A.    No.

17       Q.    Did you say that you were one of the

18    people who negotiated the application service

19    provider agreement?


22       A.    Yes.

23       Q.    Did you see the various versions of it

24    that were exchanged?

25       A.    No.

G. Christopher Imrey - September 23, 2010

1     Q.    You did not?

2     A.    Not every one of them.  That's why you

say do I recognize this one?  No.  This is some

version.  I don't know which one it is.  And I don't

recognize it.

     Q.    Who else at Apollo was making changes

to the application service provider agreement?

     A.    Who else from whom?

     Q.    From Apollo Enterprise Solutions.

     A.    You mean who from Apollo was making

changes?

     Q.    Yes.

     A.    You said who else?  I don't understand

the question.

     Q.    Well, sorry.  We already saw that

Corinne was making changes and we discussed that.

           Other than Corinne, who else was

reviewing the application service provider agreement

and making changes to it?

     A.    No one.

     Q.    If this document was produced to us by

Apollo Enterprise Solutions in this litigation,

would you agree that it came from Apollo Enterprise

Solutions file?

1          G. Christopher Imrey - September 23, 2010

2          A.    I don't know.

3          Q.    If you look on page -- these don't have

4     numbers, so I'm going to use the Bates numbers,

5     Apollo 161.

6          A.    Yes.

7          Q.    There's this 6.1 again.  It appears

8     that there appears to be a deletion for the purposes

9     of this paragraph.  The value of this contract shall

10    be deemed to be $1 million.

11              Do you see that?

12         A.    Yes.

13         Q.    Do you remember the negotiations

14    regarding that million dollars?

15         A.    Vaguely.

16         Q.    What were the negotiations regarding

17    the million dollars?

18         A.    I believe it was a number that was

19    picked in order to determine what the termination

20    fee would be equal to when you divided it by this.

21              So Bank of America terminated without

22    cause at its convenience in month 6, and roughly

23    3/4ths of the one million dollars would be due or

24    $750,000 would be due.

25         Q.    Do you know who proposed the million

1      G. Christopher Imrey - September 23, 2010

2  dollars?

3        A.    No.

4        Q.    If you turn to page Apollo 164 under

5  Section 9.2, to the right there is a comment, two

6  comments that say, "Mike?"

7              Who's Mike?

8        A.    This appears to be Mike Walker.  And it

9  appears to be he was the chief operating officer of

10 Apollo Enterprise Solutions.  And this appears to be

11 a comment, probably by Corinne, to ask Mike about

12 the ability to comply with furnishing source code

13 escrow, or what versions were in source codes

14 escrow, or what versions or commitments to service

15 level commitments or SLAs.  So she was probably

16 referring making a note to herself to discuss that

17 with Mike.

18       Q.    If you turn to Apollo 172, under

19 paragraph 25.2.

20       A.    Yes.

21       Q.    Do you remember negotiations regarding

22 that paragraph?

23       A.    Talking about 25.2 you said?

24       Q.    25.2.  Yes.

25             Under confidentiality and information

1    G. Christopher Imrey - September 23, 2010

2    protection.

3         A.    Yes.  It even references.  It says,

4    upon expiration or termination of this agreement --

5    the expiration refers to the contract expires, the

6    term of the contract expires must be mutually

7    renewed upon by both parties.  The termination by --

8         Q.    I'm going to have to stop you.

9         My question was do you remember

10   negotiations regarding that paragraph?

11        A.    Not this specific revisions.

12        Q.    So you don't know which party, whether

13   it was Apollo Enterprise Solutions or Bank of

14   America, N.A. that was asking for changes to 25.2?

15        A.    Well, typically, if I was to look at

16   the comments in the margin as what was deleted, it

17   seems that Bank of America is deleted.  And it says

18   the recipient, we have confidential information,

19   Apollo has confidential information, and the clients

20   have confidential information.  And it's very

21   typical for us to want to protect our confidential

22   information.  And it's a two-way street.  And it

23   looked like this was a one-way street.

