# EXHIBIT A
# Part 1 of 5

**DEFENDANTS' SYNOPSIS OF THE DEPOSITION TESTIMONY OF DANA WASSAM**

Dana Wassam's deposition testimony completely contradicts assertions contained in her July 27, 2010 and August 23, 2010 declarations submitted in support of Bank of America's ("B of A's") motion for a preliminary injunction. B of A contends that it is entitled to a preliminary injunction because it will be irreparably harmed if Apollo is permitted to terminate the Contract on October 15, 2010. In this regard, Ms. Wassam stated in her declarations that "if access to the IDS software was terminated, customers would not be able to make online payments" and "it would take an estimated minimum of nine months for [B of A] to implement a new fully functional online payment website, including consumer adoption." *See* Dkt. # 7 at ¶¶ 10, 23. However, Ms. Wasam admitted during her deposition that 85% of the customers using the Apollo websites are able to make online payments through B of A's online banking site, and the remaining 15% will be able to do so by November 7, 2010. (Wassam Tr. at 62:15-63:9; 65:16-67:3; 82:8-82:24; 86:19-95:9; 176:3-177:4). In addition, customers are able to make payments by phone, through the mail, and at B of A branches. (*Id.* at 67:4-67:15; 177:5-177:10). Further, although Ms. Wassam's declarations state that in the event Apollo's services are terminated, B of A will experience a "vast" increase in call volume which will adversely affect "all" B of A consumer account customers and damage B of A's reputation (*see, e.g.,* Dkt. # 7 at ¶ 24), a line of business contingency plan prepared by B of A and reviewed by Ms. Wassam states that while "[c]all centers would have an increase in call volume . . . minimal impact has been noted during past outages" (Wassam Tr. at 145:16-151:20; 155:15-175:13). Indeed, Wassam testified that management of B of A's Card Services division, which accounts for 70% of the traffic over the Apollo websites, did not believe that the division required additional call center resources to handle the increased call volume expected in the event Apollo terminated its services. (*Id.* at 80:14-80:17; 133:5-133:14).

Ms. Wassam's deposition testimony also completely undermines her assertion in her declaration that both B of A and Apollo understood the term "web hit" as used in the Contract to mean "a unique visitor accessing the website." (*See* Dkt. # 7 at ¶ 19). Ms. Wassam was not involved in negotiating the Contract and could not identify any documents contemporaneous with the Contract's execution demonstrating that B of A understood the term to mean a "unique visitor accessing the website." (Wassam Tr. at 45:18-49:21; 51:15-55:11). Ms. Wassam's assertion in her declaration was based solely on statements made to her by Steven Demarest. (Wassam Tr. at 53:17-54:2). However, Mr. Demarest submitted a declaration in support of B of A's motion for a preliminary injunction, which Ms. Wassam reviewed before it was submitted, stating that he "does not recall any discussions regarding web hits" at the time the Contract was executed. (*See* Dkt. # 24 at ¶ 6, Wassam Tr. at 143:20-145:15). Ms. Wassam also conceded that even if B of A's definition of web hits is used the number of unique visitors accessing the sites each month exceeds the 170,000 figure used in Schedule C to the Contract. (Wassam Tr. at 55:12-61:3; 197:15-198:20).

Ms. Wassam's deposition testimony also supports Apollo's contentions (i) that the Apollo websites were originally intended to be used by delinquent credit card customers to make payments but that B of A redirected customers whose accounts were current to make payments using the Apollo websites (Wassam Tr. at 192:7-197:4); and (ii) that Apollo has not been paid for processing payments for "Collect" and "Recover" transactions received via the Apollo websites (*id.* at 189:10-192:6).

Page 1

1

2      UNITED STATES DISTRICT COURT

3      SOUTHERN DISTRICT OF NEW YORK

4      - - - - - - - - - - - - - - - - - - -x

5      BANK OF AMERICA, N.A.,

6                              Plaintiff,

7           -against-    Civil Action No.
                         10-5707 (DLC)

8

       APOLLO ENTERPRISE SOLUTIONS, LLC,

9      APOLLO ENTERPRISE SOLUTIONS, INC. and
       MORIAH PARTNERS, LLC,

10

                            Defendants.

