# EXHIBIT C

## DEFENDANTS' SYNOPSIS OF THE DEPOSITION TESTIMONY OF
## CHRISTOPHER IMREY

Mr. Imrey noted in his deposition that the perpetual term that existed in early drafts of the Application Service Provider Agreement was not present in later versions and confirmed that the change in the final version to a two year term with annual renewal periods was mutually agreed upon by Apollo and Bank of America. (Imrey Tr. at 26:11-27:7).

Mr. Imrey described IDS Recover as referring to an account that has been charged off by Bank of America or an account that is more than 180 days past due and an IDS Collect account as more than 30 days past due but no more than 180 days past due. He described the difference between Pay, Collect and Recover as based on the status of the customer and the level of delinquency. (Imrey Tr. at 45:2-46:12) and (Imrey Tr. at 104:18-106:5).

In describing the losses incurred by Apollo due to the excessive utilization of the Apollo system by Bank of America, Mr. Imrey indicated that the losses included costs for labor, time and materials, fees, legal costs, compliance costs, audit costs, and third party charges, among others. (Imrey Tr. at 91:14-92:8).

Mr. Imrey testified that Apollo performed an internal audit and discovered that, based on the "Days Past Due" and other data provided by Bank of America, substantial numbers of accounts with Days Past Due greater than 30 were being processed by the system and that Apollo had not been informed of this and was not being paid appropriately for these transactions. (Imrey Tr. at 93:23-99:24).

CORRECTED

```
 1  IN THE UNITED STATES DISTRICT COURT
    FOR THE SOUTHERN DISTRICT OF NEW YORK
 2  Civil Action No. 10-5707 (DLC)
    ----------------------------------------x
 3  BANK OF AMERICA, N.A.,
                        Plaintiff,
 4
         -vs-
 5
    APOLLO ENTERPRISE SOLUTIONS, LLC,
 6  APOLLO ENTERPRISE SOLUTIONS, INC.,
    and MORIAH PARTNERS, LLC,
 7                      Defendants.
    ----------------------------------------x
 8            Videotape deposition of G.
 9  CHRISTOPHER IMREY, taken by the
10  Plaintiff, at the law office of
11  Whatley Drake & Kallas, LLC, 1540
12  Broadway, New York, New York, on
13  September 23, 2010, at 10:13 a.m.,
14  before Robert M. Levine, a Shorthand
15  Reporter and Notary Public of the
16  State of New York.
17
18
19
20         ROSENBERG & ASSOCIATES, INC.
21      Certified Court Reporters & Videographers
22  425 Eagle Rock Ave., Suite 201     575 Madison Ave.
23  Roseland, NJ 07068                 New York, NY 10022
24   (973) 228-9100   1-800-662-6878    (212) 868-1936
25            www.rosenbergandassociates.com
```

**Page 26**

G. Christopher Imrey - September 23, 2010

1
2  Q. Who negotiated the pricing for the
3  agreement between Apollo Enterprise Solutions and
4  Bank of America?
5  A. Myself and Ed Dewispelare.
6  Q. And who for Bank of America?
7  A. Julie Gonzales and Ahn Gates.
8  Q. If you could turn to page 8 of the
9  attachment there, 6.1.
10 A. Yes.
11 Q. It states that this agreement shall
12 apply and remain in effect from the effective date
13 and perpetually thereafter unless terminated
14 pursuant to the following section; is that right?
15 A. Yes.
16 Q. Was that the final agreement for the
17 term of the contract?
18 A. No.
19 Q. Do you know who suggested the change to
20 that?
21 A. It was mutually agreed upon.
22 Q. Do you know who first suggested the
23 change to that?
24 A. No. Actually, I believe it was the
25 bank, now that I think about it. Because they

**Page 27**

G. Christopher Imrey - September 23, 2010

1
2  wanted to limit it to a two-year term.
3  Q. What did Apollo want?
4  A. Apollo wanted a five-year term.
5  Q. And you mutually agreed on a two-year
6  term with renewal?
7  A. Correct.
8  Q. And 6.2 allowed the Bank of America to
9  terminate for convenience; is that right?
10         MS. CLARK-WEINTRAUB: Objection
11 to form. You can answer.
12         THE WITNESS: Please restate the
13 question.
14 Q. Section 6.2 states, Bank of America may
15 terminate this agreement for its convenience; is
16 that correct?
17 A. Well, it says a lot more than that.
18 Q. Does it also say that?
19 A. Part of the first sentence says that.
20 Q. Does it say that Apollo Enterprise
21 Solutions can terminate for convenience?
22 A. No.
23         MS. CLARK-WEINTRAUB: Objection
24 to form.
25 A. Does what state?