24        So it said that looks like the

25   revisions were asking that either party properly

1            G. Christopher Imrey – September 23, 2010

2    return to the discloser, rather than Apollo return

3    to Bank of America or Bank of America return to

4    Apollo.  So that way it was a two-way street of

5    confidential information.

6            Q.    Can you turn to Apollo 173.

7            A.    Yes.

8            Q.    Do you see changes to paragraph 25.6.

9                  My question is do you recall

10   negotiations regarding paragraph 25.6?

11           A.    No.  I don't recall any specific

12   negotiations on 25.6.

13           Q.    Do you recall negotiations on the 25.7?

14           A.    No.  I don't recall any specific edits

15   here.

16           Q.    Would you agree that page Apollo 173

17   reflects edits of the 5.6 and 25.7?

18           A.    Yes.

19           Q.    The very last partial paragraph at the

20   bottom, 25.10.1, again, there's a comment Mike – all

21   make mutual.

22                 Would you think that's another comment

23   from Corinne?

G. Christopher Imrey – September 23, 2010

1

2     A.    Yes.  It appears to be another question

3  that she has regarding this.  Because this, again,

4  dealt with some operational components:  Accept,

5  transmit, store or otherwise impact.  And then it

6  talks about the Bank of America security

7  requirements.  Which again, would be, she wanted to

8  ask Mike about.  And she writes, "What are these?"

9  And then highlights it on the next page.

10           And actually going on to the next page

11  there are a few other notations under 25.1.2

12  questions.  And again, also with Mike's name.

13           Do you again think those are from

14  Corinne?

15     A.    Yes.

16     Q.    Moving to Apollo 180 under paragraph

17  36.4.

18           Would you agree that that looks, again,

19  as if there is some negotiation going on and there's

20  a comment shown by the comment and to check with

21  legal?

24     A.    This is almost illegible, this comment.

25  So I definitely want to check with legal.  This is

1        G. Christopher Imrey – September 23, 2010

2   some revisions there.  And then I think it looks to

3   me like it's a Corinne comment which says that Ahn

4   was going to check with legal regarding whether or

5   not this could be, whether this language is mutually

6   agreeable.  But I can't even tell what it says.

22              MS. MORRIS:  I'm going to ask the

23        court reporter to mark this document with the

24        next exhibit number 15.

25              (Document bearing production Nos.

```
1          G. Christopher Imrey – September 23, 2010
2           BANA-02837 and 02837-0002 marked Exhibit 15
3           for identification as of this date.)
4          Q.    Mr. Imrey, the top E-mail does not
5    involve you.  But the one underneath, do you
6    recognize that?
```

1          G. Christopher Imrey - September 23, 2010

7          Q.     Do you recognize the E-mail, Tuesday

8    July 8, 2008 from Mike Walker?

9          A.     Yes.

10         Q.     Who is Jim Mahoney?

11         A.     Jim Mahoney was our EVP of business

12   development.  And was helping us to get the recovery

13   side accounts deployed.

14         Q.     In the second paragraph Mike Walker

15   refers to open side settlements on credit card

16   accounts.

17                What does that term mean?

18         A.     An open side is a pre-chargeoff or

19   collect account.

20         Q.     Did you discuss this E-mail with Mike

21   Walker before he sent it out?

22         A.     I don't recall.

23         Q.     In July of 2008 you were the president

24   of Apollo Enterprise Solutions; is that right?

25         A.     Correct.

1          G. Christopher Imrey - September 23, 2010
2          Q.     And you were also the CEO at that time
3    or was there no separate CEO?
4          A.     We became an Inc. right around this
5    time period.  So I'm not sure.  President of the
6    LLC.  And we had no CEO.  Typically not a CEO of an
7    LLC.  I became president CEO of the Inc. on its
8    formation, around July or August of 2008.
9          Q.     In this Mike Walker states, "Apollo
10   will not submit any invoice or request for payment
11   regarding open side settlements that have not been
12   completely agreed to in advance between Bank of
13   America and Apollo."
14             Did I read that correctly?
15         A.     Yes.
16         Q.     Do you recall any discussions at Apollo
17   Enterprise Solutions regarding that?
18         A.     Yes.
19         Q.     What was discussed?
20         A.     Well, this was a result of a meeting
21   that we had had with Sharon Stockton, Julie Whitmore
22   via phone, Jim Mahoney, Alex Rhoads, Vinnie Iacconno
23   in Newark on June 26th, and John Verjanek.  And John
24   Verjanek had found that there were recover accounts
25   going through the system.  And when we presented

1          G. Christopher Imrey – September 23, 2010

2     that to the bank, Sharon Stockton said that there

3     were no recover accounts going through the system.