11

       - - - - - - - - - - - - - - - - - - -x

12

                            31 West 52nd Street

13                          New York, New York

14

                            September 24, 2010

15                          10:14 a.m.

16

17           DEPOSITION of DANA WASSAM,

18     on behalf of the Plaintiff in the

19     above-entitled action, held at the

20     above time and place, taken before

21     Barbara P. Goldsmith, a Notary Public

22     of the State of New York, pursuant to

23     order and stipulations between

24     Counsel.

25

Page 45

```
 1                      DANA WASSAM
 2        A.   I have not.                    10:52:31AM
 3        Q.   And I apologize.  You said     10:52:31AM
 4   three names.  You said Ms. Whitmore,     10:52:37AM
 5   Mr. Demarest and who else in terms of    10:52:39AM
 6   negotiate the agreement?                 10:52:42AM
 7        A.   Anh Gates.                      10:52:43AM
 8        Q.   Anh Gates.  Have you spoken    10:52:44AM
 9   with Ms. Gates about paragraph 6.1 of    10:52:46AM
10   the application services provider        10:52:49AM
11   agreement?                               10:52:49AM
12        A.   I have not.                    10:52:49AM
13        Q.   Have you spoken with her       10:52:50AM
14   about paragraph 6.2?                     10:52:53AM
15        A.   I have not.                    10:52:55AM
16        Q.   6.3?                            10:52:55AM
17        A.   I have not.                    10:52:56AM
18        Q.   If you can turn to Schedule    10:52:57AM
19   C of the agreement.                      10:53:11AM
20             Do you recognize that to be    10:53:28AM
21   the pricing schedule for the            10:53:30AM
22   agreement?                               10:53:31AM
23        A.   I recognize this to be         10:53:32AM
24   Schedule C of the agreement.             10:53:36AM
25        Q.   And what is your               10:53:37AM
```

Page 46

```
 1                    DANA WASSAM
 2   understanding of what Schedule C of      10:53:38AM
 3   the agreement is?                        10:53:40AM
 4        A.   The fees and pricing for the   10:53:42AM
 5   agreement.                               10:53:44AM
 6        Q.   I'm sorry?                      10:53:44AM
 7        A.   The fees and pricing for the   10:53:46AM
 8   agreement.                               10:53:50AM
 9        Q.   Okay.  And did you negotiate    10:53:50AM
10   Schedules C of the agreement?            10:53:52AM
11        A.   I did not.                      10:53:53AM
12        Q.   Do you know who negotiated      10:53:54AM
13   Schedule C of the agreement for Bank     10:53:57AM
14   of America?                              10:53:59AM
15        A.   By fact, no.  By assumption,    10:53:59AM
16   as I said before, Anh, Steve and         10:54:03AM
17   Julie.                                   10:54:05AM
18        Q.   But you don't know for a        10:54:06AM
19   fact?                                    10:54:08AM
20        A.   Correct.                        10:54:08AM
21        Q.   Did Mr. Demarest ever tell      10:54:08AM
22   you that he had negotiated Schedule C    10:54:10AM
23   of the agreement?                        10:54:12AM
24        A.   He told he had approved         10:54:13AM
25   Schedule C of the agreement.             10:54:15AM
```