**Page 28**

G. Christopher Imrey - September 23, 2010

1
2  Q. 6.2.
3  A. No.
4  Q. I'm going to show you what was marked
5  as Exhibit 1 at Ahn Gates' deposition yesterday and
6  ask if you recognize that document?
7  A. Yes.
8  Q. What is it?
9  A. This is a final version of the
10 financial service provider agreement signed by both
11 parties.
12 Q. And is that your signature on the front
13 page?
14 A. Yes.
15 Q. I'm going to show you another document
16 that has been marked Apollo 628 to 643. And ask if
17 if you --
18         MS. MORRIS: Actually, we need to
19 have that marked Exhibit 9.
20         MS. CLARK-WEINTRAUB: That's 9?
21         MS. MORRIS: I believe it's 9.
22         (Document bearing production Nos.
23 Apollo 628 through 643 inclusive, marked
24 Exhibit 9 for identification as of this
25 date.)

**Page 29**

G. Christopher Imrey - September 23, 2010

1
2  A. Yes.
3  Q. What is that document?
4  A. It's entitled, "Intelligent Debt
5  Settlement, IDS System Implementation, Statement of
6  Work."
7  Q. What was it used for?
8  A. This looks like a template that we
9  started from and describing a statement of work.
10 Q. The statement of work for Bank of
11 America's online payment project?
12 A. Yes. Well, you said Bank of America's
13 online payment project? I don't believe that is the
14 title of it.
15 Q. This is for the statement of work for
16 what became the application service provider
17 agreement; is that right?
18 A. Yes. I believe so.
19 Q. Was this statement of work ever
20 finalized?
21 A. I don't know.
22 Q. Do you know if there is a copy of this
23 statement of work?
24 A. I don't know.
25 Q. Was this statement of work sent to Bank

## 42

1  G. Christopher Imrey - September 23, 2010
2  authorization to Apollo to access the scores of its
3  individual customers?
4      A.   No.
5      Q.   Are the scores used by Apollo to
6  develop an intelligent payment or settlement offer?
7      A.   I don't -- Apollo doesn't offer any
8  settlement offers because Apollo is not a collection
9  agency or a licensed agent of the bank. Apollo
10 simply is a solutions provider.
11     Q.   Who uses the scores from the bureaus to
12 develop an intelligent payment or settlement offer
13 to make to the customer?
14     A.   The client.
15     Q.   Bank of America?
16     A.   No.
17     Q.   Which client?
18          THE WITNESS: Is this marked
19 attorneys' eyes only?
20          MS. CLARK-WEINTRAUB: We can mark
21 this portion of it. It is confidential
22 information.
23          THE WITNESS: Sure. Yes. We
24 can't talk about another client on the
25 record.

## 43

1  G. Christopher Imrey - September 23, 2010
2          MS. CLARK-WEINTRAUB: I think
3  she's only interested in Bank of America.
4          MS. MORRIS: Right. I'm only --
5          THE WITNESS: You said which
6  client. You said which client.
7          MS. MORRIS: I'm trying to
8  understand how it's working. So if you can
9  explain to me how it works...
10         MS. CLARK-WEINTRAUB: For Bank of
11 America.
12         MS. MORRIS: For Bank of America.
13     A.   Okay. All right.
14 Bank of America, from what we were led
15 to believe, incorporates bureau data as part of its
16 scoring and analytics and an account segmentation
17 and status codes.
18     Q.   When Apollo Enterprise Solutions was
19 offering its services to Bank of America was Apollo
20 Enterprise Solutions offering to do those analytics
21 to present the customers with an intelligent payment
22 or settlement offer?
23     A.   Well, the system is configurable. So
24 either, you know, the bureau data could be retrieved
25 by the bank passed to, the credit report could be