4               And then we were talking about pricing.

5     We had gone to the bank to ask for, to say that we

6     needed more money for the contract.  Because we

7     needed to renegotiate the pricing because they

8     currently -- the volumes were increasing on the

9     site.  The system was starting to reach capacity.

10              We had now turned on an additional line

11    of business, DFS.  And we were also moving to add

12    redundancy in the system.  We were asked by the bank

13    to include disaster recovery plans and business

14    continuity plans additionally to support more

15    sustained critical operations.

16              So the 10,500 a month that was used to

17    support some of the base, baseline components of the

18    system was grossly inadequate.  Apollo had already

19    spent, you know, money and time and effort trying to

20    accommodate the limitations of that amount.  And we

21    wanted to fix the pricing metrics that existed with

22    recover accounts and with collect accounts.

23              And this was, Sharon Stockton made a

24    comment about the open side settlements were a

25    program of a batch of specific account numbers that

1          G. Christopher Imrey – September 23, 2010
2     the bank was going to provide.  And have the
3     customers then have the ability to receive
4     settlements and differentiated set of offers.  And
5     she had said something about there was no decision
6     fee.  And that we were not going to be charging her
7     a decision fee.  And we said that absolutely there's
8     a decision fee that would be charged anytime a
9     decision is made in the system.

1          G. Christopher Imrey – September 23, 2010

20                    MS. MORRIS:  I'm going to ask the

21          court reporter to mark this as the next

22          Exhibit 16.

23                    (Document entitled, "Bank of

24          America MEP/FIA Project" marked Exhibit 16

25          for identification as of this date.)

```
 1            G. Christopher Imrey - September 23, 2010
 2        Q.    Mr. Imrey, do you recognize that
 3   document?
 4        A.    Yes.  This looks like a documentation
 5   update of the Web site.  Apollo maintains a current
 6   copy of functionality.  And typically when changes
 7   are introduced into the system or new functionality
 8   exists or new features that are added, a document
 9   like this is generated to document what is occurring
10   on the site.  This seems to be a portion of that.
11        Q.    On page 2 of 16 it states, July 3,
12   2010; is that right?
13        A.    Yes.
14        Q.    On page 11 of 16 under summary of
15   functionality, the subheading is functionality for
16   current or past due accounts; is that correct?
17        A.    Yes.
18        Q.    Then there's a separate heading for
19   functionality for only past due accounts?
20        A.    Yes.
21        Q.    And on page 12, the last heading is
22   settlement options, open paren, for delinquent
23   customers, close paren; is that right?
24        A.    Yes.  This is my first time seeing this
25   document.  But this is exactly what we would -- type
```

1       G. Christopher Imrey – September 23, 2010

2  of document, what happens for delinquent customers

3  and what type of settlement offers they would get

4  and how it's deployed.

5      Q.   On page 15 of 16 under changes in this

6  release, the first box has settlements for some past

7  due accounts the MEP and FIA sites now provide

8  settlement offers for certain eligible past due

9  accounts.  This is a new feature that did not exist

10  in the previous release; is that correct?

11      A.   That's what the text says, yes.

12      Q.   Was that correct?

13      A.   Yes.

14      Q.   Going back to page 12 under settlement

15  options...

16      A.   Yes.

17      Q.   The third paragraph states, "When an

18  account becomes delinquent it gets assigned to FIA

19  card services for internal recovery so every

20  delinquent account which is eligible for the

21  settlement options, see the FIA branding on the

22  remaining Web pages (even if it is a BAC account)."

23      What does that mean?

24      A.   Well, this would be an example of a

25  decision being performed that says if the account is

1          G. Christopher Imrey - September 23, 2010

2     delinquent it gets assigned to FIA card services.