Page 47

1                        DANA WASSAM

2        Q.    Did he tell you whether he          10:54:16AM

3    ever negotiated it?                           10:54:18AM

4        A.    We didn't specifically talk         10:54:19AM

5    about the term, negotiate.  Excuse me.        10:54:21AM

6        Q.    Did Ms. Gates -- I'm sorry.         10:54:24AM

7    Withdrawn.

8               Have you spoken with               10:54:31AM

9    Ms. Whitmore about Schedule C of the          10:54:33AM

10   agreement?                                    10:54:34AM

11       A.    No.                                 10:54:34AM

12       Q.    Have you spoken with                10:54:35AM

13   Ms. Gates about Schedule C of the             10:54:36AM

14   agreement?                                    10:54:38AM

15       A.    We talked about Schedule C,         10:54:39AM

16   yes.                                          10:54:41AM

17       Q.    And tell me about your              10:54:41AM

18   discussion with Ms. Gates regarding           10:54:43AM

19   Schedule C.                                   10:54:45AM

20       A.    It was actually as part of          10:54:46AM

21   the discussions that we had with our          10:54:49AM

22   attorneys and it was related to asking        10:54:51AM

23   her who had negotiated it.                    10:54:56AM

24       Q.    And what did she tell you?          10:54:58AM

25               MS. MORRIS:  Could I just         10:55:02AM

Page 48

```
 1                    DANA WASSAM
 2       interrupt.  Were these discussions    10:55:03AM
 3       with the attorneys present?           10:55:07AM
 4            THE WITNESS:  Yes.               10:55:08AM
 5            MS. MORRIS:  I'm going to        10:55:09AM
 6       assert privilege if the attorneys    10:55:12AM
 7       were present during the              10:55:14AM
 8       discussions.                         10:55:16AM
 9            MS. CLARK-WEINTRAUB:  Okay.      10:55:16AM
10       Q.    You can turn to paragraph 19   10:55:16AM
11   of your declaration.  Excuse me.  In     10:55:32AM
12   paragraph 19 of your declaration, you    10:55:45AM
13   say in the last line that, "A web hit    10:55:47AM
14   as used in the agreement was             10:55:50AM
15   understood by both Bank of America and   10:55:52AM
16   Apollo to mean a unique visitor          10:55:54AM
17   accessing the website."                  10:55:57AM
18            Do you see that?                10:55:59AM
19       A.    Uh-huh.  Yes.                  10:55:59AM
20       Q.    Did you negotiate the          10:56:01AM
21   meaning of the term, web hit, with       10:56:06AM
22   Apollo?                                  10:56:08AM
23       A.    I did not.                     10:56:08AM
24       Q.    Do you know for a fact who     10:56:09AM
25   negotiated -- who at Bank of America     10:56:11AM
```

Page 49

1                    DANA WASSAM

2    negotiated the meaning of the term,      10:56:13AM

3    web hit, as used in Schedule C of the    10:56:15AM

4    agreement with Apollo?                    10:56:17AM

5         A.    As with my other answers,     10:56:18AM

6    for a fact, no.  I assume it was Julie   10:56:20AM

7    and Steve and Anh.                        10:56:22AM

8         Q.    Did Mr. Demarest tell you      10:56:23AM

9    that he had negotiated the meaning of    10:56:25AM

10   the term, web hit, with Apollo as used   10:56:26AM

11   in Schedule C?                            10:56:29AM

12        A.    He did not tell me that he     10:56:30AM

13   specifically negotiated it.  He told     10:56:33AM

14   me that he understood it to mean a       10:56:34AM

15   unique visitor.                           10:56:38AM

16        Q.    So your assertion in          10:56:38AM

17   paragraph 19 that Bank of America        10:56:40AM

18   understood the term to mean a unique     10:56:41AM

19   visitor is based upon whoa              10:56:44AM

20   Mr. Demarest told you?                    10:56:46AM

21        A.    Yes.                           10:56:46AM

22        Q.    And you understand that       10:56:47AM

23   Apollo takes the position in this        10:56:55AM

24   litigation that it did not understand    10:56:57AM

25   the term, web hit, to be a unique        10:56:59AM

Page 50

|    | DANA WASSAM |            |
|----|-------------|------------|
| 1  |             |            |
| 2  | visitor to the website? | 10:57:02AM |
| 3  | A.    I understand that. | 10:57:04AM |
| 4  | Q.    What is a unique visitor | 10:57:05AM |
| 5  | accessing the website?  What do you | 10:57:08AM |
| 6  | mean by that term as you've used it in | 10:57:11AM |
| 7  | paragraph 19 of your declaration? | 10:57:15AM |
| 8  | A.    A unique visitor is a | 10:57:16AM |
| 9  | customer who comes to the website and | 10:57:17AM |
| 10 | up indicates for services. | 10:57:23AM |
| 11 | Q.    So if that same customer | 10:57:29AM |
| 12 | signs in again, are they counted again | 10:57:32AM |
| 13 | as a unique visitor? | 10:57:35AM |
| 14 | A.    We would count the total | 10:57:36AM |
| 15 | number of times that they sign in, but | 10:57:39AM |
| 16 | they are still one unique person. | 10:57:41AM |
| 17 | Q.    So if the same person, if I, | 10:57:43AM |
| 18 | for example, signed in to the site 100 | 10:57:46AM |
| 19 | times, I would only be counted once? | 10:57:48AM |
| 20 | A.    It would count 100 | 10:57:50AM |
| 21 | authentications, one unique visitor. | 10:57:53AM |
| 22 | Q.    So if -- but if I signed in | 10:57:55AM |
| 23 | 100 times, you would count me as one | 10:57:58AM |
| 24 | unique visitor? | 10:58:02AM |
| 25 | A.    One unique visitor, you're | 10:58:02AM |