## 44

1  G. Christopher Imrey - September 23, 2010
2  passed to Apollo. The Apollo system can go retrieve
3  the credit report independently using the bureau
4  codes of the bank on behalf of the bank. Since
5  they're the owner of the credit report and have
6  permissible purpose to pull the credit report. The
7  credit report could be pulled by the bank and used
8  to compile and segment accounts. And then, you
9  know, give a code of 1 to 5, for example.
10 And then, you know, the accounts, you
11 know, everybody -- that's a 2, had some bureau data
12 or analytics to used to calculate what a 2 is. And
13 then the system could be configured to go present
14 different offers to somebody's who's categorized as
15 a 2.
16 So there's many different methods of
17 implementation that can be used. And so it's simply
18 configurable.
19     Q.   Which method is used now?
20     A.   I believe that Bank of America
21 incorporates bureau data or they pull the credit
22 report themselves. They do not pass it to us. And
23 they use it to mark and segment accounts internally.
24     Q.   Moving to page 3.
25     A.   Yes.

## 45

1  G. Christopher Imrey - September 23, 2010
2      Q.   IDS Pay. It states, "The IDS Pay," and
3  then the trademark symbol there, "System, provides a
4  secure platform for customers to pay their current
5  accounts on line."
6  Is that what it says?
7      A.   Yes.
8      Q.   Is that your understanding of IDS Pay?
9      A.   Yes.
10     Q.   IDS Collect. The IDS Collect system
11 uses account history scoring an analytic and bureau
12 data to provide intelligent offers to customers to
13 self-secure their delinquent accounts with
14 individualized payment terms.
15 Is that your understanding of IDS
16 Collect?
17     A.   Not exactly.
18     Q.   What is your understanding of IDS
19 Collect?
20     A.   Well, it can use account history
21 scoring and analytics. And can use bureau data. So
22 those are options at the customers, you know, or the
23 clients -- sorry. The client's request.
24     Q.   When IDS Collect is not using those
25 options, what is it doing?

46

1  G. Christopher Imrey - September 23, 2010
2    A.  It decisions the customers to determine
3  their status. And then presents options that don't
4  use account history, scoring and analytics. But the
5  IDS Collect refers to an account in a status which
6  is greater than 30 days delinquent and less than a
7  pre-charge off.
8        IDS Recover refers to an account that
9  is charged off or post-180 days. So the difference
10 between Pay, Collect and Recover is the status of
11 the customer and the level of delinquency, which
12 system is being used.
13   Q.  And what do you rely on for your
14 definitions?
15   A.  The industry standard definitions.
16 Federal Reserve Board definitions, government
17 agencies, credit bureau reporting, and fact
18 definitions.
19   Q.  And do those different definitions
20 include the term IDS Collect or just collect?
21   A.  Well, just collect or collections.
22   Q.  And do they include the term IDS
23 Recover or just recover?
24   A.  Recover or charge-off or recovery.
25   Q.  On page 18 in the box, the phrase in

47

1  G. Christopher Imrey - September 23, 2010
2  there says, "The Apollo IDS self-settlement system
3  authenticates the user and pulls a real-time credit
4  report."
5    A.  Yes.
6    Q.  What is the Apollo IDS Self-Settlement
7  system?
8    A.  That's the application.
9    Q.  Which application?
10   A.  The Intelligent Debt Solution system.
11   Q.  So the Intelligent Debt Solution,
12 Intelligent Debt Solution system authenticates the
13 user?
14       MS. CLARK-WEINTRAUB: Objection
15 to form. You can answer.
16   A.  No. The Apollo Intelligent Debt
17 Solution Self-Settlement system authenticates the
18 user.
19   Q.  How is the self-settlement system
20 different or added to the term IDS?
21       MS. CLARK-WEINTRAUB: Object to
22 the form. You can answer.
23       THE WITNESS: Repeat the
24 question, please.
25   Q.  What does self-settlement mean?