3     So this would now say that every delinquent account

4     which is eligible for settlement, which is another

5     decision, see the FIA branding on the remaining Web

6     page.

7               So if somebody logs into the Bank of

8     America branded site which would be

9     MyEasyPayment.com or MiPagoFacil.com, the site is

10    branded with Bank of America logos, colors, et

11    cetera.  FIA card services is MyEasyPayment.  And

12    MiPago FIA, MiPagoFacil, or something like that

13    which is the Spanish version of the generic branded

14    FIA site which is a different color.  No logos.  And

15    was used to allow customers that had a nonbranded

16    Bank of America credit card to log on and use the

17    site.  The nonbranding would be, you know, Canadian

18    card.  A Bank of Nova Scotia type card.  A card that

19    is issued, appears to be issued by a branded entity.

20    Not Bank of America.

21               The name of FIA card services it says

22    was used for internal recovery.  So it appears that

23    Bank of America would be calling the customer or

24    sending them a letter saying bank services is now

25    contacting you to receive payment for every

 1          G. Christopher Imrey – September 23, 2010
 2    delinquent account which is eligible for settlement
 3    options.
 4              So, in this case the decisioning,
 5    decision engine was configured to change the
 6    branding, look and feel of the content of the site.
 7    To remove the Bank of America logo.  Change the
 8    color to a green which was the FIA card services
 9    once a customer logged in for all the remaining
10    pages.
11          Q.    So were all delinquent customers being
12    pushed onto those pages?
13          A.    No.  This is an example of the decision
14    engine having a different work flow for customers
15    that have a different status code.  In the case of
16    an FIA customer who happens to be eligible for
17    settlement options, they would then be presented
18    with two options.  And the branding would stay the
19    same as green and the content would be the FIA
20    branding.
21              In the case of a Bank of America
22    branded login, the decision engine would render the
23    screen to change to green, to the FIA.  Would then
24    present the additional settlement options to make a
25    single discounted payment today to settle for less

1        G. Christopher Imrey - September 23, 2010

2   than the full amount or to make three equal payments

3   over time to add up to the full amount.

4        Q.    In the last paragraph, it states, "For

5   the discounted settlement the bank provides a floor

6   percentage (specified separately for each account in

7   the table of delinquent accounts) then Apollo simply

8   ads 5 percent to it.  This is all we can do in the

9   initial release of settlement options because the

10  bank is unwilling to share their rules for

11  calculating the discount.  And they will not provide

12  the customer's full Social Security number which is

13  required for pulling an Experian credit report."

14            Is that what it says?

15        A.    Yes.

16        Q.    The settlement offer then was provided

17  by Bank of America; is that correct?

18        A.    Well, this looks like an implementation

19  where the decision engine would calculate what is

20  shown on the screen.  And this is a description of

21  the method of implementation for, you know, this

22  case it's using, the decision engine uses a file

23  that it is provided and each the file and account

24  number.  So when a customer would log in, if the

25  customer's account number existed in the file so the

1          G. Christopher Imrey - September 23, 2010
2     decision engine will run and then would check the
3     table of delinquent accounts.  And then they would
4     provide a floor percent in that table it appears.
5     And then the calculated items would be created by
6     adding, multiplying the floor percent times the
7     current balance.  And then adding 5 percent, the 4
8     percent plus 5 percent times the current balance.
9     Which looks like they discounted single payment for
10    less than the phone number amount.  So that was the
11    method that was used to implement this.  It's one of
12    the various methods of using the decision engine to;
13    A, modify the work flow and the prior paragraphs.
14    To modify the content, the look and feel.  And then
15    claimant elements that come from various parties; in
16    this case, the file provided by the bank.  And then
17    perform additional logic to be, you know, increase
18    the 4 percent or some other number.  Multiply and
19    calculate out those elements and then present them
20    onto the page.  And it says this is all we can do in
21    the initial release of some options because the bank
22    is unwilling to share their rules for calculating
23    discount.  So this was quite -- this is quite more
24    of a nonstandard implementation.  Because typically
25    the rules for calculating the discount would be

1            G. Christopher Imrey - September 23, 2010

2    included and marked as part of the profile.  So that

3    additional options and information that provided by

4    the customer of the Web site or third-party

5    providers such as Experian could be incorporated

6    into the offers.