Page 51

| | | |
|---|---|---|
| 1 | DANA WASSAM | |
| 2 | one unique person. | 10:58:06AM |
| 3 | Q.    And what is the basis of | 10:58:08AM |
| 4 | your understanding of a unique visitor | 10:58:09AM |
| 5 | being as you described? | 10:58:14AM |
| 6 | A.    Generally, it's how the bank | 10:58:15AM |
| 7 | reports on its visitors to its | 10:58:17AM |
| 8 | websites, whether it's Bank of | 10:58:20AM |
| 9 | America.com, online banking or other | 10:58:23AM |
| 10 | websites that it hosts.  We look to | 10:58:26AM |
| 11 | see how many times a customer comes | |
| 12 | back because that proves the | 10:58:29AM |
| 13 | usefulness of the service that we're | 10:58:30AM |
| 14 | offering. | 10:58:33AM |
| 15 | Q.    Are you aware of any | 10:58:38AM |
| 16 | documents that are contemporaneous | 10:58:47AM |
| 17 | with the time the agreement was | 10:58:50AM |
| 18 | executed that reflect Bank of | 10:58:51AM |
| 19 | America's understanding that the term, | 10:58:55AM |
| 20 | web hits, as used in Schedule C of the | 10:58:56AM |
| 21 | agreement meant a unique visitor to | 10:58:59AM |
| 22 | the site? | 10:59:01AM |
| 23 | A.    Forgive my ignorance, but I | 10:59:02AM |
| 24 | need you to tell me what the term, | 10:59:06AM |
| 25 | contemporaneous, means. | 10:59:08AM |

Page 52

```
 1                    DANA WASSAM
 2        Q.    Dated at or about the time     10:59:08AM
 3   of the agreement.                         10:59:11AM
 4        A.    Okay.  I'm not aware of any.   10:59:11AM
 5        Q.    And did Mr. Demarest explain   10:59:14AM
 6   to you why he believed the term, web      10:59:16AM
 7   hit, meant a unique visitor?              10:59:19AM
 8        A.    Not specifically.              10:59:21AM
 9        Q.    Did you ask him why then the   10:59:21AM
10   Schedule C did not use the term,          10:59:28AM
11   unique visitor?                           10:59:31AM
12        A.    No.                            10:59:31AM
13        Q.    Did you ask Ms. Gates          10:59:31AM
14   whether or not she had understood the     10:59:51AM
15   term, web hit, to mean a unique           10:59:53AM
16   visitor as used in Schedule C of the      10:59:56AM
17   agreement?                                10:59:58AM
18        A.    Again, the conversation that   10:59:59AM
19   I had with Ms. Gates was with our         11:00:00AM
20   attorneys present.                        11:00:03AM
21             MS. CLARK-WEINTRAUB:  Are       11:00:05AM
22        you going to direct her?             11:00:06AM
23             MS. MORRIS:  Yes, we'll         11:00:06AM
24        assert the privilege.                11:00:09AM
25        Q.    Did you speak with any         11:00:11AM
```