48

1  G. Christopher Imrey - September 23, 2010
2    A.  Self-settlement means that a customer
3  or end-user interacts with any type of electronic
4  device and does not involve a human.
5    Q.  Does the Apollo IDS system as used for
6  Bank of America, pull a real-time credit report when
7  a customer logs on?
8    A.  No. But it does pull the Experian
9  authentication scores.
10   Q.  Page 19 the IDS decision engine. And
11 there's an explanation that says, "The IDS decision
12 engine computes, calculates and generates multiple
13 settlement offers for the customers based on the
14 customer's current ability to pay and customer's
15 account history."
16       Did I read that correctly?
17   A.  Yes.
18   Q.  Does the IDS decision engine do those
19 things for Bank of America?
20   A.  It does portions of those things.
21   Q.  Which portions of those things does it
22 do?
23   A.  The decision engine computes,
24 calculates and generates multiple offers for the
25 customer. And it's not necessarily based on the

49

1  G. Christopher Imrey - September 23, 2010
2  customer's current ability to pay. But it is based
3  upon the customer's account history.
4    Q.  And that information that is used to
5  compute that is provided by Bank of America; is that
6  right?
7    A.  Yes.
8    Q.  The IDS parser on page 19 is described
9  as, quote, The IDS parser, extracts and calculates
10 user defined credit report items and up to the
11 minute account data. The IDS parser then submits
12 both the calculated bureau and account data to the
13 IDS decision engine for decisioning intelligence,
14 end quote.
15       Did I read that correctly?
16   A.  Yes.
17   Q.  Does the Apollo Web site provide that
18 service for Bank of America?
19   A.  Yes, in part.
20   Q.  In what part?
21   A.  Well, the parser extracts and
22 calculates the credits, the authentication scores.
23 It brings in up to the minute another account data.
24 Submits those to the decision engine for
25 authentication. Once the customer's authenticated,

**Page 90**

G. Christopher Imrey - September 23, 2010

2 Enterprise Solutions, other customers, were issues
3 found in those contracts as well?
4   A. Yes.
5   Q. In all of them?
6   A. No.
7   Q. How many were audited?
8   A. I don't recall.
9   Q. How many customers are there?
10  A. I don't know.
11  Q. Ballpark?
12  A. Six, eight.
13  Q. Were less than eight of them audited?
14  A. I don't know.
15  Q. Were less than all the audits found
16 problems?
17  A. Repeat the question, please.
18  Q. Were all the audits that were done of
19 their problems with the contracts for all of them?
20  A. No.
21  Q. Were there problems with the contracts
22 for half of them?
23  A. No.
24  Q. Were there problems with the contracts
25 for less than half of them?

**Page 91**

G. Christopher Imrey - September 23, 2010

2   A. Yes.
3   Q. Was one of the intentions of the audit
4 to find problems with the contracts in order to
5 generate revenue?
6       MS. CLARK-WEINTRAUB: Apologize.
7   Object to the form.
8   A. No.
9   Q. Turning to your declaration again,
10 Exhibit 17.
11      MS. CLARK-WEINTRAUB: 18.
12      MS. MORRIS: 18?
13      MS. CLARK-WEINTRAUB: Hmm-hmm.
14  Q. In paragraph 6 you state, "As a result,
15 and this is of the exceeding the 170,000 Web hits a
16 month, usage of the site has been far in excess of
17 the volumes contemplated by the fee schedule
18 provided in the services agreement. And having
19 imposed substantial additional unreimbursable costs
20 on Apollo."
21  A. Yes.
22  Q. Mr. Imrey, what are those substantial
23 unreimbursed costs?
24  A. I don't have all the detail of every
25 one of those.