7                 But this was the first pass.  So on the

8    first pass the data elements were, you know, didn't

9    include the Apollo system providing a pulling credit

10   report.

11                Oh, I notice that there's also

12   additional --

16                    MS. MORRIS:  I'm going to ask the

17          court reporter to mark this document as the

18          next Exhibit 17.

19                    MS. CLARK-WEINTRAUB:  Yes.

20                    (Document bearing production Nos.

21          Apollo 852 and 853 marked Exhibit 17 for

22          identification as of this date.)

23          Q.    Do you recognize this document?

24          A.    No.

25          Q.    Do you recognize the E-mail on Apollo

1          G. Christopher Imrey - September 23, 2010

2     853 from Adrian Gluck to you dated April 30, 2010?

3          A.     Yes.

4          Q.     Do you recognize the E-mail above it

5     from you to Adrian Gluck dated April 30, 2010?

6          A.     Yes.

7          Q.     In the first E-mail, Mr. Gluck asked

8     for the definition of Web hit.  And in the second

9     you responded, "Evan will E-mail you the one used

10    with our lawyers."  Is that correct?

11         A.     Yes.

12         Q.     How many different definitions of Web

13    hits were there?


18         Q.     In your answer you said, "Evan will

19    E-mail you the one he used with our lawyers."

20                How many were there?

21         A.     Oh, there's only one definition of Web

22    hit.

23         Q.     Is that the definition used by Evan

24    Pinchuk in his E-mail to Adrian Gluck of April 30th

25    on the first page?

1        G. Christopher Imrey – September 23, 2010

2        A.    Well, this appears to be a summary of

3    that.   That is the definition of Web hit.   And

4    there's an industry standard term.

5        Q.    But that's not the definition of Web

6    hit from Wikipedia; is it?


9        A.    Well, interestingly enough, Wikipedia's

10   definition of Web hit, this actually appears to be

11   what it used to be.   It's been revised.   It's been

12   changed mysteriously.   And actually now refers to

13   not Web hits.   It actually, there is no definition

14   of Web hit.   It actually refers to another page

15   which was changed subsequent to the termination

16   notice from Apollo.

17            Mysteriously, Wikipedia has also

18   identified that in the revisions to that page of Web

19   hit, the person or persons identified had been

20   identified, had been characterized and identified by

21   Wikipedia as being rogue.   They had basically been

22   barred from use of Wikipedia.

23            This was actually a real surprise when

24   I went and looked it up the other day.   And so there

25   is no definition of Web hit on Wikipedia anymore,

1           G. Christopher Imrey - September 23, 2010
2    subsequent to I think it was January-February 2010.
3    Prior to January 2010, there was a definition of Web
4    hit on Wikipedia which is consistent with this
5    definition.
6                    MS. MORRIS:  I'm going to mark
7           this document which is your declaration in
8           this action, I think, next exhibit to the
9           this deposition.
10                   (Declaration of G. Christopher
11          Imrey marked Exhibit 18 for identification as
12          of this date.)
13          Q.    Do you recognize that document?
14                   MS. MORRIS:  Maybe we can just
15          stipulate that it was the declaration that
16          was filed in this action.
17                   MS. CLARK-WEINTRAUB:  Sure.
18          A.    Yes.
19          Q.    In paragraph 7, about halfway down you
20   state, "A Web hit is simply a request to a Web
21   server for a file."  And then you cite to Wikipedia.
22          A.    Yes.
23          Q.    Are you saying that that definition is
24   no longer there?
25          A.    Absolutely been modified and changed.