Page 53

| | | |
|---|---|---|
| 1 | DANA WASSAM | |
| 2 | other -- well, withdrawn. | 11:00:12AM |
| 3 | Did you ask Ms. Whitmore | 11:00:16AM |
| 4 | whether or not she understood the | 11:00:18AM |
| 5 | term, web hit, as used in Schedule C | 11:00:19AM |
| 6 | of the agreement to be a unique | 11:00:22AM |
| 7 | visitor? | 11:00:23AM |
| 8 | A.   No. | 11:00:23AM |
| 9 | Q.   Did you ask Ms. Stockton | 11:00:24AM |
| 10 | that question? | 11:00:26AM |
| 11 | A.   No. | 11:00:26AM |
| 12 | Q.   Has anyone other than | 11:00:27AM |
| 13 | Mr. Demarest told you that Bank of | 11:00:40AM |
| 14 | America understood the term, web hit, | 11:00:43AM |
| 15 | in Schedule C to mean unique visitor? | 11:00:45AM |
| 16 | A.   No. | 11:00:49AM |
| 17 | Q.   So the sole basis for your | 11:00:49AM |
| 18 | assertion in paragraph 19 of your | 11:00:54AM |
| 19 | declaration that web hit, as used in | 11:00:55AM |
| 20 | the agreement, was understood by Bank | 11:00:57AM |
| 21 | of America to mean a unique visitor | 11:01:00AM |
| 22 | accessing the website is | 11:01:02AM |
| 23 | Mr. Demarest's statement to you? | 11:01:06AM |
| 24 | MS. MORRIS:  Objection.  You | 11:01:07AM |
| 25 | can go ahead. | 11:01:08AM |

Page 54

```
 1                    DANA WASSAM

 2      A.    It is.                        11:01:08AM

 3      Q.    And what's the basis for      11:01:14AM

 4  your statement in paragraph 19 of your  11:01:15AM

 5  declaration that "Apollo understood      11:01:17AM

 6  the term, web hit, to mean a unique      11:01:19AM

 7  visitor accessing the website"?          11:01:23AM

 8      A.    When Mr. Demarest and I        11:01:25AM

 9  spoke, he indicated that Apollo and      11:01:27AM

10  the bank had the same understanding.     11:01:29AM

11      Q.    And did he explain the basis   11:01:30AM

12  for his assertion that Apollo had the    11:01:32AM

13  same understanding?                      11:01:34AM

14      A.    Generally speaking, when       11:01:35AM

15  apparent enter into a contract, they     11:01:38AM

16  are in agreement on the terms.           11:01:40AM

17      Q.    So that was the basis for      11:01:42AM

18  Mr. Demarest's?                          11:01:52AM

19      A.    He indicated that when they    11:01:53AM

20  entered into the agreement, they         11:01:55AM

21  understood the term to mean the same     11:01:57AM

22  thing.                                   11:01:58AM

23      Q.    And did he indicate who at     11:01:58AM

24  Apollo understood the term to mean the   11:02:01AM

25  same thing?                              11:02:03AM
```

Page 55

DANA WASSAM

| | | |
|---|---|---|
| 1 | DANA WASSAM | |
| 2 | A.    No. | 11:02:03AM |
| 3 | Q.    Did Mr. Demarest ever tell | 11:02:03AM |
| 4 | you who he spoke with in negotiating | 11:02:05AM |
| 5 | the contract -- well, withdrawn. | 11:02:07AM |
| 6 | Did Mr. Demarest ever | 11:02:11AM |
| 7 | identify for you any Apollo personnel | 11:02:12AM |
| 8 | that he dealt with in negotiating the | 11:02:16AM |
| 9 | contract? | 11:02:19AM |
| 10 | A.    Not specifically, we didn't | 11:02:20AM |
| 11 | talk about it. | 11:02:22AM |
| 12 | Q.    How does the system | 11:02:23AM |
| 13 | calculate the number of unique | 11:02:48AM |
| 14 | visitors? | 11:02:51AM |
| 15 | A.    We get data from Apollo on | 11:02:51AM |
| 16 | the customers who authenticate to the | 11:02:57AM |
| 17 | system, and in our reporting we look | 11:03:00AM |
| 18 | at the account numbers for the | 11:03:03AM |
| 19 | customers who visit multiple times and | 11:03:05AM |
| 20 | we determine that, in your example, | 11:03:08AM |
| 21 | you authenticated 100 times and you | 11:03:12AM |
| 22 | are one unique visitor. | 11:03:15AM |
| 23 | Q.    So the count of unique | 11:03:15AM |
| 24 | visitors at the bank comes from a data | 11:03:20AM |
| 25 | provided by Apollo? | 11:03:21AM |