**Page 92**

G. Christopher Imrey - September 23, 2010

2   Q. Can you list some of those substantial
3 additional unreimbursed costs?
4   A. Labor, time and materials. Fees.
5 Legal, compliance, audit.
6   A. Third-party charges. Losses.
7 Opportunity cost. Time. I said that. Time and
8 materials.
9       THE VIDEOGRAPHER: We're going to
10  have to change the tape. This marks the end
11  of tape number 3 in the videotaped deposition
12  of Christopher Imrey. We are going off the
13  record. Time is 1:17.
14      (Short recess.)
15      THE VIDEOGRAPHER: Mark the
16  beginning of tape No. 4 in the videotaped
17  deposition of Christopher Imrey. We are now
18  back on the record. The time is 1:26.
19      MS. MORRIS: Mr. Imrey, I'm going
20  to ask the court reporter to mark this
21  collection of documents as the next exhibit.
22      (Document bearing production Nos.
23  Apollo 679 through 687 inclusive, marked
24  Exhibit 19 for identification as of this
25  date.)

**Page 93**

G. Christopher Imrey - September 23, 2010

2   Q. Do you recognize those?
3   A. Yes.
4   Q. What are they?
5   A. These appear to be the invoices for the
6 accounts that were in the one of the files that was
7 sent by Bank of America.
8   Q. What do you mean by files?
9   A. Well, one of the criteria for the
10 recovery for settlement offers, recovery accounts
11 that were eligible for settlement offers and
12 eligible for different monthly payments and
13 different options.
14      So the Apollo system, the person logs
15 in. Performs a decision. Determines that they're
16 eligible to have different settlement options
17 presented to them that were contained in a file that
18 was sent to us by Bank of America on a monthly,
19 monthly basis, I believe. These are the -- this
20 is -- these are the bills for the accounts that were
21 in those files that paid. That entered into a
22 settlement and then made payments.
23  Q. In your declaration, Exhibit 18, in
24 paragraph 8 you refer to an internal audit.
25      What was the internal audit?

94

```
 1      G. Christopher Imrey - September 23, 2010
 2      A.   Once we had determined that and
 3   discovered that the number of Web hits had far
 4   exceeded the contracts, we then took a look at
 5   determining if there were missing transactions or
 6   there were transactions that were not billed that
 7   fell into the collect or recovery transactions. And
 8   so just to look in the first most recent month in
 9   September produced some pretty astonishing results.
10      Q.   What were the "astonishing results?"
11      A.   That there were additional recover
12   accounts making payments on the Web site that were
13   not included in the file that was used to generate
14   this invoice. And there was -- and making what
15   appeared to be settlements as well.
16      Q.   How did Apollo reach, Apollo Enterprise
17   Solutions reach that conclusion?
18      A.   Well, one of the first things we did
19   was to see how the bank had told us that an account
20   was categorized as a collect account. And we had
21   determined that they had given us a field called
22   days past due.
23           And we then did a search of the
24   configuration of the site. And lo and behold,
25   discovered that it had been coded into the system.
```

95

```
 1      G. Christopher Imrey - September 23, 2010
 2   That a decision was being made for days past due
 3   greater than 30. That a different work flow was
 4   happening for accounts that were less than 30 days
 5   past due.
 6           We took an additional look at the
 7   transactions, the actual, the information packets.
 8   And found there was an additional field called last
 9   payment date. And that the information between the
10   days past due and the last payment date was not
11   necessarily synchronous. This caused us to delve in
12   a little deeper and realize that there may have been
13   missing or omitted information in the days past due
14   field.
15           And so there was accounts that had a
16   last pay date of, you know, several, several months.
17   Had a days past due of less than 30, like zero or a
18   blank. And yet, had delinquent, you know, had a
19   balance, had a minimum due and a past due. By
20   definition, you can't have a past due unless you're
21   late.
22           So we then went and determined, excuse
23   me, all the accounts. Did a query into the system
24   to determine all the accounts that had a days past
25   due of greater than 30 and less than 180 to see how
```