1          G. Christopher Imrey - September 23, 2010


7          Q.    Did you, from 2006 to 2009, did Apollo
8     Enterprise Solutions invoice Bank of America based
9     on the number of its Web hits?
10         A.    No.
11         Q.    Why not?
12         A.    We had no idea that there was that --
13    we didn't have any method of invoicing.  And there
14    was no pricing components for, you know, invoicing
15    based on -- we had not reviewed the -- strike that.
16         Q.    No, don't.  Carry on.
17         A.    I don't want to carry on in the
18    sentence, starting a fraction.

G. Christopher Imrey – September 23, 2010

1

4              THE WITNESS:  We were unaware

5      that there was a pricing element in the

6      contract that allowed us to charge for Web

7      hits.  And that the current site was

8      exceeding the limits that allowed us to

9      charge money for additional Web hits above

10     170,000.

11         Q.    How did you become aware that there was

12     that pricing in the contract?

13         A.    Well, when we, when -- I think it was

14     in the fall of 2009, we did a contract review of the

15     Bank of America contract.  And at that point we

16     discovered that there was this clause of 170,000 Web

17     hits.  And that anything over 170,000 Web hits was

18     billable or mutually through to be negotiated price,

19     I believe.  It's in one of the exhibits.

20         Q.    What are the costs for Web hits

21     exceeding $170,000 a month?

22         A.    Well, if you look at the base, the base

23     costs of, divide 170, 10,500 divided by 170,000

24     comes out to about 6 cents.  So the original

25     contract was pricing the Web hit in about 6 cents a

1      G. Christopher Imrey - September 23, 2010
2  transaction, 6 cents per Web hit.  And that basis
3  was used to calculate the value of the Web hits in
4  excess over 170,000.
5      Q.    So it was a pure mathematical
6  calculation?
7      A.    Yes.
8      Q.    Based on the terms of the contract of
9  payments?
10     A.    I'm sorry.  Pardon?
11     Q.    Based on the terms of the contract
12  payments under Schedule D?  C.  Sorry.  Schedule C.
13     A.    Yes.  Based on, based on, yes.  That's
14  correct.  It's Exhibit B in one place and Schedule C
15  in another place.
16     Q.    Are you familiar with the revised
17  invoices that were sent to Bank of America?
18     A.    Yes.
19     Q.    Do you know how Web hits was calculated
20  on those revised invoices?
21     A.    Yes.
22     Q.    How was it calculated?
23     A.    Well, we have a program installed
24  called CertStats which tracks a variety of different
25  elements of activity on the Web site.  And have

1        G. Christopher Imrey - September 23, 2010

2    archives of all the months of the sites since its

3    inception.

4              And so, when we originally discovered

5    that that 170,000 Web hits were being exceeded in

6    the fall of 2009, we started to perform an audit of

7    exactly how many Web hits were occurring on the

8    site.  And, you know, when those, you know, when

9    those Web hits happened.  And at what point did it

10   start exceeding the 170,000.

11             We went to the CertStats and went

12   through the archives.  And had the data were stored

13   from archive in the audit, we, the CertStats

14   reports, there are many different terms that are

15   used in CertStats reports.  And there's, you know,

16   there's a unique visitor.  There's an authentication

17   or a login.  There's a page view.

18             And so what you always do in the case

19   of trying to calculate resources that are consumed

20   by the site, the Web hits is the only method to

21   actually track that.  And that's why it was put into

22   the contract originally, was to try and create a

23   threshold for when, you know, for how much, how many

24   servers were provisioned and how many processors and

25   RAM and bandwidth was provisioned for the initial

1        G. Christopher Imrey - September 23, 2010

2   contract increased or went over the threshold.   Then

3   additional resources will be necessary.

4              We went and took a look at the actual

5   pages because we did not have the actual, you know,

6   Web hit in the CertStat report.  But we looked at

7   the pages and determined that there's an average of

8   eight Web hits per page view.  And then we

9   multiplied the page views, the number of page views

10  by 2, by 8, to calculate out the number of Web hits

11  that occurred.  Some of the pages have more than

12  eight Web hits.  Some of the pages have, you know,

13  less.  But it's pretty much around eight Web hits

14  per page.