Page 56

DANA WASSAM

| | | |
|---|---|---|
| 1 | DANA WASSAM | |
| 2 | A.   That's correct. | 11:03:22AM |
| 3 | Q.    And has Bank of America | 11:03:23AM |
| 4 | calculated how many unique visitors, | 11:03:35AM |
| 5 | as you've defined this term, accessed | 11:03:40AM |
| 6 | the website in each of the months that | 11:03:43AM |
| 7 | Apollo provided services under the | 11:03:46AM |
| 8 | agreement? | 11:03:48AM |
| 9 | A.    We have a reporting that I | 11:03:48AM |
| 10 | have been able to locate from 2008 | 11:03:50AM |
| 11 | forward.  I don't know if it was | 11:03:53AM |
| 12 | calculated before that period of time. | 11:03:54AM |
| 13 | Q.    And this is a question for | 11:03:55AM |
| 14 | your counsel, not for you. | 11:04:03AM |
| 15 | MS. CLARK-WEINTRAUB:  Has | 11:04:05AM |
| 16 | that reporting been produced; do | 11:04:05AM |
| 17 | you know? | 11:04:09AM |
| 18 | MS. MORRIS:  Yeah, I'm not | 11:04:09AM |
| 19 | entirely sure exactly what it is | 11:04:11AM |
| 20 | that Ms. Wassam is discussing.  So | 11:04:13AM |
| 21 | to be honest, I don't know. | 11:04:17AM |
| 22 | MS. CLARK-WEINTRAUB:  We | 11:04:18AM |
| 23 | would call for the production of | 11:04:19AM |
| 24 | it if you haven't produced it | 11:04:20AM |
| 25 | already. | 11:04:23AM |

Page 57

1                    DANA WASSAM

2         Q.    I'm sorry.  So you said you      11:04:23AM

3    were able to find reporting from some      11:04:27AM

4    point in 2008.  Do you remember            11:04:30AM

5    approximately when?                         11:04:32AM

6         A.    I think it was August.           11:04:33AM

7         Q.    And you don't have any           11:04:34AM

8    information on the number of unique        11:04:37AM

9    visitors for months prior to August of    11:04:40AM

10   2008?                                       11:04:42AM

11        A.    I have data on the number of     11:04:42AM

12   payments processed through the site,       11:04:44AM

13   but I don't know if that is inclusive      11:04:46AM

14   of unique visitors.                         11:04:49AM

15        Q.    Okay.  I understand that.        11:04:50AM

16   But just so I'm clear, in terms of         11:04:53AM

17   data the bank has which reflects the       11:04:58AM

18   number of unique visitors to the site,     11:05:00AM

19   you only have that information from        11:05:02AM

20   August 2008 forward?                        11:05:04AM

21        A.    That's the only information      11:05:05AM

22   I have been able to locate.                 11:05:07AM

23        Q.    So that you have not been        11:05:08AM

24   able to locate any information on          11:05:11AM

25   unique visitors in 2006?                    11:05:12AM

Page 58

```
 1                    DANA WASSAM
 2       A.    I have not.              11:05:13AM
 3       Q.    Or 2007?                 11:05:15AM
 4       A.    Correct.                 11:05:16AM
 5       Q.    Or any month prior to August   11:05:16AM
 6    of 2008?                          11:05:18AM
 7       A.    I said I believe it was  11:05:19AM
 8    August.                           11:05:21AM
 9       Q.    Sure.  Fair enough.      11:05:21AM
10             And based upon your review   11:05:24AM
11    of the data you had been able to find,   11:05:31AM
12    how many unique visitors a month visit   11:05:35AM
13    the site?                         11:05:39AM
14       A.    I actually have not focused   11:05:40AM
15    on the number of unique visitors   11:05:43AM
16    visiting the site.  The primary   11:05:46AM
17    function that Apollo serves for us is   11:05:47AM
18    to take payment instructions from our   11:05:48AM
19    customers.  So the primary focus has   11:05:50AM
20    been on the number of payment     11:05:53AM
21    instructions that have been taken and   11:05:55AM
22    processed.  And in total for both our   11:05:55AM
23    DFS product and our credit card   11:05:58AM
24    product, the peak number of payment   11:05:59AM
25    instructions taken was approximately   11:06:01AM
```