96

```
 1      G. Christopher Imrey - September 23, 2010
 2   many of those accounts were in the system and
 3   transacting on a monthly basis and how many were
 4   making payments.
 5           And then took a look at how many of
 6   those, then we looked at the field of last payment
 7   date and looked at the difference between the date
 8   of the customers login and the last payment date.
 9   And found more transactions that were in that
10   category of between 30 and 180 days.
11           We then, we took for the recover
12   accounts, we determined all the ones that were
13   greater than 180 days past due to be recover
14   accounts was when we were told by the bank that's
15   when they charged off accounts. I believe there's
16   some federal regulations regarding the number of
17   days you can have an account past due before you can
18   charge it off. And miscategorizing charge-off
19   accounts as past due accounts and holding them on
20   your books is a pretty serious offense.
21           So we were surprised to find some of
22   the data had this additional information. So we
23   took the accounts that were greater than 180 days
24   past due or past number of days from the last
25   payment date on the payment, 180. And then
```

97

```
 1      G. Christopher Imrey - September 23, 2010
 2   calculated out the number of payments that were done
 3   with those accounts.
 4           We then did, determined that we looked
 5   at any payments or future payments scheduled were
 6   equal to or above the current balance. And noticed
 7   that was would be a settlement because it would be
 8   settling the balance. And so either they paid the
 9   balance in full with which would settle the account,
10   or if they were to schedule, say, for example, 10
11   payments of $100 for $1,000 current balance, that
12   would be another settlement of an account.
13           So, we then calculated and totaled
14   those up. And then produced the totals for each
15   month for that month. And then we went to, you
16   know, in the source code we start archiving and
17   saying when did the alternate work flow and the
18   decision to treat the collect accounts differently
19   from the pay accounts occur. And we tracked it back
20   to the beginning of the site; that the actual
21   decision engine was being run on collect accounts.
22   Because there wasn't a different work flow and
23   different options available.
24           And some of those are documented in
25   this Exhibit 16. There's an update of the Web site
```

98

G. Christopher Imrey - September 23, 2010

1 function on work flow and decisioning. And, for
2 example, the bank said that, says the reasons for
3 delinquency was presented to customers that were in
4 a collect status, but were already paid was
5 presented as an option for customers who were in a
6 collect status. And reasons for delinquencies and
7 already paid were not presented for customers that
8 were in a pay status.
9      So a decision was being made from the
10 beginning that that management was not aware had
11 been programmed into the system. It seems to have
12 been a low level insertion to the development team.
13 And so when we tracked back who coded that and when
14 and went back to the beginning. So at that point we
15 realized that there was actually decisions being
16 made. And that went back, that information went
17 back to the contract audit to determine that we were
18 eligible for payments for decisions for accounts in
19 a collect status.
20      And since the decisions were, decision
21 engine was run at the top of the tree and that a
22 work flow existed and offers existed for collect
23 accounts which was different from the pay accounts,
24 you know, under the contract, we only invoiced for

99

G. Christopher Imrey - September 23, 2010

1 the accounts that had the status of collect.
2      So even though a decision is made for
3 every single account as it logs in to go as to which
4 work flow and content and direction it gets, we're
5 only eligible to invoice for the accounts that are
6 in the collect status.
7      So we went back and reviewed as to the
8 accounts between the 30 and the 180-day window as
9 being collects accounts. There's probably
10 additional accounts than what appeared in the totals
11 that we had accumulated. Since anytime there was
12 missing data, we gave the benefit of the doubt to it
13 being a pay account even though the data, you know,
14 appeared to be a collect account.
15      So if we didn't have a last payment
16 date and a days past due date, even though there was
17 indications that it was a delinquent account, we
18 couldn't ascertain it. It didn't pop up. We simply
19 didn't include it in the query.
20      So there's probably additional accounts
21 in there that were not properly flagged because of
22 the days past due field had not been calculated
23 properly by the bank.
24      Q.  Can I ask you, where did you get all

100

G. Christopher Imrey - September 23, 2010

1 the data that you used to do this internal audit?
2      A.  Well, as part of the compliance for
3 contract, you know, we have archives for federal and
4 state, and, you know, authorities for audit
5 purposes. But also for the non-ident components of
6 the data which is not confidential information or
7 personally identifiable information.
8      So we don't keep or store, you know,
9 who logged in as -- you know what, that is
10 information is only kept by Bank of America. We
11 just store a hash of a transaction. And so it's not
12 confidential proprietary MPI data.
13      Q.  Let me ask you another question.
14      You were looking at days since last
15 payment. For the accounts that you reclassified
16 into collect and recover, was there a balance due
17 for every day since the last payment?
18      A.  I don't understand the question.
19      Q.  You said you looked at the last payment
20 date in order to determine if an account should be
21 in collect or recover; is that right?
22      A.  Yes. As one of the fields.
23      Q.  As one of the fields?
24      A.  Yes.