15             And then we took the CertStats reports

16  and archived every single month on every single

17  site.  Because each one of the sites is tracked

18  independently and has its own statistics for

19  MiPagoFacil, Spanish again, and MyEasyPayment.

20             All of those were then used to sum up

21  and total up the total number of page views per

22  month of the combined sites.  And then that was

23  multiplied by 8 to calculate the correct and

24  accurate number of Web hits.

25        Q.   By correct --

```
1            G. Christopher Imrey - September 23, 2010
2        A.    For the month.
3        Q.    -- and accurate, you mean that you used
4   an average number to get to it?
5        A.    Yes, yes.
6        Q.    You said that there was an audit done
7   of the Bank of America contract in the fall of 2009;
8   is that correct?
9        A.    Yes.
10       Q.    Who was it who determined that there
11  should be that audit?
12       A.    One of the standard things that we did
13  in this company, or actually, I think it was upon
14  the due diligence and funding of Apollo in June
15  2009.  Did you say 2008 or 2009?
16       Q.    I think you said 2009.
17       A.    It was 2009, okay.  Fall of 2009.  So
18  upon the part of the due diligence was to go through
19  the contracts in detail.  And, you know, Evan
20  Pinchuk was assigned the task of reviewing each one
21  to make sure that we are in compliance in making
22  sure bank compliance was in compliance.
23       Q.    Did Moriah Partners review the
24  contracts of Apollo Enterprise Solutions before it
25  entered into the funding?
```

1          G. Christopher Imrey - September 23, 2010

2          A.     I believe they were furnished copies of

3     them.  I don't think that we had done an audit.  I

4     know that we didn't do an audit.


12         Q.     Prior to the audit in fall of 2009, had

13    Apollo Enterprise Solutions audited the agreement

14    with Bank of America before?

15         A.     No.

16         Q.     Were contracts with other customers

17    audited at the same time?

18         A.     Yes.

19         Q.     Were allegedly breaches found in those

20    contracts as well?

21         A.     I don't understand the question.

22         Q.     One of the allegations is that Bank of

23    America has exceeded its 170,000 Web hits a month.

24    And that that's a breach of the contract.

25                In doing the audits of Apollo

1          G. Christopher Imrey - September 23, 2010

2     Enterprise Solutions, other customers, were issues

3     found in those contracts as well?

4          A.    Yes.

5          Q.    In all of them?

6          A.    No.

7          Q.    How many were audited?

8          A.    I don't recall.

9          Q.    How many customers are there?

10         A.    I don't know.

11         Q.    Ballpark?

12         A.    Six, eight.

13         Q.    Were less than eight of them audited?

14         A.    I don't know.

15         Q.    Were less than all the audits found

16    problems?

17         A.    Repeat the question, please.

18         Q.    Were all the audits that were done of

19    their problems with the contracts for all of them?

20         A.    No.

21         Q.    Were there problems with the contracts

22    for half of them?

23         A.    No.

24         Q.    Were there problems with the contracts

25    for less than half of them?

1          G. Christopher Imrey – September 23, 2010

2          A.    Yes.

1              G. Christopher Imrey – September 23, 2010


19                    MS. MORRIS:  Mr. Imrey, I'm going
20        to ask the court reporter to mark this
21        collection of documents as the next exhibit.
22                    (Document bearing production Nos.
23        Apollo 679 through 687 inclusive, marked
24        Exhibit 19 for identification as of this
25        date.)

1          G. Christopher Imrey - September 23, 2010

2          Q.      Do you recognize those?

3          A.      Yes.

4          Q.      What are they?

5          A.      These appear to be the invoices for the

6    accounts that were in the one of the files that was

7    sent by Bank of America.

8          Q.      What do you mean by files?

9          A.      Well, one of the criteria for the

10   recovery for settlement offers, recovery accounts

11   that were eligible for settlement offers and

12   eligible for different monthly payments and

13   different options.

14              So the Apollo system, the person logs

15   in.  Performs a decision.  Determines that they're

16   eligible to have different settlement options

17   presented to them that were contained in a file that

18   was sent to us by Bank of America on a monthly,

19   monthly basis, I believe.  These are the -- this

20   is -- these are the bills for the accounts that were

21   in those files that paid.  That entered into a

22   settlement and then made payments.