1                 DANA WASSAM

2    300,000.  That was in the month of    11:06:04AM

3    January 2010.  At the inception of the   11:06:06AM

4    agreement, approximately 75,000 plus    11:06:09AM

5    or minus payment instructions were     11:06:13AM

6    taken, and as of last month I believe   11:06:16AM

7    the number was 230,000 payment       11:06:18AM

8    instructions.                     11:06:22AM

9         Q.    Sure.  And I think those     11:06:22AM

10   numbers, we'll get there a little      11:06:23AM

11   later, are set forth in your reply    11:06:26AM

12   declaration.  Do you recall that?     11:06:29AM

13        A.    Yes.                  11:06:31AM

14        Q.    Are the -- based upon your   11:06:31AM

15   location, though, of the number of    11:06:32AM

16   unique visitors, were the monthly     11:06:34AM

17   numbers higher or lower than 170,000?  11:06:38AM

18        A.    Higher.             11:06:42AM

19        Q.    How much higher?        11:06:42AM

20        A.    I would say higher at some   11:06:43AM

21   points because at the inception of the  11:06:46AM

22   agreement I don't know if there was   11:06:48AM

23   more than 170,000 unique visitors, as  11:06:51AM

24   we've discussed the term.  There were, 11:06:53AM

25   as I said, approximately 75,000      11:06:55AM

Page 60

```
 1                    DANA WASSAM
 2    payment instructions at that time.      11:06:58AM
 3               MS. CLARK-WEINTRAUB:   Would
 4          you just read back the beginning
 5          of the answer.
 6               (The requested portion of
 7          the record was read.)               11:06:59AM
 8          Q.    From August of 2008 forward,  11:06:59AM
 9    were the number of unique visitors to     11:07:17AM
10    the site, based upon your review, each    11:07:20AM
11    month higher than 170,000?                11:07:22AM
12          A.    Again, I didn't focus on the  11:07:26AM
13    number of unique visitors in my           11:07:27AM
14    analysis.  I would assume that they       11:07:29AM
15    may have been because not every           11:07:32AM
16    customer who comes to the site is         11:07:35AM
17    capable of making a payment or may        11:07:37AM
18    choose not to make a payment at that      11:07:40AM
19    time.  So you may have more customers     11:07:41AM
20    authenticate than actually give          11:07:43AM
21    payment instructions.                     11:07:46AM
22          Q.    I understand what you're      11:07:47AM
23    saying.                                   11:07:49AM
24               Is that generally the case,    11:07:49AM
25    that the number of unique visitors       11:07:52AM
```

Page 61

1                    DANA WASSAM
2      aside?                                 11:07:56AM
3           A.    Generally.                  11:07:56AM
4               MS. CLARK-WEINTRAUB:   And    11:08:05AM
5          again, we would call for a         11:08:05AM
6          production of those, those         11:08:06AM
7          numbers, that data to the extent  11:08:08AM
8          that you have not produced it.    11:08:10AM
9               MS. MORRIS:   We'll take that 11:08:14AM
10         under advisement.   We'll take a   11:08:15AM
11         look and see what we have and what 11:08:17AM
12         we produced.                       11:08:18AM
13              MS. CLARK-WEINTRAUB:   Okay.  11:08:20AM
14          Q.    Okay.   My understanding is  11:08:21AM
15     that there are two primary lines of    11:08:41AM
16     business within Bank of America that   11:08:45AM
17     use the Apollo website.   Is that fair? 11:08:47AM
18          A.    That's correct.             11:08:49AM
19          Q.    And one of them is consumer 11:08:50AM
20     card?                                  11:08:53AM
21          A.    Card services.              11:08:54AM
22          Q.    Card services.   And the    11:08:56AM
23     other one is DFS?                      11:08:58AM
24          A.    That's correct.             11:09:02AM
25          Q.    And DFS stands for dealer   11:09:03AM