101

G. Christopher Imrey - September 23, 2010

1      Q.  And you also looked at whether or not
2 there was a balance due?
3      A.  Yes. They had to have a current
4 balance. Actually, they were only -- it was ones
5 that made payments.
6      Q.  So all of the accounts that you
7 reclassified as collect, for instance, had a balance
8 due for the entire time since the last payment date?
9      A.  I don't understand the question.
10      Q.  Well, you made some determination that
11 the documentation past due provided to you by Bank
12 of America was incorrect?
13      A.  No.
14      Q.  The days past due provided by Bank of
15 America, you think was correct?
16      A.  No.
17      Q.  How did you use the days past due
18 information?
19      A.  Days past due was one of the components
20 of being correct for certain accounts. So we really
21 had no -- we erred on the side of caution. In the
22 case of missing or incomplete bank data, you know,
23 we didn't try and extrapolate out that it was a
24 collect or recover account.

102

G. Christopher Imrey - September 23, 2010

As I stated before, I believe that there's additional transactions that should be or should be categorized as collect. But we just simply don't have enough information to make that concrete determination. So we're just, you know, we're using the information that we have, you know, to determine their status at the time of their payment.

Q. So, to follow Apollo Enterprise Solutions taking the position if a customer comes on the site and makes a payment and they are either in collect or recover status for their account, the site must make a decision for that, and therefore, Bank of America must make a payment?

A. Not exactly. If the account has a collect status, then, yes. There's a charge in the pricing schedule for accounts that are in collect status. If the account is in recover status, then recover pricing doesn't include a decision charge for account certain recover status. If the account is in a current status, then there is no pricing for accounts that are in current status for decisions.

So even though a decision is made for every single account, the pricing only contemplates

103

G. Christopher Imrey - September 23, 2010

charges for accounts that are in collect status for decisions. Conversely, or not conversely, but additionally, accounts that are in recover status have a different pricing metrics which excuse settlements and payments.

Q. And there's no connection for Apollo Enterprise Solutions between the fact that what they were offering was an online service that generated the settlement than on actually doing that?

A. I'm sorry? Repeat the question.

Q. Would you say that Apollo Enterprise Solutions is generating the settlement offer that is being made?

MS. CLARK-WEINTRAUB: I'll object to the form. You can answer it if you understand it.

THE WITNESS: I don't, again, don't understand the question.

MS. MORRIS: Going back to the PowerPoint.

MS. CLARK-WEINTRAUB: Exhibit 12.

MS. MORRIS: Exhibit 12. Right.

Q. On page 3?

A. Yes.

104

G. Christopher Imrey - September 23, 2010

Q. There are three terms there: IDS Pay, IDS Collect and IDS Recover.

A. Yes.

Q. And those were the same three terms that are used on Schedule C to the agreement?

A. No.

Q. IDS Pay, IDS Collect and IDS Recover you don't think are on Schedule C?

A. I don't believe it says IDS at the top; does it?

Q. It's Exhibit 1.

A. This is 1. Yes.

Q. On Schedule C.

A. Oh, yes. Okay. That's right. I was thinking of the AES on the photocopy. So, yes. IDS Pay, Collect, Recover.

Q. So Apollo Enterprise Solutions is taking the position IDS Pay is for a current account?

A. Correct.

Q. IDS Collect is for any account past due?

MS. CLARK-WEINTRAUB: Objection to form.

105

G. Christopher Imrey - September 23, 2010

A. Yes.

MS. CLARK-WEINTRAUB: You can answer.

A. It's an account that's past due, greater than 30 days and less than 180 days.

Q. And IDS Recover is for any account over 180 days past due?

A. Or in an account that's categorized as charge-off. And additionally, Bank of America told us that they charge off accounts prior to 180 days past due if they have scored that account as being a high risk or for other reasons.

So there's actually another set of additional transactions that we believe are in the system for accounts that were charged off prior to 180 days past due which we would be due recover fees. But we can't categorize that because we don't know if the bank has charged off the account prior to 180 days past due. So they're probably due. We believe that there's -- if we were to really dig deeper. That there would be additional costs and additional accounts that are recover accounts where the days past due and the last payment date are less than 180 days. Because the bank specifically told

## Page 106

G. Christopher Imrey - September 23, 2010

us that they do charge off accounts prior to those periods. And if we were to try and match up the bank's charge-offs with the accounts that paid online, we'd probably be due additional fees.

Q. And I'm trying to also understand the way the tiers work. I think the way the revised invoices work is that up to a thousand are charged at a certain amount. And then you charge the next tier and the next tier. So, if you are, for instance, over, if there's over 3,000 charges categorized by Apollo as IDS Collect, you will charge the first thousand at one rate and then thousand and 2 to 3,000 at the next rate. And then the ones that are over 3,000 at the next rate; is that correct?

A. That's correct. Yes.

This is standard for grid pricing. One of the inherent challenges in grid pricing, that's one of the reasons why Vinnie said he'd like to change some of his grid pricing and why we were both interested in renegotiating the deal is, you know, to come up with a better set of pricing commensurate with the volumes that were going through the site. Because when you have grid pricing, usually you're

## Page 107

G. Christopher Imrey - September 23, 2010

locked into, you know, if you're at in this case if you're at one transaction, you're not paying a lot. If you're at 999 transactions, you're paying a lot. And if you have actually 1,050 transactions, only 50 of them are at the next rate. So where you separate the tiers and how many transactions you have is typically always something that is inherently imperfect in tiered pricing like that.

Q. When you have a percentage or a discount rate it comes out to, it doesn't matter how many transactions occur. It tends to be less unbalanced based upon the number of transactions you have.

Q. Was the contract with Bank of America rendering Apollo Enterprise Solutions insolvent?

A. Was it rendering it insolvent; is that the question?

Q. Yes.

A. If it continued. Let me see if I can accurately describe it. Before we discovered the the additional resources, the additional services, additional transactions, the accounts that were being decisioned, the accounts that were being settled that were the recover accounts, the invoices

## Page 108

G. Christopher Imrey - September 23, 2010

of $10,500 a month would have rendered Apollo insolvent.

So under the contract, you know, it's a difficult question to answer what would be happening going forward if -- with the current bills. But if Bank of America were to pay the fee, the amounts owed under the contract, then no. If Bank of America refuses to pay the amounts owed, or, you know, under the transactions, if, for example, Bank of America were to not have any recover accounts processed through the system or to reduce the number of Web hits, then, yes.

So if you look at the original contract Schedule C, IS recover is contemplated. 1,400 tracks a month. 157,143. If Bank of America decided to remove those accounts from processing through the system, then the totals for IDS Pay and the Collect accounts wouldn't be enough to pay for the costs of operating the site at all.

Yes, that would lead to insolvency.

Q. Was the cost of operating the Bank of America account one of the reasons why Apollo Enterprise Solutions sought outside investors such as Moriah?

## Page 109

G. Christopher Imrey - September 23, 2010

A. Repeat the question, please.

Q. Was the cost of operating the Bank of America online service one of the reasons why Apollo Enterprise Solutions sought outside investors such as Moriah?

A. Well, yes. We needed additional capital to operate the site at a deficit.

Q. What did you tell the Moriah investors about the Bank of America contract before they entered into the financing?

A. I told them, I told them the information that Bank of America had told us since the beginning which is documented in numerous E-mails. That the Recover accounts were where we were going to make the bulk of the profit with Bank of America.

As early as June of 2006, prior to deployment of the actual IDS Pay and IDS Collect functionality in October 2006, is really June of 2006, we had already created documents. And the bank had indicated that they were one of the 2007 initiatives was to turn on the recovery accounts.

And we were continually told that the recovery accounts would be coming. That the